Nos. 14-1920, 14-1922

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

HOSPIRA, INC., et al.,

Plaintiffs-Appellants,

v.

SYLVIA MATHEWS BURWELL, et al.,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

BRIEF FOR THE FEDERAL APPELLEES
_____

*Of Counsel:*

**WILLIAM B. SCHULTZ**
    *General Counsel*

**ELIZABETH H. DICKINSON**
    *Associate General Counsel*

**ANNAMARIE KEMPIC**
    *Deputy Chief Counsel*

**WENDY S. VICENTE**
    *Senior Counsel*
    *U.S. Department of Health
      and Human Services*

**JOYCE R. BRANDA**
    *Acting Assistant Attorney General*

**ROD J. ROSENSTEIN**
    *United States Attorney*

**SCOTT R. MCINTOSH**
**DANIEL TENNY**
    *(202) 514-1838*
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7215*
    *U.S. Department of Justice*
    *950 Pennsylvania Ave., N.W.*
    *Washington, D.C. 20530*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ...........................................3

STATEMENT OF THE ISSUE ...............................................3

STATEMENT OF THE CASE ................................................3

A.    Statutory Background ................................................3

B.    Facts and Prior Proceedings.......................................8

SUMMARY OF ARGUMENT .............................................14

STANDARD OF REVIEW .................................................16

ARGUMENT ....................................................................16

I.    FDA reasonably approved abbreviated new drug applications
      whose proposed labeling omitted the patented use............................16

      A.    The generic applicants properly carved out the patented
            use ...............................................................17

      B.    The agency reasonably declined to grant Hospira an
            effective extension of its patent protection...................22

      C.    The decision at issue here reflects FDA's longstanding
            interpretation and is consistent with the *Caraco* case.................27

II.   FDA was not obliged to engage in notice-and-comment
      rulemaking...........................................................33

CONCLUSION ...................................................................................36

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page**

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ........................................................................4, 21

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
    132 S. Ct. 1670 (2012) ................................................................. *passim*

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,,
    467 U.S. 837 (1984) ..................................................................... 16, 17

*NLRB v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974) ..................................................................... 33, 35

*Sigma-Tau Pharm., Inc. v. Schwetz*,
    288 F.3d 141 (4th Cir. 2002)........................................................21

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003)........................................................26

**Statutes:**

5 U.S.C. § 701 *et seq.*................................................................................3

21 U.S.C. § 301 *et seq.*..............................................................................3

21 U.S.C. § 355(b)....................................................................................4

21 U.S.C. § 355(b)(1)...............................................................................4

21 U.S.C. § 355(j)....................................................................................5

21 U.S.C. § 355(j)(2)(A)(i)......................................................................19

21 U.S.C. § 355(j)(2)(A)(iv) ...................................................................5

21 U.S.C. § 355(j)(2)(A)(v)..................................................................17

21 U.S.C. § 355(j)(2)(A)(vii) ................................................................6

21 U.S.C. § 355(j)(2)(A)(vii)(II) ...........................................................6

21 U.S.C. § 355(j)(2)(A)(vii)(III) ..........................................................6

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ..........................................................6

21 U.S.C. § 355(j)(2)(A)(viii) ....................................... 6, 7, 17, 18, 19, 22

21 U.S.C. § 355(j)(2)(B) .......................................................................6

21 U.S.C. § 355(j)(4)(G)......................................................................17

21 U.S.C. § 355(j)(5)(B)(iii) ..................................................................7

21 U.S.C. § 355(j)(5)(B)(iv) ..................................................................7

21 U.S.C. § 355(j)(5)(C)(ii) .................................................................30

21 U.S.C. § 355(j)(5)(C)(ii)(I) ..............................................................22

21 U.S.C. § 355(j)(5)(F)(iii) .................................................................32

21 U.S.C. § 355(q)........................................................................ 10, 34

21 U.S.C. § 355a(b)...............................................................................9

28 U.S.C. § 1291....................................................................................3

28 U.S.C. § 1331....................................................................................3

35 U.S.C. § 271(b)...............................................................................26

35 U.S.C. § 271(e)(2)(A)...................................................................6

35 U.S.C. § 281............................................................................25

35 U.S.C. § 283............................................................................25

35 U.S.C. § 284............................................................................25

Drug Price Competition and Patent Term Restoration Act of 1984,
    Pub. L. No. 98-417, 98 Stat. 1585 ...................................................5

**Regulations:**

21 C.F.R. § 10.30(d) ................................................................ 10, 34

21 C.F.R. § 10.30(e) ....................................................................34

21 C.F.R. § 201.57 .................................................................. 4, 19, 20

21 C.F.R. § 314.53(c)(2)(ii)(P)(3) ........................................................5

21 C.F.R. § 314.92(a)(1)...................................................................8

21 C.F.R. § 314.94(a)(8)(iv) ........................................................ 8, 18, 27

21 C.F.R. § 314.94(a)(12)(iii) ............................................................8

21 C.F.R. § 314.127(a)(7)........................................................... 18, 32

68 Fed. Reg. 36,682 (2003)..............................................................31

**Rule:**

Fed. R. App. P. 4(a)(1)(B)................................................................3

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

Nos. 14-1920, 14-1922

HOSPIRA, INC., et al.,

Plaintiffs-Appellants,

v.

SYLVIA MATHEWS BURWELL, et al.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRIEF FOR THE FEDERAL APPELLEES

## INTRODUCTION

The Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act created an abbreviated path to approval for manufacturers who wish to market generic versions of drugs that have already been approved. If the brand-name manufacturer asserts that marketing the generic drug would infringe a patent, the statute provides an opportunity for the generic manufacturer to contest the validity or scope of the patent in court. Alternatively, if the patent claims a particular method of using the

drug, a generic manufacturer may avoid patent litigation by submitting a statement that the applicant does not seek approval for the claimed method of use. Such applicants may "carve out" the protected use from their labeling and be approved for any remaining, non-protected conditions of use.

In this case, certain generic manufacturers declined to dispute the brand-name manufacturer's assertions about the scope and validity of its patent, and instead amended their proposed labeling to carve out the patented use. FDA found that the carve-out did not render the drugs less safe and effective for the remaining non-protected conditions of use, and thus approved the applications.

Plaintiffs claim that because doctors administering the generic drugs *might* ultimately infringe the patent in particular instances, the Hatch-Waxman Amendments required FDA to withhold generic approval altogether, even though the labeling does not disclose the patented use. FDA reasonably declined to interpret the Hatch-Waxman Amendments to insulate the brand-name manufacturer from generic competition in these circumstances.

## JURISDICTIONAL STATEMENT

Plaintiffs' claims arise under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court issued a final judgment on September 5, 2014. [JA 2407]. Plaintiffs timely appealed on September 5 and September 7. [JA 2439, 2443]; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether FDA reasonably interpreted the Hatch-Waxman Amendments to allow approval of a generic drug whose labeling omits a patented use, without regard to whether individual doctors might use the drug in ways that would infringe the patent.

## STATEMENT OF THE CASE

**A.    Statutory Background**

**1.** Under the Federal Food, Drug, and Cosmetic Act (FDCA), the Food and Drug Administration regulates the manufacture, distribution, and labeling of drugs. *See generally* 21 U.S.C. § 301 *et seq.* To obtain FDA's approval to market a new drug, a manufacturer must submit a new drug

3

application.  *Id.* § 355(b).  The application must include, among other

things, scientific data and other information demonstrating that the drug is

safe and effective for its intended uses.  *Id.* § 355(b)(1).

The manufacturer must also submit proposed labeling to FDA that

contains information about each indication, including full prescribing

information.  21 C.F.R. § 201.57.  Physicians, however, may prescribe drugs

for unapproved purposes, and FDA generally does not interfere with a

physician's exercise of professional judgment.  *See Buckman Co. v. Plaintiffs'*

*Legal Comm.*, 531 U.S. 341, 350 (2001) ("FDA is charged with the difficult

task of regulating the marketing and distribution of medical devices

without intruding upon decisions statutorily committed to the discretion of

health care professionals.").

In connection with new drug applications, brand-name

manufacturers submit information about patents that claim the drug

product, drug substance, or approved methods of using the drug.  21

U.S.C. § 355(b).  FDA publishes that information in a publication titled

*Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly

known as the "Orange Book."  *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk*

*A/S*, 132 S. Ct. 1670, 1676 (2012).  When a patent claims a method of using

4

the drug, as distinct from (or in addition to) claiming the drug itself, the brand-name manufacturer also submits a "use code," which briefly describes the patented method of use.  *See* 21 C.F.R. § 314.53(c)(2)(ii)(P)(3); *Caraco*, 132 S. Ct. at 1677.  FDA publishes that use code in the Orange Book. FDA's publication of patent information, including use codes, is a ministerial act that does not involve an independent assessment of the patent's scope.  *See Caraco*, 132 S. Ct. at 1677.

**2.**  In the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585, commonly known as the Hatch-Waxman Amendments, Congress created a mechanism for manufacturers to obtain accelerated approval of generic versions of approved brand-name drugs through the submission of abbreviated new drug applications.  *See* 21 U.S.C. § 355(j).  Generic manufacturers using this abbreviated pathway need not provide independent clinical evidence of safety or efficacy. Instead, generic manufacturers must demonstrate that the generic drug shares certain key characteristics with a previously approved drug, including that the generic version is bioequivalent to the drug that has already been approved.  *Id.* § 355(j)(2)(A)(iv).

Manufacturers using the abbreviated pathway must address the patents associated with the previously approved drug in the Orange Book. *See id.* § 355(j)(2)(A)(vii)–(viii).  That requirement is easily satisfied if the generic applicant does not request approval before the patent expires.  *See id.* § 355(j)(2)(A)(vii)(II)–(III).

If a generic manufacturer is not prepared to wait until a patent expires, it may challenge the brand-name manufacturer's assertions about its patent by including in the generic application a certification that the patent is invalid or that the manufacture, use, or sale of the generic drug would not infringe the patent.  *See id.* § 355(j)(2)(A)(vii)(IV).  This certification is known as a "paragraph IV certification."

The generic manufacturer must give notice of its paragraph IV certification to the brand-name manufacturer and the patent holder.  *Id.* § 355(j)(2)(B).  The filing of a paragraph IV certification is deemed an act of patent infringement, which allows the brand-name manufacturer or the patent holder to file an infringement suit against the generic manufacturer without waiting for some other potentially infringing act.  35 U.S.C. § 271(e)(2)(A).  The infringement suit provides a vehicle for the generic and brand-name manufacturers to obtain a judicial determination of the

6

validity or scope of the challenged patent.  When such litigation is filed,

FDA generally must refrain from approving the generic application for 30

months, unless the litigation is resolved in the generic applicant's favor

before then.  21 U.S.C. § 355(j)(5)(B)(iii).  Depending on the outcome of such

litigation, the first generic manufacturer who submits an application with a

paragraph IV certification may be entitled to market the drug for 180 days

without competition from other generic manufacturers who also filed

paragraph IV certifications.  *See id.* § 355(j)(5)(B)(iv).

Where, as here, the patent in question does not claim the drug

product or drug substance, but instead claims a method of using the drug,

there is an alternate statutory mechanism to avoid the patent.  Instead of

filing a paragraph IV certification, a generic manufacturer may submit a

statement (known as a "section viii statement") that the "method of use

patent . . . does not claim a use for which the [generic] applicant is seeking

approval."  *Id.* § 355(j)(2)(A)(viii).  FDA has implemented that statutory

provision by requiring generic applicants with a section viii statement to

carve out the protected use from the drug's labeling (which otherwise must

generally mirror the labeling for the brand-name drug), such that the

generic drug product will only be approved for any remaining, non-

7

protected conditions of use. *See* 21 C.F.R. §§ 314.92(a)(1), 314.94(a)(8)(iv), 314.94(a)(12)(iii); *Caraco*, 132 S. Ct. at 1676–77. In contrast to a paragraph IV certification, a section viii statement does not trigger a 30-month delay in the approval of the generic application; FDA may approve the application as soon as the agency is satisfied that the statutory requirements for approval have been met.

## B.    Facts and Prior Proceedings

This case concerns applications to market generic versions of dexmedetomidine hydrochloride, a drug that is marketed by Hospira under the brand name Precedex. FDA has approved Precedex for two indications, which are reflected in the approved labeling: (1) "Sedation of initially intubated and mechanically ventilated patients during treatment in an intensive care setting"; and (2) "Sedation of non-intubated patients prior to and/or during surgical and other procedures." FDA Decision, at 1 [JA 1572].

Hospira holds one unexpired patent relevant to this product (U.S. Patent No. 6,716,867). That patent was originally listed in the Orange Book with the use code "intensive care unit sedation." *Id.* at 2 [JA 1573]. A second patent (U.S. Patent No. 5,344,840), which expired in 2011, was listed

8

in the Orange Book with the use code "sedation of non-intubated patients prior to and/or during surgical and other procedures." *Id.* The use codes thus indicated that the two patents corresponded to the two approved indications for the drug. Hospira also had a drug-substance patent on the drug itself (U.S. Patent No. 4,910,214), which expired on January 15, 2014.[1]

On January 6, 2014, shortly before the drug-substance patent was going to expire, Hospira submitted a new use code for the non-expiring method-of-use patent: "intensive care unit sedation, including sedation of non-intubated patients prior to and/or during surgical and other procedures." *Id.* This change in use code did not correspond to any other change in the drug product or its approved labeling. Carrying out its ministerial function in publishing patent information supplied by brand-name manufacturers, FDA amended the Orange Book to add this new use code on January 8, 2014. *Id.*

---

[1] Technically, the patent expired six months earlier, but Hospira was entitled to an additional six-month period of exclusive marketing because it performed pediatric testing of the drug in response to a written request from FDA. *See* FDA Decision, at 1 n.1 [JA 1572 n.1]; 21 U.S.C. § 355a(b). This brief will refer to the date of patent expiration as the end of the additional six-month period of exclusivity.

As relevant here, three manufacturers have sought approval for generic versions of Precedex.  Sandoz filed a paragraph IV certification, asserting that the listed patents, including the relevant unexpired method-of-use patent, were invalid or would not be infringed.  *See* SJ Op. 9 [JA 2415].  Hospira filed patent-infringement litigation against Sandoz, which has since settled.  *Id.*  The settlement has recently been amended to allow Sandoz to begin marketing the drug immediately.  *See* Appellants' 28(j) Letter, Oct. 9, 2014.

Mylan and Par Sterile took a different approach.  They filed section viii statements, seeking to avoid infringement of the unexpired patent by obtaining approval only for Precedex's second indication (procedural sedation), and carving out the first indication (intensive care unit sedation).  SJ Op. 9–10 [JA 2415–16].

Hospira contacted FDA to challenge the approvability of any applications with section viii statements.  *Id.* at 11 [JA 2417].  FDA explained that the proper mechanism for such a challenge would be a citizen petition, which would allow all interested entities to comment on a public docket.  *See id.* at 11–12 [JA 2417–18]; Letter from FDA to James Hurst [JA 1632]; 21 U.S.C. § 355(q); 21 C.F.R. § 10.30(d).

10

Hospira declined to file a citizen petition, which would have triggered a public comment period.  Accordingly, FDA sought comment from all manufacturers seeking to market generic versions of Precedex.  *See* Letter to Applicants, at 1 [JA 769].  FDA opened a public docket and posted its letter requesting comment on www.regulations.gov, so other interested entities could submit their views.  *See* SJ Op. 12 [JA 2418].

After receiving comments, FDA issued the decision at issue in this case.  FDA concluded that it could "approve an [abbreviated new drug application] that submits a 'section viii' statement and omits labeling that discloses the protected use (as identified by Hospira)."  FDA Decision, at 1 [JA 1572].  FDA further concluded that "such omissions do not render the drug less safe or effective," *id.*, a conclusion that has not been challenged here.

FDA explained that where particular methods of use were protected by patent or other similar rights to exclusivity, FDA "previously ha[d] determined that it can approve [generic drug applications] for broad, general indications that may partially overlap with a protected method of use, so long as any express references to the protected use are omitted from the labeling."  *Id.* at 10 [JA 1581].  Here, the second indication (for use of the

11

drug in connection with surgical procedures) "and related information in the labeling do not impermissibly disclose the use of Precedex for procedures in the ICU (i.e., for the use covered by the use code)." *Id.*

FDA emphasized that Hospira's amended use code did not "somehow expand the patented use to encompass and prevent approval for all patients who seek to use the drug for the separately delineated procedural sedation indication." *Id.* And FDA confirmed that its decision was "consistent with the goals of the Hatch-Waxman Amendments," which were designed to create an "abbreviated approval mechanism" for "approval of . . . generic products when intellectual property barriers to approval expire or otherwise are removed." *Id.* at 13 [JA 1584]. FDA accordingly approved the applications of Mylan and Par Sterile to market the drug with labeling that omits Precedex's first indication, as well as other references to ICU sedation. [2]

---

[2] FDA did not consider other alternative bases upon which approvals of the generic applications could have been made, such as whether the language in the procedural indication could have been modified to expressly exclude use in the ICU, or whether Hospira had submitted its amended use code too late. *See* FDA Decision, at 15 [JA 1586].

Hospira commenced this action in district court to challenge FDA's decision. Sandoz intervened as a plaintiff, agreeing with Hospira's position in order to force all other generic applicants to file paragraph IV certifications and thus be subject to Sandoz's 180-day exclusivity period. Mylan and Par Sterile intervened as defendants to support the agency's position.

After granting a temporary restraining order, the district court rejected Hospira's challenge and granted summary judgment to FDA and the defendant-intervenors. The district court concluded that section viii is ambiguous as to the amount and type of overlap permitted between a generic manufacturer's labeling and a brand-name manufacturer's use code, and that FDA's interpretation is a reasonable construction of the statute. SJ Op. 19 [JA 2425].

The court agreed with FDA that the agency's prior decisions were consistent with the decision at issue here. *Id.* at 24 [JA 2430]. The court thus rejected plaintiffs' procedural argument, which was premised on the view that additional procedures would have been required if the agency were departing from its previous practices. *Id.* at 30–31 [JA 2436–37].

13

Hospira and Sandoz appealed to this Court and sought an injunction

pending appeal.  This Court denied the requested injunction, but expedited

briefing and argument.  *See* Order, Sept. 8, 2014 (denying injunction);

Briefing Order, Sept. 8, 2014.

## SUMMARY OF ARGUMENT

The Hatch-Waxman Amendments to the Federal Food, Drug, and

Cosmetic Act provide an abbreviated pathway for manufacturers to obtain

approval for generic versions of brand-name drugs that have already been

approved.  The statute contains provisions to allow brand-name

manufacturers to assert that manufacture, use, or sale of the generic drug

would infringe their patents, and channels disputes about the scope or

validity of those patents to the courts before approval.

Congress created an alternative mechanism (a "section viii

statement") that allows generic manufacturers to "carve out" patented uses

from their proposed labeling and thus obtain FDA approval without

undergoing litigation over the scope or validity of patents.  If the generic

applicant carves out the patented use in that manner, it may then submit a

statement under section viii that a method-of-use patent "does not claim a

use for which the applicant is seeking approval," and FDA may approve the application without further delay.

Where, as here, a generic manufacturer files a section viii statement, FDA requires the manufacturer to omit the protected use (as identified by the brand-name manufacturer in the use code) from its labeling. The labeling at issue here omits the protected use, and plaintiffs cannot plausibly suggest otherwise. FDA also concluded that the omissions from the labeling did not render the generic drug less safe or effective than the brand-name drug itself for the remaining non-protected conditions of use, and plaintiffs do not take issue with FDA's conclusion on that point either.

Plaintiffs assert that despite the excision of the patented use from the generic labeling, FDA was required to deny approval of the applications, and thus block the defendants' generic drugs from entering the market for any use. Plaintiffs premise this conclusion on the bare possibility that physicians could prescribe the drug, consistent with the proposed labeling, in a manner that would infringe the patent. FDA properly did not seek to determine the manner in which approved drugs may be prescribed by physicians, and instead limited its review to the labeling itself.

15

FDA's interpretation of section viii is consistent with the purposes of the Hatch-Waxman Amendments.  The Hatch-Waxman Amendments were specifically designed to allow the marketing of generic drugs even when some (but not all) uses were protected by patent.  Plaintiffs' position would artificially expand brand-name manufacturers' ability to insulate their drugs from generic competition.

## STANDARD OF REVIEW

This court reviews *de novo* the district court's grant of summary judgment.  Like the district court, this Court defers to the agency's reasonable construction of the statute it is charged with administering. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

## ARGUMENT

## I.     FDA reasonably approved abbreviated new drug applications whose proposed labeling omitted the patented use.

The FDA decision at issue here interpreted the Hatch-Waxman Amendments to permit approval of an application for a generic version of a brand-name drug that is the subject of a method-of-use patent, so long as the generic drug's labeling omits the patented use.  FDA's interpretation is entirely consistent with the terms of the governing statute and advances

Congress's evident objective of facilitating the marketing of generic drugs for uses that are not subject to a patent. The district court properly recognized that FDA's interpretation of the statute was reasonable and entitled to deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

### A. The generic applicants properly carved out the patented use.

The Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act create a mechanism for manufacturers to obtain approval to market a generic version of a drug that has already been approved. In general, the labeling for the generic drug must be the same as the labeling for the brand-name drug. *See* 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G). But the generic applicant need not seek approval for all of the approved uses for the brand-name drug. Instead, to avoid infringing patents that claim methods of using the drug, the generic applicant may omit portions of the approved labeling for the brand-name drug, provided that the alteration in the labeling does not render the generic drug less safe and effective for the remaining non-protected conditions of use. *See id.* § 355(j)(2)(A)(viii); 21

17

C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7).  *See generally Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1677 (2012).

This case nicely illustrates the purpose of allowing the generic manufacturer to tailor the labeling in this fashion.  The brand-name manufacturer, Hospira, has asserted that marketing its drug for use in an intensive care unit would infringe its patent.  Generic manufacturers Mylan and Par Sterile do not wish to challenge that assertion.  Because the drug's first approved indication (for ICU sedation) corresponds to a patented use, Mylan and Par Sterile are not seeking approval for that indication.  Instead, Mylan and Par Sterile wish to market the drug only for the second indication (for sedation in connection with surgical procedures).  They therefore sought to "carve out" the patented use, and submitted applications with proposed labeling that omitted references to the protected ICU indication.

In evaluating the generic applications, FDA was required to assess the generic manufacturers' assertion (known as a "section viii statement") that "a method of use patent . . . does not claim a use for which the applicant is seeking approval."  21 U.S.C. § 355(j)(2)(A)(viii).  In performing that assessment, FDA necessarily relies on the brand-name manufacturer's

18

characterization of its own patent, rather than analyzing the relevant patent on its own. *See Caraco*, 132 S. Ct. at 1677. The question in this case is whether FDA reasonably concluded, for each of the two materially identical generic applications at issue here, that Hospira's method-of-use patent (as described by Hospira) "does not claim a use for which the applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(viii).

Answering that question requires determining the "use for which the applicant is seeking approval." The generic applicants informed FDA of the uses for which they were seeking approval by submitting proposed labeling to FDA. *See id.* § 355(j)(2)(A)(i); Mylan Proposed Labeling [JA 1696–1719]; Par Sterile Proposed Labeling [JA 1772–95]. This labeling seeks approval for a subset of the uses for which the brand-name drug was approved. The brand-name manufacturer's labeling that generic applicants use as their starting point (before making any permissible changes due to protected uses) does not merely describe the uses in single-clause indications (such as "Sedation of non-intubated patients prior to and/or during surgical and other procedures"). Rather, the labeling must contain extensive information about the indication, including directions for use (dosage and administration), and full prescribing information. 21

19

C.F.R. § 201.57.  The "use for which the applicant is seeking approval" thus does not merely refer to the fact that the drug will be used for procedural sedation, but rather refers to the actual indication in the labeling, as qualified by other information in the labeling relating to that indication, including the directions for use.

Based on a comparison of the proposed labeling and the use code submitted by Hospira, FDA properly determined that Hospira's patent did not claim a use for which the generic applicants sought approval. Hospira's use code is limited to use of Precedex in an ICU, and the "procedural indication and related information in the [generics' proposed] labeling do not impermissibly disclose the use of Precedex for procedures in the ICU."  FDA Decision, at 10 [JA 1581].  To the contrary, the generic manufacturers' proposed labeling in this case was designed precisely to omit the patented use, and thus did not mention using the drug in the ICU.

Plaintiffs do not and could not plausibly take issue with FDA's conclusion that the labeling does not mention the patented use.  Instead, plaintiffs argue that FDA was required to consider the possibility that some uses of the drug for sedation in connection with surgical procedures might happen to take place in the ICU (though they concede that others will not).

20

But the statutory scheme contemplates that FDA will assess only the labeling itself. Congress did not require FDA to determine which actions doctors might take that are not referenced in the labeling. *See Sigma-Tau Pharm., Inc. v. Schwetz*, 288 F.3d 141, 147 (4th Cir. 2002) (upholding FDA's conclusion that it must assess drugs for approval based upon the labeling rather than based upon conjecture about how the drug will be marketed or used). And FDA generally does not interfere with the practice of medicine, so the question whether a particular patented use would be consistent with the labeling, even if the use is not referenced in the labeling, is not a part of FDA's evaluation. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("'off-label' usage of medical devices (use of a device for some other purpose than that for which it has been approved by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine").

Compounding their error in identifying the potential uses that FDA was required to consider, plaintiffs mistakenly insist that FDA may not approve a generic drug whenever there is "overlap" between the use code and the approved indication. *See, e.g.*, Appellants' Br. 29–30. But the statute does not speak in terms of "overlap" between a patent and a broad,

21

general indication. Instead, the statute requires that the patent "does not claim a use for which the applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(viii). The test of whether a patent "claim[s] a use," to the extent it would have any meaning at all when applied to a broad, general indication that may in some circumstances be performed in an infringing manner, is not unambiguously satisfied by mere "overlap" between the use code and the indication.[3]

### B. The agency reasonably declined to grant Hospira an effective extension of its patent protection.

For these reasons, the district court properly concluded that plaintiffs' preferred interpretation was not compelled by the statute's text. Faced with ambiguous statutory language, FDA properly construed the statute to effectuate its purpose of facilitating the marketing of generic drugs, and its reasonable interpretation is entitled to deference.

---

[3] This linguistic ambiguity is a variant of the one recognized by the Supreme Court in the *Caraco* case on which plaintiffs heavily rely. *See Caraco*, 132 S. Ct. at 1681 (noting inherent ambiguity about whether the requirement that a patent "does not claim . . . an approved method of using the drug," 21 U.S.C. § 355(j)(5)(C)(ii)(I), means that the patent does not claim any approved method or that it does not claim a particular one).

FDA's interpretation, in contrast to plaintiffs' position, avoids the anomaly of construing the Hatch-Waxman Amendments to impose more restrictive patent-based limits on marketing than the patent laws themselves. This outcome would run counter to one of the purposes of the Hatch-Waxman Amendments, which were designed to facilitate marketing of generic drugs "when intellectual property barriers to approval expire or otherwise are removed." FDA Decision, at 13 [JA 1584]. As the Supreme Court has explained, the Hatch-Waxman "scheme . . . contemplates that one patented use will not foreclose marketing a generic drug for other unpatented ones." *Caraco*, 132 S. Ct. at 1681–82; *see also* FDA Decision on Irinotecan Hydrochloride, at 14 [JA 1970] (rejecting argument that would block generic products for non-protected uses).

Hospira's approach in the administrative proceedings in this case highlights the dissonance of its position with the purpose of the Hatch-Waxman Amendments. In its initial submission to FDA, Hospira characterized its patent as claiming "'[i]ntensive care unit sedation.'" FDA Decision, at 2 [JA 1573] (quoting plaintiffs' submission). Hospira later amended the description to "'intensive care unit sedation, including sedation of non-intubated patients prior to and/or during surgical and

23

other procedures.'" *Id.* (quoting plaintiffs' submission).  This revision "d[id] not broaden the claimed method of use beyond 'intensive care unit sedation,'" but merely clarified that in some circumstances such a method of use could also coincide with the second approved indication (procedural sedation).  *Id.* at 10 [JA 1581]; *see also* Letter from Hospira to FDA, at 15 [JA 870] (stating that both the old and the new use code "have exactly the same scope").  FDA properly reasoned that "the clarified use code and its explicit inclusion of a subset of patients that may undergo procedural sedation" in an ICU does not "somehow expand the patented use to encompass and prevent approval for all patients who seek to use the drug for the separately delineated procedural sedation indication."  FDA Decision, at 10 [JA 1581].  If the mere possibility that a drug could be prescribed in a way that infringed the patent sufficed to block generic marketing, narrow method-of-use patents could effectively be expanded, through clever drafting of use codes, to prevent generic drugs from coming to market for more general uses that do not infringe any patent.

Plaintiffs err in suggesting that FDA failed to "defer[] to Hospira's description of its method of use patent."  Appellants' Br. 37.  The dispute in this case is not one of patent construction.  All parties agree that, according

24

to Hospira's own submissions, the use code (which is what FDA relies on for the description of the patent claims), does not cover use of the drug for the second approved indication (procedural sedation) outside the ICU. *See, e.g.*, *id.* at 27 (diagram reflecting both infringing and noninfringing uses consistent with the second indication). And Hospira makes no argument that the labeling for the generic drug discloses the protected use.

It may be true that the use code would cover certain specific uses of the drug related to the second indication that are not disclosed in the labeling. But that fact does not foreclose FDA approval. FDA assesses the uses that are disclosed by the labeling, and does not assess potential uses to which doctors might put the drug after approval.

The result that FDA reached in this case, based on its analysis of the labeling and application of the Hatch-Waxman scheme, does not deprive Hospira of rights to which it is entitled under the patent laws. Now that the generic drugs are on the market, if Hospira believes that one of the generic manufacturers is infringing its patent, it may file a patent-infringement action to obtain damages, injunctive relief, or both. *See* 35 U.S.C. §§ 281, 283–284. FDA was not compelled to prejudge the outcome of

25

such potential litigation by blocking generic approval altogether in the absence of any litigation.

Moreover, although FDA properly did not engage in a patent-infringement analysis, its approach is consistent with basic principles of patent law. A generic manufacturer, which does not itself perform methods of use as claimed in a method-of-use patent, can be liable for infringement of such a patent only if it "actively induces" doctors or patients to use the drug in an infringing way. *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 & n.7 (Fed. Cir. 2003) (describing manufacturer's potential liability for infringement of method-of-use patent). And liability for active inducement cannot be premised on the mere possibility that doctors or patients will use the drug in a manner that infringes the patent: "mere knowledge alone of possible infringement by others is insufficient to prove inducement." *Warner-Lambert*, 316 F.3d at 1364. To the contrary, such liability could arise only based on "evidence that [the generic manufacturer] has or will promote or encourage doctors to infringe the . . . patent." *Id.* As the Federal Circuit has explained, to prevent generic marketing based on the

26

patent laws, a brand-name manufacturer cannot rely on the possibility of infringing acts in the future, but instead must demonstrate that "what the generic drug maker is requesting authorization for . . . would be an act of infringement if performed." *Id.* at 1365.

### C.   The decision at issue here reflects FDA's longstanding interpretation and is consistent with the *Caraco* case.

The decision at issue here reflects FDA's longstanding interpretation of the Hatch-Waxman Amendments, as reflected in its regulations and prior decisions.  FDA regulations provide that generic manufacturers who submit section viii statements may "omi[t] . . . an indication *or other aspect of labeling* protected by patent."  21 C.F.R. § 314.94(a)(8)(iv) (emphasis added). Under plaintiffs' theory, there would be no circumstances in which omission of any "other aspect of labeling" would suffice to avoid a patent: plaintiffs argue that so long as the patent claims a single use that is not expressly excluded by the indication, no generic may be approved for that indication regardless of the presence or absence of any other aspects of labeling.

It is therefore unsurprising that the statute and regulations have consistently been interpreted in a manner contrary to plaintiffs'

contentions.  *See* FDA Decision, at 12–13 [JA 1583–84].  For example,
applications for approval of generic repaglinide involved the same scenario
that is at issue here.  Repaglinide had been approved with only a single
indication: "'as an adjunct to diet and exercise to improve glycemic control
in adults with type 2 diabetes mellitus.'"  FDA Decision, at 10 [JA 1581]
(quoting repaglinide labeling).  The brand-name manufacturer submitted a
"use code" to FDA stating that its patent covered "'[u]se of repaglinide in
combination with metformin to lower blood glucose.'"  *Id.* (quoting use
code).  The brand-name manufacturer asserted that FDA could not approve
any generic version of repaglinide, because "there was no . . . separate
indication for metformin combination therapy that could be carved out,"
and thus "FDA's only option was to omit the entire indication (which
partially overlapped with the protected use) or to require [generic]
applicants to change from section viii statements to paragraph IV
certifications (and omit nothing at all)."  *Id.*  "FDA rejected this argument,"
concluding instead—consistent with its position here—that it could
approve the generic product "for the entire indication (as an adjunct to diet
and exercise to improve glycemic control in adults with type 2 diabetes
mellitus) with the combination metformin information removed from

the . . . labeling in sections where such combination use was mentioned expressly." *Id.* at 10–11 [JA 1581–82]; *see* FDA Decision on Repaglinide, at 9–10 [JA 1980–81].

After further agency proceedings, the dispute about generic repaglinide reached the Supreme Court in *Caraco*. The issue in the Supreme Court arose because the brand-name manufacturer responded to the FDA decision discussed above by amending the use code on file with FDA to read "'[a] method for improving glycemic control in adults with type 2 diabetes.'" *Caraco*, 132 S. Ct. at 1679 (alteration in original) (quoting court of appeals decision in *Caraco*, which in turn quoted the use code). According to the revised description, the patent covered not just one of several potential ways of using the drug consistent with the indication, but the entire indication. *Id.* The brand-name manufacturer thus argued that the new description prevented the generic manufacturer from carving out a portion of the labeling, and FDA agreed. *Id.*

The generic manufacturer then abandoned its carve-out labeling and converted its section viii statement to a paragraph IV certification alleging that the patent was invalid. In the infringement litigation that ensued, the generic manufacturer sought to assert a counterclaim to force the brand-

29

name manufacturer to return to the narrower use code. *Id.*; *see* 21 U.S.C.
§ 355(j)(5)(C)(ii) (providing for counterclaim). The Federal Circuit
concluded that the counterclaim was not available in these circumstances,
and the Supreme Court granted certiorari to resolve that issue.
Summarizing the practical significance of the question presented, the
Supreme Court explained that an order requiring the brand-name
manufacturer to return to the narrower use code "would permit the FDA to
accept [the generic's] proposed carve-out label and approve the company's
[abbreviated new drug application]." *Caraco*, 132 S. Ct. at 1679.

According to plaintiffs, the Supreme Court was operating on a
mistaken premise. On plaintiffs' theory, the proposed carve-out labeling
would be impermissible regardless of whether the generic manufacturer
was forced to return to the narrower use code: even the narrower use code
in the *Caraco* case, like the use code at issue in this case, was capable of
intersection with certain uses associated with the approved indication,
depending on how the physician prescribed or administered the drug.

Ignoring the Supreme Court's explicit recognition that a narrower
use code would have allowed generic marketing, plaintiffs instead rely on
a different sentence from the *Caraco* opinion (which echoed the

30

government's brief in that case): "FDA will not approve [an abbreviated new drug application with a carve-out label] if the generic's proposed carve-out label overlaps at all with the brand's use code." *Caraco*, 132 S. Ct. at 1677. Given the history and context of the *Caraco* litigation, it is clear that the Supreme Court (like the government) was referring to an explicit overlap between the labeling and the use code, which is not present in this case. That is why, under the narrower use code, the generic manufacturer in *Caraco* could submit proposed labeling "carving out [the brand-name manufacturer's] patented metformin therapy," *id.* at 1679, and why the generic would have been approved but for the subsequent amendment of the use code. Such carve-out labeling would avoid overlapping with the patent in the relevant sense, just as the labeling here, which does not disclose the patented use, avoids overlapping with the patent. Thus, FDA's position here is entirely consistent with the government's position, and the Supreme Court's decision, in *Caraco*.[4]

---

[4] FDA's position is similarly consistent with the Federal Register notice referred to in the *Caraco* brief, which does not support plaintiffs' theory here. *See* 68 Fed. Reg. 36,682 (2003).

FDA's decision here is fully consistent with the agency's actions in other circumstances in which generic manufacturers sought to omit protected information from a label.  The agency approved the marketing of a generic version of tramadol after carving out a protected titration schedule, even though it was possible that a doctor might prescribe the drug for the protected use, and even though the protected use was within the scope of the broad, approved indication.  FDA Decision, at 12 [JA 1583].

Similarly, FDA approved a generic version of oxandrolone after the generic manufacturer carved out information "related to geriatric use for which the innovator had gained three years of exclusivity."  *Id.* at 13 [JA 1584]; *see* 21 U.S.C. § 355(j)(5)(F)(iii) (providing for such exclusivity); 21 C.F.R. § 314.127(a)(7) (allowing generic labeling to differ from previously approved drug "because aspects of the listed drug's labeling are protected by patent, or by exclusivity, and such differences do not render the proposed drug product less safe or effective than the listed drug for all remaining, nonprotected conditions of use").  This protected use was within the scope of the approved indications "because the drug may be used in the geriatric population for all of them," FDA Decision on Oxandrolone, at 16 [JA 1951], but FDA did not "explicitly limit or disclaim

use in geriatric patients for these indications," FDA Decision, at 13

[JA 1584]. In short, FDA has consistently approved generic applications for

broad indications that may encompass a protected use, so long as that

protected use is carved out of the labeling.

## II. FDA was not obliged to engage in notice-and-comment rulemaking.

Plaintiffs' procedural challenges to the FDA decision are likewise

without merit. The agency did not create new legal obligations that it

expected all regulated entities to follow, but instead was simply resolving a

particular dispute through an adjudication. It is black-letter administrative

law that agencies have broad discretion to proceed by case-by-case

adjudication instead of by promulgating generally applicable rules. *See,*

*e.g., NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974)

("[T]he Board is not precluded from announcing new principles in an

adjudicative proceeding and . . . the choice between rulemaking and

adjudication lies in the first instance within the Board's discretion.").

Plaintiffs do not advance their argument by pointing out that FDA

sought *more* input from regulated entities than might have been strictly

necessary in an adjudication. *See* Appellants' Br. 46. Soliciting comments

from entities that might have informed viewpoints on the issue presented is a virtue, not a vice. FDA did not implicitly concede that it was required to engage in rulemaking simply by soliciting input from interested parties.

FDA reasonably chose to open a public docket because Hospira did not file a citizen petition, despite FDA's explicit statement that a citizen petition was the proper vehicle to raise the objections asserted here. *See* SJ Op. 11–12 [JA 2417–18]; 21 U.S.C. § 355(q). Such a petition would, by regulation, give rise to an opportunity for the public to comment, followed by a resolution of the issue presented. *See* 21 C.F.R. § 10.30(d)–(e). Having declined to avail themselves of the formal procedures specifically designed for this type of dispute, Hospira is in no position to complain about the procedures that were followed, which accomplished the same functions. There was nothing untoward about taking steps to make an informed decision by initiating a public docket, and there is no dispute that interested parties, including plaintiffs, were given a fair opportunity to be heard.

There is no merit to plaintiffs' suggestion that FDA was required to engage in rulemaking because the subject matter at issue here might come up in other cases. The possibility that the agency's decision in this case

might affect its decisionmaking in future cases is a fundamental feature of filling in statutory gaps through case-by-case adjudication. The Supreme Court has long recognized that "adjudicated cases may and do serve as vehicles for the formulation of agency policies, which are applied and announced therein, and that such cases generally provide a guide to action that the agency may be expected to take in future cases." *Bell Aerospace*, 416 U.S. at 294 (brackets, ellipsis, and internal quotation marks omitted).

Moreover, as discussed above, the decision at issue here merely followed the approach FDA had taken in prior cases presenting similar issues. *See* Part I.C, *supra*. Plaintiffs fail to identify any prior FDA decision that conflicts with the decision at issue here, and their assertion that FDA has deviated from its prior position is baseless.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

*Of Counsel:*

WILLIAM B. SCHULTZ
  *General Counsel*

ELIZABETH H. DICKINSON
  *Associate General Counsel*

ANNAMARIE KEMPIC
  *Deputy Chief Counsel*

WENDY S. VICENTE
  *Senior Counsel*
  *U.S. Department of Health*
    *and Human Services*

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

ROD J. ROSENSTEIN
  *United States Attorney*

  s/ Daniel Tenny
SCOTT R. McINTOSH
DANIEL TENNY
  *(202) 514-1838*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

OCTOBER 2014

**CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)**

I certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B).  This brief contains 6,825 words.

         s/ Daniel Tenny       
         Daniel Tenny

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

 s/ Daniel Tenny
Daniel Tenny

**ADDENDUM**

## TABLE OF CONTENTS

21 U.S.C. § 355(j) (excerpts)...................................................................A1

**21 U.S.C. § 355(j) states, in pertinent part:**

(1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2) (A) An abbreviated application for a new drug shall contain--

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii) (I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

(II) if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

(III) if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of

A1

administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi) the items specified in clauses (B) through (F) of subsection (b)(1) of this section;

(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section--

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) of the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii) if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

\* \* \*