No. 14–1920

_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

HOSPIRA, INC.,

*Plaintiff-Appellant*,

and

SANDOZ INC.

*Intervenor-Plaintiff-Appellant*,

v.

SYLVIA BURWELL,
Secretary of Health and Human Services

MARGARET A. HAMBURG, M.D.,
Commissioner of Food and Drugs,

and

UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Defendants-Appellees,*

MYLAN INSTITUTIONAL LLC,

and

PAR STERILE PRODUCTS, LLC

*Intervenor-Defendants-Appellees.*

_____

Appeal from the United States District Court for the District of Maryland
in case no. 8:14-cv-02662, Judge George J. Hazel

_____

**BRIEF OF INTERVENOR-DEFENDANTS-APPELLEES MYLAN
INSTITUTIONAL LLC AND PAR STERILE PRODUCTS, LLC**

_____

Sheldon T. Bradshaw
Michael R. Shebelskie
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037

Shannon M. Bloodworth
Brandon M. White
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960

David E. Jones
David L. Anstaett
David R. Pekarek Krohn
PERKINS COIE LLP
1 East Main St., Suite 201
Madison, WI, 53703

Bryan D. Beel
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209

*Counsel for Intervenor-Defendant-*
*Appellee*
*Mylan Institutional LLC*

James P. Ulwick
Steven M. Klepper
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202

Michael J. Freno
Seed IP Law Group PLLC
701 Fifth Avenue, Suite 5400
Seattle, WA 98104 USA

*Counsel for Intervenor-*
*Defendant-Appellee Par Sterile*
*Products LLC*

## CORPORATE DISCLOSURE STATEMENT

Intervenor-Defendant-Appellee Mylan Institutional LLC is a wholly owned subsidiary of Mylan Inc.

Intervenor-Defendant-Appellee Par Sterile Products, LLC (f/k/a JHP Sterile Products, LLC) is an indirect, wholly-owned subsidiary of Par Pharmaceutical, Inc., which is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc., which itself is a wholly-owned subsidiary of Sky Growth Holdings Corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION ...................................................................1

STATEMENT OF THE ISSUES..........................................................5

STATEMENT OF THE CASE AND FACTS ........................................5

I.    THE HATCH-WAXMAN STATUTORY AND REGULATORY
SCHEME ....................................................................5

II.   STATEMENT OF FACTS...............................................10

III.  STATEMENT OF CASE ................................................20

SUMMARY OF THE ARGUMENT .................................................25

ARGUMENT ....................................................................26

I.    STANDARD OF REVIEW ........................................26

II.   FDA'S INTERPRETATION OF SECTION VIII IS PERMISSIBLE
AT BOTH *CHEVRON* STEPS ..............................................26

A.   *Chevron* Step One:  Congress Has Not Spoken to the Precise Question
of "Overlap" with "Use Codes".......................................27

B.   *Chevron* Step Two:  The District Court Correctly Held that FDA's
Interpretation Is Permissible Under the Statute and Consistent with
Its Past Practice......................................................37

C.   FDA Did Not Violate the Notice and Comment Requirements
of the APA .........................................................48

CONCLUSION ...................................................................55

# TABLE OF AUTHORITIES

**CASES**

*Actavis Elizabeth LLC v. FDA,*
689 F. Supp. 2d 174 (D.D.C. 2010) *aff'd*, 625 F.3d 760 (D.C. Cir. 2010) ........39

*Andrx Pharms., Inc. v. Biovail Corp.,*
276 F.3d 1368 (Fed. Cir. 2002) .................................................................5, 6, 8

*Apotex, Inc. v. Food & Drug Admin.,*
226 F. App'x 4 (D.C. Cir. 2007).........................................................................49

*Apotex, Inc. v. Thompson,*
347 F.3d 1335 (Fed. Cir. 2003) ...........................................................................9

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988).............................................................................................40

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.,*
69 F.3d 1130 (Fed. Cir. 1995) ..............................................................................5

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
132 S. Ct. 1670 (2012)...............................................................................*passim*

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ...........................*passim*

*Citizens for Health v. Leavitt,*
428 F.3d 167 (3rd Cir. 2005) ...........................................................................54

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971)...........................................................................................50

*Eli Lilly & Co. v. Medtronic, Inc.,*
496 U.S. 661 (1990)...........................................................................................10

*Fed. Power Comm'n v. Fla. Power & Light Co.,*
404 U.S. 453 (1972)...........................................................................................49

*Fernandez v. Keisler,*
502 F.3d 337 (4th Cir. 2007) ............................................................................36

*Friends of Back Bay v. U.S. Army Corps of Engineers*,
  681 F.3d 581 (4th Cir. 2012) .................................................................26

*Hospira, Inc. v. Sandoz Inc.*,
  Nos. 2012-1426 and -1427, 2013 WL 298230 (Fed. Cir. Jan. 11, 2013)...........19

*In re Barr Labs.*,
  930 F.2d 72 (D.C. Cir. 1991) ............................................................4, 9

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987).........................................................................40

*Kentuckians for Commonwealth, Inc. v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) ..........................................................32, 36

*King v. Burwell*,
  759 F.3d 358 (4th Cir. 2014) ..........................................................27, 37

*Laber v. Harvey*,
  438 F.3d 404 (4th Cir. 2006) (en banc) .............................................26

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
  744 F.3d 1272 (Fed. Cir. 2014) (en banc) .........................................18

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996).........................................................................18

*Mayo Found. for Med. Educ. & Research v. United States*,
  131 S. Ct. 704 (2011)......................................................................30

*Md. Dep't of Health & Mental Hygiene v. Ctrs. for Medicare & Medicaid*
  *Servs.*, 542 F.3d 424, 434 (4th Cir. 2008)) .........................................35

*Mylan Labs., Inc. v. Thompson*,
  332 F. Supp. 2d 106 (D.D.C. 2004) *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004) ......38

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005).........................................................................36

*Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*,
  654 F.3d 496 (4th Cir. 2011) ....................................................31, 33, 35

*Pharm. Research & Mfrs. of Am. v. Thompson*,
  362 F.3d 817 (D.C. Cir. 2004) .................................................................26

*Philip Morris USA, Inc. v. Vilsack*,
  736 F.3d 284 (4th Cir. 2013) ..............................................27, 31, 35

*Purepac Pharm. Co. v. Thompson* (*Purepac I*), 238 F. Supp. 2d 191, 208
  (D.D.C. 2002) .................................................................................7, 50

*Purepac Pharm. Co. v. Thompson* (*Purepac II*), 354 F.3d 877, 879 (D.C.
  Cir. 2004) ...............................................................................5, 8, 9, 38

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998)....................................................30, 38, 39

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995)...............................................................................52

*Sigma-Tau Pharms., Inc. v. Schwetz*,
  288 F.3d 141 (4th Cir. 2002) ........................................................*passim*

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
  482 F.3d 1330 (Fed. Cir. 2007) ...........................................................6

*United States v. Fla. E. Coast Ry. Co.*,
  410 U.S. 224 (1973).............................................................................49

*Wise v. Ruffin*,
  914 F.2d 570 (4th Cir. 1990) .............................................................40

## STATUTES

5 U.S.C. § 553(b) ...............................................................................1

5 U.S.C. § 702........................................................................................1

5 U.S.C. § 706.................................................................................1, 38

5 U.S.C. § 706(2)(a)......................................................................20, 26

21 U.S.C. § 355(b)(1).........................................................................6, 7

21 U.S.C. § 355 (i)(2) ...........................................................................7

21 U.S.C. § 355(j)(1) .................................................................28

21 U.S.C. § 355(j)(2)(A).................................................28, 33, 47

21 U.S.C. § 355(j)(2)(A)(vii)(I) ......................................................8

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ...................................................8

21 U.S.C. § 355(j)(2)(A)(viii)..............................................*passim*

21 U.S.C. § 355(j)(2)(B) .................................................................8

21 U.S.C. § 355(j)(4) .....................................................................31

28 U.S.C. § 1291 .............................................................................1

35 U.S.C. § 271(e)(2)(A) ................................................................8

**OTHER AUTHORITIES**

21 C.F.R. § 10.30 ..........................................................................14

21 C.F.R. § 314.53(c)(2)(ii) ............................................................7

21 C.F.R. § 314.53(c)(2)(ii)(P) .......................................................6

21 C.F.R. § 314.53(c)(2)(ii)(P)(3) .................................................29

21 C.F.R. § 314.53(e).....................................................................29

21 C.F.R. § 314.94(a)(12)(vi) ........................................................15

59 Fed. Reg. 50338, 50347 (Oct. 3, 1994)......................................9

67 Fed. Reg. 65448, 65457 (Oct. 24, 2002)...................................29

FDA Form 3542 (rev. 11/2013) .......................................................6

Fed R. Civ. P. 65(a)(2)...................................................................21

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is neither complete nor correct. Appellants state that this action specifically arises under 21 U.S.C. § 355(j)(2)(A)(viii) ("section viii") and 5 U.S.C. § 553(b)-(d). Section viii, however, describes only what an applicant for an Abbreviated New Drug Application ("ANDA") must include with that application, and does not create a cause of action against the U.S. Food and Drug Administration ("FDA") or anyone else. Section 553 applies only to agency rulemaking and does not establish judicial review of agency action.

This action properly arises under 5 U.S.C. §§ 702 and 706. Section 702 establishes the right of judicial review of agency action by any person purporting to have suffered a legal wrong. Section 706 defines the scope of such review.

This Court has jurisdiction over this appeal from the final judgment of the U.S. District Court for the District of Maryland ("the District Court") under 28 U.S.C. § 1291.

## INTRODUCTION

Appellants' arguments amount to little more than three conclusory assertions, recycled time and again, in want of any proof. *First*, Appellants insist repeatedly that the Mylan and Par labels disclose a use of generic Precedex® that "overlaps" with "the brand's use code." Br. of Appellants 2, D.I. 62 (hereinafter

"Br."). This is empirically wrong. As an initial matter, the Hatch-Waxman Act does not use the word "overlap," much less speak to the question of what it would mean in this context. And in any event, the Mylan and Par labels do not disclose a patent-protected use of generic Precedex®. Hospira listed its '867 patent as covering only the use code for Intensive Care Unit Sedation, and Hospira has conceded in separate patent litigation that the '867 patent does *not* cover Procedural Sedation—the only use disclosed in the Mylan and Par labels. The Mylan and Par labels, which Appellants neither quote nor even cite, thus omit any reference to Intensive Care Unit Sedation and contain none of the distinct dosing, withdrawal or adverse event information that would be necessary for such use.

Even more, the Mylan and Par labels specifically describe use of generic Precedex® in the operating room setting alone; neither label discloses the use of generic Precedex® in the Intensive Care setting. *See* A1701 (Mylan label); A1815 (Par label). As such, the Mylan and Par labels leave wholly untouched the use of sedation in the ICU, and Appellants' claim that a physician might potentially use the generic product in an ICU setting is legally irrelevant. *See Sigma-Tau Pharms., Inc. v. Schwetz,* 288 F.3d 141, 146-48 (4th Cir. 2002) (rejecting as "profoundly anticompetitive" the argument that "if there is 'foreseeable off label use' FDA must bar the approval of generic drugs, even for unprotected

- 2 -

indications"). Accordingly, under any circumstances the Mylan and Par labels *do not overlap at all* with the use code for the '867 patent.

*Second*, Appellants claim that FDA has somehow deviated from its past interpretation of the section viii carve-out provision of the Hatch-Waxman Act, 21 U.S.C. § 355(j)(2)(A)(viii), in approving as safe and effective Mylan's and Par's ANDAs for generic Precedex®. Yet Appellants fail to identify a single FDA decision that runs contrary to FDA's interpretation of the statute in connection with this approval. The District Court asked Appellants "on several occasions to provide the Court with examples of situations where FDA interpreted section viii in a manner consistent with [their] preferred approach and thus inconsistent with FDA's approach in the instant manner. [Appellants'] counsel was unable to provide any examples." A2432 n.5.

Appellants' briefing before this Court has not remedied this crucial defect, nor could it. As the record shows, FDA has consistently approved generic entry under section viii when the generic label only discloses a use of a pharmaceutical product that is not protected by a patent or statute and carves out (i.e., omits) any reference to a protected use. *See* A2430-31. Such approvals are wholly consonant with the statute. In enacting section viii, Congress expressly authorized a generic pharmaceutical company to market a product where a method of use patent listed by the brand company "does not claim a use for which the [ANDA] applicant is

seeking approval," just as Mylan and Par have done. 21 U.S.C. § 355(j)(2)(A)(viii). This provision furthers the Congressional goal of "get[ting] generic drugs into the hands of patients at reasonable prices—fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

Appellants' arguments are thus exposed as empty rhetoric. They cannot show under *Chevron* step one that Congress has foreclosed FDA's interpretation of section viii, because the language used by Congress leaves ample room for FDA to determine *how* it will assess whether a patent "claim[s] a use for which the [ANDA] applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(viii). Nor have Appellants shown under *Chevron* step two that FDA has acted here in a manner that is inconsistent with either the statute or the agency's prior practice. Indeed, Appellants have not cited *any* FDA decision that runs contrary to the agency's action here.

*Finally*, contrary to Appellants' assertions otherwise, because FDA was plainly engaged in an informal adjudication involving Hospira's use code and the specific ANDA labels at issue, Appellants have no plausible claim that FDA violated notice-and-comment rulemaking procedures. FDA's action here is entirely consistent with its past informal adjudications, and Appellants have not shown otherwise. The ruling below should therefore be affirmed.

- 4 -

## STATEMENT OF THE ISSUES

1.      Whether the FDA's decision to approve Mylan's and Par's ANDAs was arbitrary, capricious, or manifestly contrary to 21 U.S.C. § 355(j)(2)(A)(viii).

2.      Whether the FDA's decision approving Mylan's and Par's ANDAs manifests a new rule requiring notice-and-comment rulemaking under the Administrative Procedure Act.

## STATEMENT OF THE CASE AND FACTS

## I.      THE HATCH-WAXMAN STATUTORY AND REGULATORY SCHEME

This case involves important questions of FDA's authority to approve generic drugs under the Hatch-Waxman Act and the implementing regulations promulgated by FDA.  The Hatch-Waxman Act "strikes a balance between the interests of a party seeking approval of an ANDA and the owner of a drug patent." *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1132 (Fed. Cir. 1995).  Congress wanted to "induc[e] pioneering research and development of new drugs" by encouraging the submission of new drug applications by branded drug manufacturers ("NDA holders").  *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002).  At the same time, Congress also sought to "enabl[e] competitors to bring low-cost, generic copies of those drugs to market."  *Id.*; *see also Purepac Pharm. Co. v. Thompson* (*Purepac II*), 354 F.3d 877, 879 (D.C. Cir. 2004).  To expedite the generic-drug approval process, the Hatch-Waxman Act

expressly permits a generic drug company to submit an ANDA to FDA and rely on the "safety and efficacy studies previously submitted by the pioneer manufacturer by submitting information showing the generic drug's bioequivalence with the previously approved drug product." *Andrx Pharms.,* 276 F.3d at 1371 (citing 21 U.S.C. § 355(j)(2)(A)(iv)).

**The Patent Listing Requirements**.  To inform ANDA applicants of what patents purportedly cover an NDA holder's drug, the NDA holder must notify FDA of all patents for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use or sale" of the drug.  *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1341 (Fed. Cir. 2007) (citing 21 U.S.C. § 355(b)(1) (internal quotation marks omitted)).  FDA then lists the patents submitted with the NDA in the Orange Book. *Id.*

A patent listed in the Orange Book can claim either the drug compound itself or methods of using the drug.  21 U.S.C. § 355(b)(1).  To implement this statutory provision, FDA promulgated regulations and forms governing the process for listing patents.  For each listed method-of-use patent, FDA has promulgated regulations requiring the NDA holder to submit to FDA patent information describing numerous aspects of the patent.  *See* 21 C.F.R. § 314.53(c)(2)(ii)(P); Form FDA 3542 (rev. 11/2013).  More specifically, the NDA holder is required to

submit information regarding a method-of-use patent on FDA's Form 3542 and to certify to its accuracy within 30 days after either issuance of the method patent or approval of the NDA or a supplement thereto. *See* 21 U.S.C. § 355(b)(1), (i)(2); 21 C.F.R. § 314.53(c)(2)(ii). Among other things, the NDA holder must draft a description of any method-of-use patent—called a "use code"—to be listed with the method patent and FDA, in a ministerial capacity, publishes this information in the Orange Book. *Purepac Pharm. Co. v. Thompson* (*Purepac I*), 238 F. Supp. 2d 191, 208 (D.D.C. 2002). Use codes, Form 3542, and FDA's ministerial role are not described or specified in the statutory text.

Importantly, courts have repeatedly warned that this process must not be manipulated for purposes of improperly extending patent monopolies. *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1678 (2012) (noting Congressional concern with misuse and abuse of Orange Book use codes); *Purepac I*, 238 F. Supp. 2d at 206-07 (observing that impediments to allowing appropriate use of section viii statements "slows the process of bringing generic drugs to market, thus assuring the brand manufacturer of a continued monopolistic position in the market"), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004).

As part of the generic-drug approval process, when there is a patent claiming the actual chemical *compound* of a drug listed in the Orange Book (as opposed to a method of using the drug), an ANDA applicant makes one of four certifications

- 7 -

addressing each listed patent. *Andrx Pharms.*, 276 F.3d at 1371; 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV). The four certifications are labeled according to the paragraph number in the statute that describes them—paragraphs I through IV. A paragraph IV certification, for example, informs FDA that the ANDA filer both seeks approval of its ANDA prior to the expiration of the listed patent and believes that the patent is invalid or unenforceable, or will not be infringed by the manufacture, use, or sale of the new generic drug for which the ANDA is submitted. *Andrx Pharms.*, 276 F.3d at 1371; 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The ANDA filer must give notice to the NDA sponsor and to patent holders of the paragraph IV certification, and the NDA sponsor or patent holder can, in turn, bring a patent infringement action against the ANDA applicant. *Andrx Pharms.*, 276 F.3d at 1371; 21 U.S.C. § 355(j)(2)(B); 35 U.S.C. § 271(e)(2)(A).

**Section viii Statements**. For a patent listed in the Orange Book claiming a method of use of the listed drug product, however, the Hatch-Waxman Act specifically allows an ANDA applicant to file *either* one of the certifications listed above *or* a "section viii statement," which informs FDA that the listed patent "does not claim a use for which the [ANDA] applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(viii); *see also Purepac II*, 354 F.3d at 880.

To pursue this second option, the ANDA applicant must submit a section viii statement to FDA for the listed method patent and both remove (or "carve out") the

use listed in the use code from its ANDA label, creating a so-called "skinny label" (i.e., a label listing only uses that the generic drug is to be approved for). *See* 59 Fed. Reg. 50338, 50347 (Oct. 3, 1994) (noting the distinction between an applicant seeking approval for a listed method of use and one which is not); *Purepac II*, 354 F.3d at 880 ("Thus, whereas applicants use paragraph IV certifications to challenge the validity of admittedly applicable patents, they use section viii statements to assert that *patents do not apply*.") (emphasis added).

Appellants describe ANDA applicants who use section viii as "seeking to bypass paragraph IV." Br. at 8. But this is a mischaracterization. Each approval pathway was authorized by Congress, and each has potential benefits and drawbacks. Due in part to the possibility of patent infringement litigation, approval under a paragraph IV certification may take longer, but the result is that the generic manufacturer may eventually be able to market its product for the full set of approved indications and may also enjoy a 180-day period of market exclusivity. Approvals based on section viii statements, on the other hand, may be quicker, but the generic manufacturer will have had to carve out of its label one or more of the approved indications, and there is no statutory market exclusivity.

This process facilitates a primary Congressional goal of the Hatch-Waxman Act: "get[ting] generic drugs into the hands of patients at reasonable prices—fast." *In re Barr Labs.*, 930 F.2d at 76; *see generally Apotex, Inc. v. Thompson*, 347 F.3d

- 9 -

1335, 1338 (Fed. Cir. 2003); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990). Assessment of use codes and generic product labeling falls plainly among the functions Congress delegated to FDA, and constitutes a common, and necessary, aspect of FDA practice.

## II.    STATEMENT OF FACTS

**Submission and Tentative Approval of the Mylan and Par ANDAs**. On February 28, 2011, Mylan submitted ANDA No. 202881 seeking FDA approval to market and sell Mylan's DEX injection products, i.e., Mylan's generic version of dexmedetomidine, branded by Hospira as Precedex®. *See* A1673-74.[1] Precedex® is approved for two indications:

> "Sedation of initially intubated and mechanically ventilated patients during treatment in an intensive care setting." (i.e., Intensive Care Unit Sedation); and

> "Sedation of non-intubated patients prior to and/or during surgical and other procedures." (i.e., Procedural Sedation).

With its submission of ANDA No. 202881, Mylan filed a patent certification and exclusivity information, as required by the Hatch-Waxman Act, to the patents listed in the Orange Book for Hospira's Precedex® NDA. *See id*. On February 2, 2012, Par submitted ANDA No. 203972 seeking FDA approval to market and sell its generic Precedex® product. *See* A1819-21. The Mylan and Par ANDA

---

[1] Citations to "A__" refer to the internal pagination of the Joint Appendix, filed in this Court as ECF Nos. 61-1 through 61-6. For example, "A1673" refers to the page marked "JA-1673," which is located at Page 227 of ECF No. 61-3.

submissions both included section viii statements.  Appellants have not argued that there is any significant difference between Appellee Mylan's and Par's respective approvals.

Hospira's FDA-approved label for Precedex® delineates "Intensive Care Unit Sedation" and "Procedural Sedation" throughout as separate uses.  For example, in addition to separate indications, the label lists different dosages, different warnings regarding withdrawal, and different adverse event information for each separate indication.  *See* A1634-58 (Label for Hospira's Precedex®).  Further, to support each separate indication, Hospira conducted separate clinical trials for Intensive Care Unit Sedation and Procedural Sedation.  *See id*.

U.S. Pat. No. 6,716,867 ("the '867 patent") is a method-of-use patent, and as such, is listed in the Orange Book with a use code.  At the time Mylan and Par submitted their ANDAs, the patent information submitted to FDA by Hospira and published in the Orange Book listed "Intensive Care Unit Sedation" as the use code for the '867 patent.  *See* A1667.  Neither Mylan nor Par sought to market their respective ANDA products for this use, so Appellees each appropriately submitted a section viii statement to the '867 patent, pursuant to 21 U.S.C. § 355(j)(2)(A)(viii), and carved out the listed use of Intensive Care Unit Sedation, and all references to the Intensive Care Unit, from the proposed labeling for its respective ANDA product, *leaving only references to Procedural Sedation.*

A1673-74 (Mylan); A1819-21 (Par). This included carving out dosage information, withdrawal information, adverse event information, and clinical trial information related to Intensive Care Unit Sedation. A1696-1720.[2]

Importantly, the branded Precedex® label indicated that the drug should be "administered only by persons skilled in the management of patients *in the intensive care or operating room setting*." A1701 (Section 5.1; emphasis added). Mylan specifically carved out the intensive care setting, such that under Section 5.1 of its proposed label, the drug "should be administered only by persons skilled in the management of patients *in the operating room setting*." *Id.* (emphasis added):

**5.1     Drug Administration**
        Precedex should be administered only by persons skilled in the management of patients in the ~~intensive care or~~ operating room setting. Due to the known pharmacological effects of Precedex, patients should be continuously monitored while receiving Precedex.

Par's label contains an identical carve out. A1815 (Section 5.1).

Mylan's ANDA with its proposed labeling that omits all references to the Intensive Care Unit was tentatively approved by the FDA on March 4, 2013. A1675. At that time, Mylan did not receive final FDA approval because Hospira's

---

[2] As discussed *infra* at 18-20, in previous patent litigation Hospira asserted unequivocally that the Procedural Sedation indication is *not* covered by the '867 patent. Consistent with this assertion, Hospira listed its now-expired U.S. Pat. No. 5,344,840 in the Orange Book with a use code corresponding to the Procedural Sedation indication and separately listed the '867 patent with a use code corresponding only to Intensive Care Unit Sedation. *See* A1580, A1581 n.30.

exclusivity under another patent had not yet expired. *Id.* Otherwise, Mylan's tentative approval letter from FDA stated that Mylan's ANDA—with the section viii statement—was ready for final approval on January 15, 2014. *Id.*[3] But Hospira discovered that Mylan and Par were about to receive FDA approval and revised its use code in order to prevent generic competition with Precedex®. *See* A1625.

**Hospira's Change to the '867 Patent Use Code.** On January 8, 2014, with the exclusivity of a separate method-of-use patent ending and approval of Mylan and Par's ANDAs imminent, Hospira submitted a last-minute change to its use code and wrote a letter to FDA, arguing that the modified use code barred any generic applicant from gaining approval under section viii. A1623–31. In its ministerial role and by operation of law, FDA changed the use code for the '867 patent listed in the Orange Book to "Intensive Care Unit Sedation, Including Sedation Of Non-Intubated Patients Prior To And/Or During Surgical And Other Procedures." *See* A1665-69.

Hospira offered no medical, scientific or other substantive justification for this change; rather, Hospira simply grafted onto the use code for the '867 patent

---

[3] The March 4, 2013, letter stated that final approval would occur on July 15, 2013, on expiration of U.S. Pat. No. 4,910,214. A1677. After the letter was sent, on March 12, 2013, Hospira was granted a six-month period of pediatric exclusivity, delaying the final approval date for ANDA No. 202881 until January 15, 2014. A1572.

the use code that had applied to its now-expired U.S. Patent No. 5,344,840 (the "'840 patent"). Hospira sent a letter to FDA stating that the "clarification is to assist the FDA by emphasizing that the '867 patent overlaps with both approved indications for this drug" and arguing that "FDA cannot approve any [ANDA] containing a 'section viii statement' . . . with regard to this patent." A1623. In response, FDA sent a letter to Hospira, noting that Hospira's private letter to FDA was not the appropriate mechanism for asking FDA to bar generic applicants from using section viii statements in ANDAs for generic Precedex®. A1632. FDA explained that, under 2007 and 2012 amendments to the Federal Food, Drug, and Cosmetic Act, FDA "shall not delay approval of a pending [NDA or ANDA] . . . unless" a citizen petition is submitted pursuant to 21 C.F.R. § 10.30 or 10.35. *Id.* (quoting 21 U.S.C. § 505(q)(1)(A)). Nevertheless, as a result of Hospira's last-minute change to its use code, FDA approval of Mylan's and Par's pending ANDAs was delayed for more than seven months.

**FDA's Response to Hospira's Belated Use Code Change**. Although Hospira was advised by FDA that it must file a citizen petition if it wanted FDA to consider delaying approval of ANDAs for generic Precedex®, Hospira did not file such a petition. FDA then opened a public docket and posted a Dear NDA/ANDA Applicant letter, requesting comments from interested parties on a number of issues related to Hospira's use code revision, including: (1) whether the breadth of

- 14 -

the new use code would foreclose use by ANDA applicants of a section viii statement; (2) whether it was acceptable to add new words to a carved out label to explicitly exclude the purportedly protected use; (3) whether Hospira's late listing of the use code would affect ANDAs that had already been filed, *see* 21 C.F.R. § 314.94(a)(12)(vi); and (4) what relevance there was to the fact that Hospira had revised its use code to include "very similar use code information" to a recently expired patent. A770.

FDA's Docket No. FDA-2014-N-0087 received twelve submissions during the opening-comment period, including one from Hospira, and ten submissions during the responsive-comment period, also including one from Hospira. As in its private letter to FDA, Hospira's submissions emphasized that the new use code had exactly the same scope as the original use code. A859, A1323. In addition to comments from NDA and ANDA applicants, FDA received comments from industry organizations such as the Biotechnology Industry Organization. *See* A1333. Of the numerous comments received, the clear majority opposed Hospira's attempt to quash generic competition by manipulating its use codes. *See* A774-855, A999-A1016, A1334-73.

Also in response to Hospira's last-minute use code change, FDA's Office of Generic Drugs requested a consult from FDA's Division of Anesthesia, Analgesia, and Addiction Products. The Anesthesia Division was asked to assess whether

information on the Intensive Care Unit Sedation indication could be carved out from the Precedex® label without affecting the safety and efficacy of the remaining Procedural Sedation indication. A1746. As part of the consult, Dr. Amelia Luckett, an FDA anesthesiologist and clinical reviewer, specifically found that "[n]one of the language explicitly related to intensive care unit (ICU) sedation was incorporated into the Mylan Dexmedetomidine Hydrochloride Injection package insert." A1747.[4] Dr. Luckett evaluated Mylan's carved-out label and found no reference to administering dexmedetomidine in the ICU. In addition, FDA conducted a full labeling review for each of Mylan's and Par's label and determined each "carves out ICU sedation use." A1727, A1802. FDA also concluded that Mylan's and Par's skinny labels were safe and effective for the remaining Procedural Sedation indication. A1746, A1819.

**FDA's August 18, 2014, Decision Letter**. After careful consideration of the matter, FDA notified Mylan and Par that their respective ANDAs were approved by letters dated August 18, 2014. *See* A1764, A1819. Also on August 18, FDA issued a decision in docket FDA-2014-N-0087, describing in detail its long-standing and well-established practice of approving ANDAs with appropriate

---

[4] While the consult referenced Mylan's ANDA, Dr. Luckett noted that her "analysis and conclusions can be applied to the labeling for all ANDAs [such as Par's] for dexmedetomidine that have proposed a carve-out of the 'ICU Indication.'" A1746.

section viii carve-outs.    A1572-87.    FDA's fifteen-page decision thoroughly reviewed the public comments that had been received, set forth the statutory and regulatory framework governing patent protection for NDAs and for permissible labeling differences for ANDAs, described the requirements for ANDA labeling, explained FDA's authority to determine permissible labeling carve-outs, and determined that ANDA sponsors may carve out the use protected by the '867 patent.  *Id.*

In particular, FDA rejected the sole legal argument, purportedly grounded in *Caraco*, proffered in Hospira's initial letter to FDA (A1626), which continues to be the centerpiece of Appellants' argument on appeal.  FDA reasoned that:

> As the *Caraco* Court observed, 'only if the use code provides sufficient space for the generic's proposed label will the FDA approve an ANDA with a section viii statement.'  Here, sufficient space exists; FDA can approve ANDAs with only the second procedural indication and related information in the labeling without disclosing the protected use.

A1583 (footnote omitted).  Accordingly, even though "use for procedural sedation may at times occur in an intensive care setting," the generic labeling did not "overlap" with Hospira's use code because "[u]se in an intensive care setting is *not* expressly disclosed in any proposed ANDA labeling."   *Id.* (emphasis added).  Moreover, FDA did not find or acknowledge any overlap between the proposed labeling and the protected use, but rather noted only the possibility of future use of the generic products in an ICU setting.  *See* A2430.

- 17 -

FDA also noted that "Hospira's reliance on a single sentence about a different type of 'overlap' at issue in *Caraco* does not control the outcome here." *Id.* FDA then catalogued the many previous instances in which it had similarly determined that "a labeling carve out is permissible if the proposed ANDA labeling does not disclose the protected use." A1583-85. FDA concluded by making clear that "permitting ANDA sponsors to omit information from the labeling related to use for ICU sedation does not render the product less safe or effective for the remaining use of sedation of non-intubated patients prior to and/or during surgical and other procedures. The generic labeling will include all of the information necessary to use dexmedetomidine safely and effectively for the procedural sedation indication." A1585.

**Hospira's Inconsistent Positions Concerning Its '867 Patent.** In this appeal, Appellants at times attempt to shift the focus from Hospira's use code to its patent. Br. at 5-6 & n.1 (arguing one of the '867 patent's claims is "broad" and "covers . . . both of Hospira's indications"). But the scope of a patent claim is a question of substantive patent law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996); *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77, 1292 (Fed. Cir. 2014) (en banc). As Hospira conceded in response to this Court's jurisdictional inquiry, its legal claims "do not require resolution of any issue of patent law." ECF No. 17-1 at 2.

Nevertheless, the flatly inconsistent positions Appellant Hospira has taken before different federal courts as to the '867 patent's scope are telling. During patent litigation with Appellant Sandoz, Hospira was asked by the U.S. District Court for the District of New Jersey whether "that other approved label use [for Procedural Sedation]; is that the subject of a patent application?" A320. Hospira's counsel stated that the Procedural Sedation indication is *not* covered by the '867 patent. *Id*. But Hospira took the exact opposite position before the FDA when it revised its use code, and continues to do so in this Court.

After the '867 patent was found invalid by the New Jersey court, Hospira appealed to the Federal Circuit. In its appeal brief, Hospira again stated unequivocally that "Precedex's [Procedural Sedation] indication . . . is not covered by the '867 patent." *Hospira, Inc. v. Sandoz Inc.*, Nos. 2012-1426 and -1427, 2013 WL 298230, at \*76-77 (Fed. Cir. Jan. 11, 2013) (Br. for Pls.-Cross Appellants Hospira, Inc.). In the instant litigation, when pressed by the District Court, Hospira's counsel likewise admitted that the District Court was "absolutely not wrong that [Hospira] took that position [that its use code was limited to the indication for Intensive Care Unit Sedation]" in prior litigation. A2464-65. Hospira has never sued Mylan or Par for infringement of the '867 patent.

As in the District Court, Appellants here argue that Hospira's prior inconsistent statements "were not matters of interest to FDA." Br. at 26 n.7. But

to be clear, Hospira's statements *are* part of the administrative record. A1002-04, A1125-26, A1300-01. And Hospira's willingness to speak out of both sides of its mouth, depending on the forum, goes directly to a major concern articulated by Congress, the courts, and the Federal Trade Commission: When "a brand . . . describes a patent on one use as extending to others, the brand submits misleading patent information to the FDA," and thereby "delay[s] or block[s] approval of a generic drug that infringes no patent—and that under the statute should go to market." *Caraco*, 132 S. Ct. at 1687.

## III.    STATEMENT OF CASE

Hospira brought this suit on August 19, 2014, in the District Court under the auspices of the Administrative Procedure Act ("APA"). Hospira challenged FDA's August 18, 2014, decision ("Decision Letter") approving ANDAs for a generic version of Precedex® that carved out of the proposed labeling all references to the Intensive Care Unit. A22, A28. Hospira asserted that the decision was contrary to law under 5 U.S.C. § 706(2)(a). A39. Without the benefit of any briefing on the merits by FDA or Intervenor-Defendants Mylan and Par—each of whom had ANDAs for generic Precedex® approved by FDA the day before—the District Court initially granted a temporary restraining order in favor of Hospira. A135.

After briefing and a hearing on Appellees' motion to reconsider the

temporary restraining order, which was granted in part, the District Court consolidated preliminary injunction briefing with briefing on the merits under Fed R. Civ. P. 65(a)(2) in the form of cross-motions for summary judgment. A2408. After full briefing and a hearing on the cross-motions, the District Court issued a judgment on September 5, 2014, denying Hospira's motion for summary judgment and granting the motions for summary judgment filed by FDA, Mylan, and Par. A2438.

In its decision, the District Court found that FDA's action was "not arbitrary, capricious, or otherwise not in accordance with law, but was instead based on reasonable and sound interpretation of the relevant statute." A2408. Further, the District Court found that the agency's action "was entirely consistent with FDA's established practice" and that "no new 'rule' was created." *Id.* "FDA was therefore not required to follow the APA's formal rulemaking procedures [requiring notice and comment]." *Id.*

The District Court's opinion noted that FDA had approved Precedex® for two indications, and that "the FDA-approved label for Precedex® indicates that these separate uses call for different dosages, provide different warnings regarding withdrawal, and describe different adverse event information." A2413-14. The District Court also noted that different clinical trials were considered by FDA in determining that Precedex® was safe and effective for each indication. A2414.

The District Court further noted that it was of "great significance" that Hospira had stated to FDA that its revised use code was meant to "clarify" the original use code and that "the amended use code had 'exactly the same scope' as the previous use code for 'intensive care unit sedation.'" A2417. The District Court therefore recognized that while Hospira had revised the use code, the proper analysis was whether the generic labels carved out references to Intensive Care Unit Sedation. The District Court then held that FDA's actions were proper because (1) under *Chevron* step one, section viii "does not speak to the 'precise question at issue' before" the District Court, A2425; (2) FDA's decision was a permissible interpretation of section viii under *Chevron* step two, A2436; and (3) FDA's decision was consistent with FDA's established practice and did not create a new rule subject to notice and comment procedures, A2437.

In particular, the District Court extensively addressed Hospira's argument that the Supreme Court's decision in *Caraco*, 132 S. Ct. 1670, foreclosed FDA's action in this case. A2428-36. The District Court analogized the facts of the instant case to those of repaglinide, the drug at issue in *Caraco*, and concluded that FDA had consistently interpreted section viii. A2433-34. The District Court noted that FDA had approved a generic version of repaglinide that included a label that carved out all explicit references to the patent-protected use: repaglinide in combination with another drug, metformin, to treat diabetes. *Id.* And "FDA made

this decision even though the scope of the broad [remaining] indication was silent as to the methods for treating diabetes, and it was possible that a doctor might prescribe the drug for the protected use, *i.e.*, in combination with metformin to treat diabetes." *Id.*  The District Court found this to be "quite similar to the situation presented here; that is, in both situations, the use codes were narrower than the approved indication, and the ANDA proposed labeling carved out the protected use." A2434.[5]

The District Court also distinguished between two types of "overlap." According to the District Court, "the relevant 'overlap' inquiry concerns the overlap between the NDA's use code and the ANDA's proposed labeling." A2435.  Regarding that "overlap," the District Court noted that "FDA assessed the ANDAs proposed carve out, and in exercise of its scientific judgment, determined that there was no reference to the protected method of use." *Id.*  The District Court contrasted this with the type of "overlap" Hospira was asserting exists: "overlap" between the proposed labeling and "the possibility of use." *Id.*  The District Court noted that "[f]or purposes of the 'overlap' analysis, however, it is irrelevant that

---

[5] The District Court also explained that only later—when Novo expanded its use code to cover completely *all* methods of using repaglinide—did FDA determine that a section viii carve-out was impermissible. A2434.  By contrast, unlike the amendment "in *Caraco*, which greatly expanded Novo's use code, the use code here would not create a similar complete and express overlap with the ANDA labeling" because the "use code (original or amended) is concededly limited to intensive care unit sedation." *Id.*

the FDA has acknowledged the *possibility* that generic Precedex[®] may be used for the procedural indication in an ICU setting since all references to the protected ICU use code have been carved out of the proposed label" and "the law requires a focus only on the label." A2435-36. Therefore, it was consistent with FDA's past practice to approve the ANDAs at issue.

Because FDA's decision was "entirely consistent" with what it had done previously and was "exactly the practice FDA followed in its handling of generic repaglinide" and in similar carve-out cases, the District Court found that FDA's decision did not amount to a new rule subject to notice and comment procedures. A2436-37. Therefore, the District Court ruled in favor of FDA, Mylan and Par, and against Hospira. A2437.

Hospira sought a stay of the final judgment in the District Court and an emergency injunction pending appeal from this Court. Both requests were denied. A2441; ECF No. 44.

On October 6, 2014, Intervenor-Plaintiff-Appellant Sandoz announced that it was marketing a generic version of Precedex[®] for both indications—Intensive Care Unit Sedation and Procedural Sedation. *See Sandoz launches generic version of PRECEDEX[®] in the US*, Sandoz.com, http://www.us.sandoz.com/mediacentre/ news/news_100614.shtml (last visited Oct. 17, 2014). In that announcement, the President of Sandoz was quoted as saying Sandoz was offering a "more affordable

version" of Precedex®.  *Id.*

## SUMMARY OF THE ARGUMENT

The District Court's decision should be affirmed because it was permissible agency action under both steps of *Chevron* and did not involve rulemaking—formal or otherwise—but was an informal adjudication consistent with FDA's past practice.  Regarding *Chevron* step one, Appellants' argument that FDA's action was improper fails because the statute at issue, 21 U.S.C. § 355(j)(2)(A)(viii), does not speak to the precise question at issue.  That statutory section deals only with what an ANDA applicant must submit to FDA, and does not address under what circumstances FDA can approve an ANDA.  Under *Chevron* step two, contrary to Appellants' argument—which generally dresses its *Chevron* step one argument in a new outfit—FDA's action in this case was a reasonable one and completely consistent with past FDA practice.

Finally, as they did in the District Court, Appellants again attempt to invoke the improper regulatory framework to argue that FDA violated notice and comment requirements of the APA.  As has been previously recognized, however, FDA's action in approving the ANDAs constitutes informal adjudication, not rulemaking.  Further, as the adjudications here were consistent with prior ANDA approvals by FDA, no new rule was adopted by FDA and thus rulemaking procedures were not required.

While Appellants attempted to delay and disrupt FDA's approval of Appellees' ANDAs by playing use code games, in the end FDA recognized that the approval of the ANDAs was a straightforward application of FDA regulations and prior practice. FDA's decision, therefore, is entitled to deference and this Court should affirm the District Court's decision.

## ARGUMENT

## I. STANDARD OF REVIEW

Review of the District Court's grant of summary judgment is de novo. *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Review of agency action is governed by the APA, which "provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)." *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 586-87 (4th Cir. 2012).

## II. FDA'S INTERPRETATION OF SECTION VIII IS PERMISSIBLE AT BOTH *CHEVRON* STEPS

Courts review "an agency's interpretation of a statute it is charged with implementing under the familiar and deferential two-part framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)." *Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 821 (D.C. Cir. 2004). That is, a court first looks to whether

Congress has "directly spoken to the precise question at issue," and if Congress has not so spoken, then the court will defer to the agency's interpretation as long as it is reasonable, even if it is not the interpretation "the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 842, 843 n.11.

### A.    *Chevron* Step One:  Congress Has Not Spoken to the Precise Question of "Overlap" with "Use Codes"

"The objective of *Chevron* step one is not to interpret and apply the statute to resolve a claim, but to determine whether Congress's intent in enacting it was so clear as to foreclose any other interpretation." *King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014) (internal quotations and citation omitted).  Said another way, the question is not whether Appellants' "reading of [the statute] may be a plausible one," because their "burden is far higher than showing plausibility." *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 291  (4th Cir. 2013).  Rather, "[t]o disturb [FDA's] decision at *Chevron* step one," Appellants "must persuade [the court] that [FDA's] decision is contrary to the unambiguously expressed intent of Congress." *Id*.  At step one, courts "should employ all the traditional tools of statutory construction in determining whether Congress has clearly expressed its intent regarding the issue in question." *King*, 759 F.3d at 367.  If "the statute is susceptible to multiple interpretations," the step one inquiry ends and the reviewing court moves to *Chevron's* second step. *Id*.

Appellants contend that in 21 U.S.C. § 355(j)(2)(A)(viii), Congress spoke directly to the precise questions at issue in this case, and that FDA violated an unambiguous statutory command by approving ANDAs where administration to a patient for an admittedly non-protected use (Procedural Sedation) could in theory "overlap" in part with a protected use that is entirely carved out of the generic label (Intensive Care Unit Sedation). Appellants' *Chevron* step one argument is exceptionally weak. Neither the plain language of section viii nor the statute's structure or legislative history compels Appellants' interpretation and forecloses all others. As a consequence, Appellants devote most of their *Chevron* step one argument to mischaracterizing the District Court's opinion and dwelling on material that plays no part in the step one analysis.

### 1. The statutory text does not compel Appellants' interpretation of section viii

Section 355(j) is titled "Abbreviated new drug applications," and provides that "[a]ny person may file" an ANDA with the FDA. 21 U.S.C. § 355(j)(1). The statute then sets forth—in eight subparts—the information that "[a]n abbreviated application for a new drug shall contain." 21 U.S.C. § 355(j)(2)(A). In the eighth subpart, Congress described the statement that an ANDA applicant must submit to FDA when the applicant seeks to market a drug for fewer than all of the patent-protected uses:

[I]f with respect to the listed drug . . . information was filed [by the brand manufacturer] . . . for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, [the applicant's ANDA shall contain] a statement that the method of use patent does not claim such a use.

21 U.S.C. § 355(j)(2)(A)(viii).

The language of section viii does not speak directly to the precise question posed by Appellants here: *how* FDA is to make the determination that a particular patent "does not claim a use for which the [ANDA] applicant is seeking approval." The statute's text says nothing about how FDA must determine which uses an Orange Book-listed patent claims. Nor does the text explain what evidence and criteria FDA must consider in determining if the ANDA applicant is seeking approval for a claimed use. Congress left the methodology for making these determinations to FDA's discretion.

Because of this ambiguity, as well as other delegations to FDA in the Hatch-Waxman Act, the agency has promulgated regulations to fill the statutory gaps. *See, e.g.,* 67 Fed. Reg. 65448, 65457 (Oct. 24, 2002) (describing FDA's legal authority to clarify Sections 505(b) and 505(j) of the Hatch-Waxman Act through regulation). For example, FDA's implementing regulations require an NDA holder to provide a "description" of any method-of-use patents it holds. *See* 21 C.F.R. §§ 314.53(c)(2)(ii)(P)(3), (e). The NDA holder submits that description to the agency in FDA Form 3542, which is where the term "use code" originates. *See*

- 29 -

A1590-93 (Hospira's FDA Form 3542 for Precedex®).  Both use codes and Form
3542, on which they are reported, were developed by FDA pursuant to its
regulatory authority, not by Congress.  The necessity for such implementing
regulations and for case-by-case carve-out determinations by FDA under this
section of the statute is powerful evidence that Congress has delegated to FDA the
authority to determine whether an ANDA applicant is seeking approval for a
protected use.  *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir.
1998) (holding under *Chevron* step one that the term "same as" under § 355(j) was
ambiguous because the statute says nothing about *how* FDA is to determine
sameness).

Appellants would prefer that FDA approve section viii applications only
where the generic label "does not overlap at all," even in theory, with the brand's
use code.  For its part, and consistent with its past practice, FDA concluded that
Mylan's and Par's section viii statements are permissible because all "express
references to the [patent] protected use are omitted from" the generics' labels.
A1581.  Both methodologies assess whether Appellant Hospira's patent "claim[s] a
use for which the [ANDA] applicant is seeking approval," 21 U.S.C.
§ 355(j)(2)(A)(viii), but neither the text nor the structure of the statute shows that
Congress dictated use of the former methodology over the latter.  *See, e.g., Mayo
Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011)

(rejecting *Chevron* step one argument where, even if statute required tax exemption for student-employees when educational aspects of employment "predominate" over service aspects, "the statutory text still would offer no insight into how Congress intended predominance to be determined"); *Philip Morris*, 736 F.3d at 292 (rejecting *Chevron* step one argument where the "minimal textual evidence is equally consistent with [two different] methodologies"). Appellants' plain-meaning argument is thus fatally flawed: it hinges both on a word not found in the statutory text ("overlap") and on the "use code" regime *created by FDA* as a way of implementing section viii.

If it had intended to unambiguously require the Appellants' preferred "no overlap at all" construction and to foreclose all others, "Congress had much less roundabout ways of" doing so. *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 509 (4th Cir. 2011). For starters, Congress could have explicitly imposed a "no overlap" requirement in 21 U.S.C. § 355(j)(4). That is where Congress directed the FDA to "approve an application for a drug unless [it] finds" one of a detailed list of disqualifying flaws. *Id.* Congress might also have actually used the words "overlap" or "use code"—something it did not do in the whole of § 355. *Contra* Br. at 30 ("overlap is what the statute prohibits"). After all, both use codes and Form 3542, on which they are reported, were developed not by Congress but by FDA pursuant to its regulatory authority.

Even then, use of the word "overlap" would simply beg the question: is "overlap" avoided where the patent-protected use is excised entirely from a generic's proposed label (as the ICU Sedation indication is from the Mylan and Par labels), or would a carve-out nonetheless be rendered unavailable if a physician *might* prescribe the generic product for a protected—but undisclosed—use (as Appellants contend)? While Appellants recite the word "overlap" at every turn, the statute simply does not use that word or speak to the subsidiary question of what it would mean in this context. *See Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 441 (4th Cir. 2003) ("[S]ilence 'normally creates ambiguity. It does not resolve it.'") (citation omitted).

## 2. Appellants' interpretation finds no support in the structure or legislative history of the Hatch-Waxman Act

Appellants ignore the Hatch-Waxman Act's structure and distorts its legislative history in order to arrive at its preferred construction of the statute. In fact, neither the statute's structure nor its history supports Appellants' interpretation.

As for the Act's structure, section viii describes the statement that a generic manufacturer must include in its ANDA when it seeks to carve out from its label a protected method of using the drug for which it is not seeking regulatory approval. Section viii is thus directed to, and imposes an obligation on, the ANDA applicant. It is not, as Appellants wrongly contend, "plain prohibitory language" directed at

the agency.  Br. at 21.  The only prohibitory language applicable to the FDA in §

355(j)(2)(A) states that the agency "may not require" information in addition to

that identified in subparts (i)-(viii).

In their brief, Appellants ignore this broader statutory context.  That

approach is flawed.  *See Nat'l Elec. Mfrs. Ass'n*, 654 F.3d at 506 ("We must, of

course, evaluate the permissibility of the [agency's] interpretation by reference to

the entirety of the definition, and not by reading any portion thereof in isolation.").

Only by quoting a handful of words from section viii in isolation, and ignoring the

balance of the statutory text, can Appellants pretend that the statute ties the FDA's

hands and leaves "no room for an agency interpretation" concerning the

implementation of labeling carve-outs.  Br. at 20-21.

As for legislative history, in the District Court Appellants cited none.

A2426 (noting "Hospira has not identified any legislative history in support of its

construction").  On appeal, Appellants rely on a single passage from a House of

Representatives committee report to argue that their preferred interpretation of the

statute "makes the most sense."  *See* Br. at 24; *cf. Nat'l Elec. Mfrs. Ass'n*, 654 F.3d

at 510 (rejecting *Chevron* step one argument that relied in part on "a single

sentence of a [House] committee report").  And to the extent it should be

considered at all, the report actually undermines Appellants' arguments.  It states:

> The [ANDA] applicant need not seek approval for all of the
> indications for which the listed drug has been approved.  For example,

> if the listed drug has been approved for hypertension and angina pectoris, and if the indication for hypertension is protected by patent, then the applicant could seek approval for only the angina pectoris indication.

H.R. Rep. No. 98-857, pt. 1, at 21 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2654.  That is precisely what Mylan and Par did here—each sought approval only for the Procedural Sedation Indication, and not for the Intensive Care Unit Sedation Indication.[6]  Specifically addressing section viii, the report continues:

> If there are indications which are claimed by any use patent and for which the applicant is not seeking approval, then an ANDA must state that the applicant is not seeking approval for those indications which are claimed by such use patent.  For example, the listed drug may be approved for two indications.  If the applicant is seeking approval only for indication No. 1, and not indication No. 2 because it is protected by a use patent, then the applicant must make the appropriate certification and a statement explaining that it is not seeking approval for indication No. 2.

H.R. Rep. No. 98-857, pt. 1, at 22, *reprinted in* 1984 U.S.C.C.A.N. at 2655.  Like the statutory language, the legislative history makes clear that section viii (*i*) imposes a requirement on the ANDA applicant, not the agency; (*ii*) says nothing about "overlap"; and (*iii*) certainly does not prescribe *how* FDA is to determine

---

[6] Of course, there will be a significant population of patients with concomitant hypertension (high blood pressure) and angina pectoris (chest pain associated with lack of enough blood to the heart).  Therefore, the legislative history recognizes that even though a doctor *could* prescribe the hypothetical drug for a hypertensive patient with angina, that does not prevent FDA from approving a generic label that carved out hypertension.

- 34 -

whether a particular patent "does not claim a use for which the [ANDA] applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(viii).

Because "Congress has not clearly answered the question at issue," *Philip Morris*, 736 F.3d at 289, and the statutory language is "open to varying constructions," *Nat'l Elec. Mfrs. Assoc.*, 654 F.3d at 505 (quoting *Md. Dep't of Health & Mental Hygiene v. Ctrs. for Medicare & Medicaid Servs.*, 542 F.3d 424, 434 (4th Cir. 2008)), Appellants' *Chevron* step one argument fails.

### 3. Appellants mischaracterize the District Court opinion and rely on material that has no bearing on the *Chevron* step one analysis

Appellants contend that the District Court "fail[ed] to analyze the plain text of the statute," Br. at 19 & 30, but that is nonsense.  The District Court identified the relevant statutory language (A2424-25), noted Hospira's counsel's conflicting statements as to whether the provision is ambiguous (A2425), observed that the statute does not use the words "overlap," "at all," "use code," or "carve out," and, most importantly, described the numerous questions section viii's plain language does *not* address, including "how the FDA is to determine whether a particular patent does not 'claim a use' for which the ANDA applicant is seeking approval," (*Id.*).

Finally, as they did below, Appellants also rely on material irrelevant to the *Chevron* step one analysis—namely dicta in the Supreme Court's *Caraco* decision

and a sentence from the government's amicus brief in that case.  Br. at 25-26.

Reliance on the former is scotched by the Supreme Court's decision in *Nat'l Cable*

*& Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).  Under

*Brand X*, "[o]nly a judicial precedent holding that the statute unambiguously

forecloses the agency's interpretation . . . displaces a conflicting agency

construction."  545 U.S. at 982-83.  There is no such holding in *Caraco*.  Rather,

there is but a single sentence of dicta (not a holding) which cites the *Federal*

*Register* (not the statute).  *See Fernandez v. Keisler*, 502 F.3d 337, 348 (4th Cir.

2007) (prior judicial opinion did not control *Chevron* step one analysis because it

"did not hold that its interpretation flowed from the unambiguous terms of the

[statute], or that its interpretation was the *only permissible construction* of the

statute") (citing *Brand X*, emphasis in original).

Reliance on the government's amicus brief is equally far-fetched.  Even if

the brief were evidence of an agency interpretation, reliance on it would be

"entirely inappropriate to the court's analysis under *Chevron* step one."

*Kentuckians*, 317 F.3d at 443 ("Relying on *agency* interpretations as evidence of a

clear *congressional* intent is . . . misguided.") (emphasis in original).  Moreover,

like the lone sentence in the *Caraco* opinion*,* the single sentence in the

government's amicus brief cites the *Federal Register* and says nothing about the

meaning of "overlap," much less whether 21 U.S.C. § 355(j)(2)(A)(viii) forever forecloses any interpretation other than Appellants' preferred reading.

### B.    *Chevron* Step Two:  The District Court Correctly Held that FDA's Interpretation Is Permissible Under the Statute and Consistent with Its Past Practice

This Court has been clear that its review under *Chevron* step two "is highly deferential, with a presumption in favor of finding the agency action valid." *King*, 759 F.3d at 373 (internal quotations omitted).  Accordingly, this Court "will not usurp an agency's interpretive authority by supplanting its construction with [the Court's] own, so long as the interpretation is not arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 372 (internal quotations omitted).

Here, FDA's interpretation of section viii to permit carve-outs that entirely omit any reference to a protected method of use in the product labeling is a permissible, reasonable interpretation of the statutory gap left by Congress.  It is reasonable, and neither arbitrary nor capricious, for FDA to rely upon its scientific and technical expertise to focus on what the proposed labeling discloses.  More to the point, FDA's interpretation is consistent with the way it has handled prior section viii carve-outs.  Because FDA's interpretation is permissible, its decision to approve Mylan's and Par's section viii carve-outs was not invalid under the highly deferential standard of review afforded agency action under *Chevron* step two.

476 U.S. at 844-45 (construing the standard of review for agency action under the Administrative Procedure Act, 5 U.S.C. § 706).

Appellants contend that the District Court improperly applied this deferential standard of review, reiterating their assertion that FDA's Decision Letter was "severely inconsistent" with its past practice in implementing section viii carve outs and that the District Court erred in its understanding that this Court previously rejected Appellants' "foreseeable use" argument in *Sigma-Tau Pharmaceuticals, Inc. v. Schwetz*, 288 F.3d 141 (4th Cir. 2002). Br. at 31-32. As explained below, Appellants' arguments are without merit, and the District Court's judgment should be affirmed.

> **1.** **FDA reasonably and permissibly interpreted section viii and its own regulations to focus on the technical and scientific information disclosed in the ANDA applicants' labels**

FDA interpretations of the FDCA, including the Hatch-Waxman amendments and section viii, are entitled to significant deference from the judiciary. *Chevron*, 467 U.S. at 844–45 (recognizing the "considerable weight" accorded to an agency's construction of the statutes and regulations it is entrusted to administer); *see, e.g.*, *Purepac II*, 354 F.3d at 883; *Serono Labs.*, 158 F.3d at 1319–20; *Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 117 (D.D.C. 2004) *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004). Further, FDA decisions that pertain to highly complex technical and scientific issues are entitled to a high degree of

deference. *See Serono Labs.*, 158 F.3d at 1320; *Actavis Elizabeth LLC v. FDA*, 689 F. Supp. 2d 174, 179 (D.D.C. 2010) *aff'd*, 625 F.3d 760 (D.C. Cir. 2010). Here, the FDA decision interpreting section viii and approving Appellees' ANDAs involves an inquiry into what uses are described in proposed drug labeling, including the sections on dosage and administration, indications of use, warnings, and clinical studies, as well as whether the carve-out labeling will be rendered less safe or effective for its remaining non-protected use. *See* A1579–80, A1585 & n.48.

FDA interpreted section viii to permit it to focus on the information contained in proposed drug labels, where the agency has substantial scientific and technical expertise, as well as experience. *See* A1579 ("Such determinations fall squarely within the ambit of FDA's scientific expertise."). This is not only permissible under the statute, which sets out no specific approach, it is also reasonable. FDA is capable of examining proposed drug labels to determine if a protected use is disclosed. Because FDA's interpretation was permissible, the decision to approve Mylan's and Par's carve-out ANDAs was not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844–45.

> **2.    Appellants fail to identify any instance in which FDA implemented a section viii carve-out in a manner inconsistent with the Decision Letter**

Appellants argue that FDA's interpretation of section viii is not entitled to any deference because the interpretation is inconsistent with its prior interpretation. Br. at 31.   But Appellants do not identify a single example of FDA actually implementing a section viii carve-out in a manner that conflicts with the Decision Letter.   This alone negates the import of the cases Appellants cite in which courts declined to defer to agency interpretations that conflicted with prior interpretations. *See* Br. at 32 & n.8.   In those cases, the court identified and examined the prior interpretation and compared it to a new and conflicting interpretation being advanced by the agency.   *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (finding that the agency's prior wage-index rule did not purport to allow retroactive corrective adjustments, and that "it is only in the context of this litigation that the Secretary has expressed any intent to characterize the rule as a retroactive corrective adjustment"); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (listing examples of agency decisions that had interpreted relevant statutory authority "in at least three different ways"); *Wise v. Ruffin*, 914 F.2d 570, 580 (4th Cir. 1990) (comparing the agency's new interpretation as promulgated in the *Federal Register* with a prior agency Opinion Letter stating the former interpretation).

Appellants eschew this approach and fail to identify any prior FDA section viii carve-out determination that is inconsistent at all with the Decision Letter. This is fatal to Appellants' *Chevron* step two claim that FDA's action should be overturned because it deviates from past practice. The District Court cogently observed that, despite numerous invitations for Appellants to provide an example of a previous inconsistent FDA action, "counsel was unable to provide any examples." A2432 n.5.

Rather than responding to the District Court's invitation (which Appellants have not answered to this day), Appellants—once again—focus exclusively on the single phrase of *dicta* from *Caraco* discussed above. As already explained (*supra* 22-23 & n.5), the phrase from *Caraco* and the government's brief in that case did not address the situation confronting FDA here, in which ANDA applicants (Mylan and Par) sought approval under section viii to market a generic drug where the patent-protected use (Intensive Care Unit Sedation) had been completely carved out of the generic label.

It is thus absurd for Appellants to suggest that the District Court was "incorrectly dismissive of the Supreme Court's understanding of section viii." Br. at 33. To the contrary, the District Court provided an extensive discussion of *Caraco* (A2432-35) and described accurately the "complete and co-extensive" *overlap* between the protected use—as proffered by the branded drug maker in its

use code submission—and the generic label at issue in that case as compared to the complete *carve out* of the protected use from the Mylan and Par proposed labels for their ANDA products (A2435).

The District Court was thus "dismissive" only of Appellants' mischaracterization of *Caraco*, recognizing that Appellants' position would turn "the *holding* of *Caraco* on its head." A2429. This is so because Appellants here are engaged in the same type of use code abuse that led the Court to find that when a brand "describes a patent on one use as extending to others, the brand submits misleading patent information to the FDA" in order to "delay or block approval of a generic drug that infringes no patent—and that under the statute should go to market." 132 S. Ct. at 1687; *see also id.* at 1678 ("In the late 1990's, evidence mounted that some brands were exploiting this [use code] statutory scheme to prevent or delay the marketing of generic drugs, and the Federal Trade Commission (FTC) soon issued a study detailing these anticompetitive practices.").

The FDA's Decision Letter noted that Hospira had originally listed the '840 patent with the Procedural Sedation use code and listed the '867 patent with the Intensive Care Unit Sedation use code. A1580. Only after the '840 patent expired, and on the eve of the approval of the Mylan and Par ANDAs, did Hospira change the use code for the '867 patent in January 2014 to also include general procedural use. A1581 n.30. At that time, as found by the District Court, Hospira had assured

FDA that the "amended use code had 'exactly the same scope' as the previous use code for 'intensive care unit sedation.'" A2417 (citing A101). Despite this assurance, FDA correctly observed that now "Hospira appears to be attempting to resurrect patent coverage to which it is no longer entitled by arguing that the '867 patent precludes approval of an ANDA for dexmedetomidine for procedural sedation to the same extent the '840 patent did – that is, in its entirety." A1581 n. 30. FDA's decision here thus vindicates the significant policy goal, as recognized in *Caraco*, of curtailing abusive use code practices by brand companies.

This cannot constitute arbitrary or capricious agency conduct. And as discussed below, there is no "overlap," partial or otherwise, between the use code at issue and the labeling proposed by Mylan and Par.

### 3.    The labeling proposed by Mylan and Par completely carves out the protected use of intensive care sedation

Appellants contend that FDA's Decision Letter is arbitrary and capricious because it "would allow successful section viii applicants to market their generic drugs for uses covered by the brand drug's use code and claimed by the brand's method of use patent." Br. at 34. Appellants also contend that Mylan's and Par's "*indicated, on label* use of generic Precedex includes procedural sedation that takes place in the ICU." Br. at 39. These contentions are flatly wrong, as an examination of the actual labels exposes.

Appellants never bother to quote from, or even cite to, the labels at issue, relying instead on mischaracterization.  In fact, the Mylan and Par labels contain no references at all to Intensive Care Unit Sedation.  *Compare* A1634-58 (Hospira's Precedex® label listing the Intensive Care Unit Sedation indication) *with* A1696-1720 (Mylan's label listing only the Procedural Sedation indication) *and* A1800-16 (Par's label listing only the Procedural Sedation indication).  This includes omission of dosage information, withdrawal information, and clinical trial information related to Intensive Care Unit Sedation.  A1696-1720.

But the carve out was not limited to the Intensive Care Unit Sedation indication itself.  The Mylan and Par labels specifically exclude any reference to using the generic products in the intensive care unit *setting*, stating that the products "should be administered only by persons skilled in the management of patients in the *operating room setting*."  A1701 (Section 5.1 of Mylan label, emphasis added); A1585 (Section 5.1 of Par label, emphasis added).  Appellants' Precedex® label, in contrast, provides that the brand product may be administered by persons "skilled in the management of patients in the *intensive care . . .* setting." A1634-70 (Section 5.1 of Precedex® label).  Appellants are thus wrong to contend that Mylan and Par could market their generic products either for the Intensive Care Unit Sedation indication or for other uses (*e.g.*, procedural sedation) in the intensive care unit setting.

The complete exclusion by Mylan and Par of any reference to the Intensive Care Unit Sedation indication and to the intensive care setting in their labeling also demonstrates that the District Court was correct in concluding that there was *no* "overlap" with Appellants' use code. A2435. As such, Appellants fail to show that FDA's Decision Letter was inconsistent with either its past practice or with the *Caraco* dicta.

### 4. The District Court properly followed this Court's rejection in *Sigma-Tau v. Schwetz* of the "foreseeable use" test advanced by Appellants

The District Court correctly determined that Appellants' overlap argument turns not on what is actually disclosed in the generic labels (where no "overlap" exists), but instead "boils down to what doctors *may* do with generic Precedex." A2435. The District Court then rejected this argument because "FDA is not obligated to consider how the product *might* be used by physicians beyond the approved labeling." A2435-36. In so holding, the District Court relied on *Sigma-Tau*, 288 F.3d at 146-48, for its rejection "as profoundly anti-competitive" of "the argument that if there is 'foreseeable off-label use' FDA must bar the approval of generic drugs, even for unprotected indications." A2436.

Appellants criticize this holding, arguing that *Sigma-Tau* is inapposite. Br. at 38-39. Not so. This Court in *Sigma-Tau* discussed the same issue presented here regarding whether FDA should consider only a generic drug's label or also the

foreseeable use of the generic drug when determining if the generic would encroach a protected use. *Sigma-Tau*, 288 F.3d at 144. To be sure, the brand drug in *Sigma-Tau* was protected by a statutory period of exclusivity rather than a patent, but that is a distinction without a difference. FDA there had the same task that it had here: deciding if the generics' labels disclosed a protected use or if, instead, the labels are limited to an unprotected use. *Compare* A1583 (Letter Decision concluding that "a labeling carve out is permissible if the proposed ANDA labeling does not disclose the protected use") *with Sigma-Tau*, 288 F.3d at 146 ("The FDA determined the intended use for [the] generic drugs by relying primarily upon the proposed labeling provided by the companies"). This Court approved of FDA's focus on the generics' labels to determine if there was unprotected space in which they could market and rejected the argument that "FDA was obligated to look beyond the labeling" and to consider arguments regarding possible foreseeable uses. *Id.* at 147.

Appellants contend (Br. at 39) that *Sigma-Tau* has no application here because, they claim, "the present case is not about foreseeable off-label use, but acknowledged on-label use." That is wrong. FDA made clear that "[u]se in an intensive care setting is not expressly disclosed in any proposed ANDA labeling." A1583. Moreover, as explained above, the generic labels carve out not only the Intensive Care Unit Sedation indication, but also use of the generic product in the

intensive care setting. *See supra* 12-13 & 44-45. So to establish the purported partial overlap, Appellants must necessarily rely on a "foreseeable use" test to argue that generic Precedex® products offered by Mylan and Par will be used in an intensive care setting. *Sigma-Tau* precludes this approach. *Sigma-Tau*, 288 F.3d at 147.

In any event, the applicability of *Sigma-Tau* to the issue before this Court was certainly appreciated by FDA, which cited the case in its August 18, 2014 Decision Letter for the very proposition that FDA, Mylan and Par are advancing: "the carve out of patent and exclusivity-protected labeling is generally permitted . . . if the omission does not render the proposed drug product less safe or effective for the conditions of use that remain in the labeling." A1579 (citing *Sigma-Tau*, 228 F.3d at 148, 148 n.3). Additionally, Appellants' suggestion (Br. at 39) that *Sigma-Tau* should be limited to the Orphan Drug Act context ignores the analysis in that case of Section 505(j)(2)(A) (codified at 21 U.S.C. § 355(j)(2)(A)), the same statutory provision considered by FDA here. *See* A1578-79; *Sigma-Tau* 228 F.3d at 148 n.3.

Appellants' *Chevron* step two arguments thus do nothing to show that FDA exceeded its statutory authority or acted inconsistently with its past practice in issuing its Decision Letter. Far from altering the Hatch-Waxman balance, as asserted by Appellants, the Decision Letter advances the statute's purpose by

enabling the American public to enjoy the benefits of affordable, safe, and effective pharmaceutical products while preserving patent-protected uses from competition under section viii. Appellants' position, if accepted, would only advance the improper expansion of their monopoly and would encourage the very type of use-code abuse decried by the Supreme Court in *Caraco*.

## C.     FDA Did Not Violate the Notice and Comment Requirements of the APA

As an alternative to its *Chevron* arguments, Appellants argue (Br. at 41) that FDA announced a new rule without engaging in notice-and-comment rulemaking.[7] As discussed above, however, Appellants have not specified what new "rule" FDA purportedly issued. Even more conspicuous by its absence is any identification— by reference to the Code of Federal Regulations or otherwise—of the old rule FDA purportedly overturned.

This is because FDA did not adopt a new rule. Instead, FDA did what it routinely does with ANDA applications: it engaged in informal adjudication, considered the specific facts at issue, applied its scientific expertise, and approved

---

[7] By making this argument Appellants are hedging their bet. That is because this argument and Appellants' *Chevron* step one argument are by necessity mutually exclusive. Here Appellants argue that FDA acted improperly *not* by adopting a rule interpreting 21 U.S.C. § 355(j)(2)(A)(viii), but by doing so without observing the APA's notice-and-comment procedures. A necessary predicate to this argument is that Congress did indeed leave "a gap for the agency to fill" through rulemaking, and that the relevant statute does not "directly address[] the precise question at issue." *Chevron*, 467 U.S. at 843.

- 48 -

the Mylan and Par ANDAs, recognizing that the section viii statements were proper and that the carved-out labels were safe and effective for their intended use. *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (explaining that informal adjudication involves "proceedings designed to adjudicate disputed facts in particular cases"); *Apotex, Inc. v. Food & Drug Admin.*, 226 F. App'x 4, 5 (D.C. Cir. 2007) (unpublished). Indeed, were ANDA approvals and the explanatory decision letters that often accompany such approvals required to follow notice-and-comment rulemaking procedures, the approval process for generic drugs would grind to a virtual halt, frustrating Congress's intent to facilitate speedy entry of generic competition.

### 1. FDA's scientific determinations are entitled to significant deference.

Appellants ignore the thorough consideration of the generic labels by Dr. Amelia Luckett, an FDA anesthesiologist. A1747. Dr. Luckett specifically found that "[n]one of the language explicitly related to intensive care unit (ICU) sedation was incorporated into the Mylan Dexmedetomidine Hydrochloride Injection package insert." *Id.* FDA's expertise on these scientific matter is entitled to significant deference from this Court. *See Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 463 (1972) (noting that an agency receives deference for its "technical expertise and experience"). Here, FDA made a thorough consideration of the facts, and it would be improper for this Court to "substitute its

judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).

Appellants argue (Br. at 43-44) that FDA must have promulgated a rule requiring full-blown notice and comment procedures because FDA's decision to approve the Mylan and Par ANDAs "affects individual rights and obligations" and "took away . . . Hospira's statutory right to patent exclusivity and Sandoz's right to 180-days of marketing exclusivity." This proves far too much.

These are precisely the harms that *every* brand manufacturer alleges *whenever* FDA approves a section viii carve out. Appellants have simply described the statutorily mandated difference between a paragraph IV certification and a section viii statement. That is, the 30-month stay provision is specific to paragraph IV filers, and when FDA approves an ANDA with a section viii statement the brand manufacturer always faces immediate generic competition. *See Purepac I*, 238 F. Supp. 2d at 195 (recognizing that "FDA may approve a section viii application *immediately*, making it an attractive route for generic manufacturers") (emphasis added). Sandoz too has not suffered any harm, as it retains the exclusive right to market generic Precedex® for the Intensive Care Unit Sedation indication and for the intensive care setting, which Mylan and Par

expressly excluded from their labels.[8]  Surely not even Appellants would contend that full notice and comment procedures are required *every time* FDA approves a section viii carve out because "individual rights and obligations" are impacted.

Further, this Court should give little weight to the disingenuous argument Appellants make (Br. at 46) that the public docket web page listed "Rulemaking" as the "Type" of proceeding in which FDA was engaged.  To supply the context that Appellants omit, it is important to remember that FDA opened the docket by posing *three* questions, with multiple sub-questions, to interested parties.  A770. In part, FDA sought comment on whether it would be appropriate for an ANDA applicant to *add* words to a label (rather than remove them) to carve out a protected use.  *Id.*  Tellingly, during the public comment period, the potential to add new words (and thereby foil Hospira's use code ploy) was the *only* issue on which Hospira argued there should be full notice-and-comment rulemaking.  A1327.

FDA, however, did not take any action that involved this issue or the creation of a new rule.  Instead, FDA decided only that a section viii statement and corresponding carve-out of Intensive Care Unit Sedation was appropriate and did not make the drug less safe and effective for the remaining use of Procedural

---

[8] In fact, Sandoz has now launched a generic version of Precedex® and is marketing it for *both* indications.  *Sandoz launches generic version of PRECEDEX® in the US*, Sandoz.com, http://www.us.sandoz.com/mediacentre/ news/news_100614.shtml (last visited Oct. 17, 2014).

Sedation.   A1585.   Therefore, FDA made "no decision at this time on the remaining issues identified in [its] initial letter."  A1585-86.  FDA instead made its decision based on the specific facts of the ANDAs and accompanying proposed labels before it.  As such, FDA's decision was the result of informal adjudication, is entitled to significant deference, and did not require FDA to observe the APA's notice and comment procedures.  *Cf. Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication.").

## 2.  FDA's decision is consistent with prior adjudications.

FDA cited several prior adjudications in its decision letter.  A1583-84.  For Appellants' part, at the August 26, 2014, hearing before the District Court, Hospira's counsel dodged the Court's question, "Can you cite me examples where [FDA] interpreted the rule the way that you are suggesting it should have been interpreted here?"  A2092 (Lines 10-13).  While Hospira's counsel started by claiming, "I can," he cited no examples of any FDA decision or regulation, offering only, "And I would begin – the Supreme Court cited, and we did in our papers as well, to the statements of the FDA [in] the Federal Register."  *Id.* (Lines 14-16).  The District Court made note of this failure in its opinion.  A2432 n.5.

The record has not improved for Appellants here.  Their briefing contains not a single example where FDA has followed the rule Appellants are proposing in

this case. Instead, Appellants only try, unsuccessfully, to distinguish (Br. at 35-36) the prior FDA decisions relied on in the Decision Letter and discussed by the District Court (A2430-35). But Appellants' purported distinctions do not support their argument. For example, Appellants argue that FDA's tramadol decision related to safety and efficacy, and not application of use codes. Yet this supports Appellees' argument: only after FDA has determined that a label carves out a protected use is there any reason to determine whether the drug is safe and effective under that label. A1583-84. That FDA even reached the issue of safety and efficacy shows that it had already determined the carve out was appropriate. Indeed, FDA approved a carve-out for generic tramadol notwithstanding the brand manufacturer's argument that tramadol "was and is approved for only a single indication." A1928.

Appellants' attempt to distinguish FDA's oxandrolone decision fares no better. They make much of the fact that the decision involved "a three-year statutory exclusivity (not a patent)," Br. at 35, but that is irrelevant. As FDA's oxandrolone decision notes, agency regulations "permit generic labeling to omit an indication or other aspect of the reference listed drug's labeling that is protected by a patent *or* exclusivity." A1939 (emphasis added).[9] Just as occurred here, the

---

[9] Whether evaluating exclusivity based on a patent or a statute, the carve-out regulations seek to "expedite competition from generic products, which are

generic company omitted from its label all references to a protected use, so FDA approved the generic drug for an unprotected use. A1584. FDA did so even though the omitted information might be "relevant to nonprotected indications that will remain in the label." A1954.[10]

\* \* \*

In the end, Appellants have not shown that FDA acted inconsistently with its past practice or outside the ambit of its statutory and regulatory authority when it granted approval under section viii for Mylan and Par to market their generic products according to their carved-out labels. As the District Court determined, "no new 'rule' was created by FDA's decision, and the FDA was therefore not required to follow the formal rulemaking procedures required by the APA when the FDA promulgates a new rule." A2437. Appellants provide no reason why that ruling should be disturbed.

---

typically less expensive than the innovator's product, while ensuring that these generic products are just as safe and effective as the innovator's product for all remaining, nonprotected conditions of use." A1940.

[10] Even if Appellants were correct—and they are not—that FDA's interpretation here upset a settled course of behavior, FDA's reasoned analysis and articulation of the reasons for approval of Mylan's and Par's ANDAs are sufficient to satisfy arbitrary-and-capricious review. *See Citizens for Health v. Leavitt*, 428 F.3d 167, 186 (3rd Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–42 (1983)).

- 54 -

## CONCLUSION

For the reasons stated above, Mylan and Par ask this Court to affirm the judgment of the District Court.

Dated: October 17, 2014.                    Respectfully submitted,

                                            /s/ Michael R. Shebelskie

Sheldon T. Bradshaw
Michael R. Shebelskie
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
(202) 955-1575

Shannon M. Bloodworth
Brandon M. White
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite
600
Washington, D.C. 20005-3960
(202) 654-6204

David E. Jones
David L. Anstaett
David R. Pekarek Krohn
PERKINS COIE LLP
1 East Main St., Suite 201
Madison, WI, 53703
(608) 663-7460

Bryan D. Beel
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
(503) 727-2116

*Counsel for Intervenor-Defendant-
Appellee
Mylan Institutional LLC*

James P. Ulwick
Steven M. Klepper
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
Telephone: (410) 752-6030
Facsimile: (410) 539-1269
julwick@kg-law.com
sklepper@kg-law.com


Michael J. Freno
Seed IP Law Group PLLC
701 Fifth Avenue, Suite 5400
Seattle, WA 98104 USA
Telephone: (206) 622.4900
Facsimile: (206) 682.6031
mikef@seedip.com

*Counsel for Intervenor-Defendant-
Appellee Par Sterile Products LLC*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)

I certify that this brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B).  This Brief contains 12,795 words.


/s/ Michael R. Shebelskie

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Michael R. Shebelskie

**ADDENDUM**

## TABLE OF CONTENTS

**Page**

5 U.S.C. § 553(b) ................................................................................ A-1

5 U.S.C. § 702 .................................................................................... A-3

5 U.S.C. § 706 .................................................................................... A-5

21 U.S.C. § 355 .................................................................................. A-7

21 C.F.R. § 10.30 ............................................................................... A-47

21 C.F.R. § 314.53 ............................................................................. A-50

21 C.F.R. § 314.94 ............................................................................. A-55



UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-185, approved 10/6/14 ***

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 5. ADMINISTRATIVE PROCEDURE
SUBCHAPTER II. ADMINISTRATIVE PROCEDURE

**Go to the United States Code Service Archive Directory**

*5 USCS § 553*

§ 553.   Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved--
    (1) a military or foreign affairs function of the United States; or
    (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--
    (1) a statement of the time, place, and nature of public rule making proceedings;
    (2) reference to the legal authority under which the rule is proposed; and
    (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply--
    (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
    (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this *title [5 USCS §§ 556 and 557]* apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--
    (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
    (2) interpretative rules and statements of policy; or
    (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

**HISTORY:**
   (Added Sept. 6, 1966, P.L. 89-554, § 1, 80 Stat. 383.)

### HISTORY; ANCILLARY LAWS AND DIRECTIVES

Prior law and revision:

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............*5 USC Sec. 1003* | | June 11, 1946, ch 324, Sec. 4. 60 Stat. 238. |

   In subsection (a)(1), the words "or naval" are omitted as included in "military".
   In subsection (b), the word "when" is substituted for "in any situation in which".
   In subsection (c), the words "for oral presentation" are substituted for "to present the same orally in any manner". The words "sections 556 and 557 of this title apply instead of this subsection" are substituted for "the requirements of sections 1006 and 1007 of this title shall apply in place of the provisions of this subsection".
   Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

Explanatory notes:
   A former *5 USC § 553* was transferred by Act Sept. 6, 1966, which enacted *5 USCS §§ 101* et seq., and now appears as *7 USCS § 2245.*

Other provisions:
   **Ex. Or. No. 12044 revoked.** Ex. Or. No. 12044 of Mar. 23, 1978, *43 Fed. Reg. 12661,* formerly classified to this section, was revoked by § 10 of Ex. Or. No. 12291 of Feb. 17, 1981, *46 Fed. Reg. 13193,* which formerly appeared as *5 USCS § 601* note. Such Order provided for improving government regulations.



UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-185, approved 10/6/14 ***

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**Go to the United States Code Service Archive Directory**

*5 USCS § 702*

§ 702.   Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**HISTORY:**
   (Sept. 6, 1966, P.L. 89-554, § 1, 80 Stat. 392; Oct. 21, 1976, P.L. 94-574, § 1, 90 Stat. 2721.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**


Prior law and revision:

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ...............5 USC Sec. 1009(a) | | June 11, 1946, ch 324, Sec. 10(a), 60 Stat. 243. |

   Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

Amendments:

1976. Act Oct. 21, 1976, substituted this section for one which read: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.".



UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-185, approved 10/6/14 ***

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**Go to the United States Code Service Archive Directory**

*5 USCS § 706*

§ 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
   (1) compel agency action unlawfully withheld or unreasonably delayed; and
   (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
     (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
     (B) contrary to constitutional right, power, privilege, or immunity;
     (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
     (D) without observance of procedure required by law;
     (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this *title [5 USCS §§ 556 and 557]* or otherwise reviewed on the record of an agency hearing provided by statute; or
     (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**HISTORY:**
   (Sept. 6, 1966, P.L. 89-554, § 1, 80 Stat. 393.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Prior law and revision:

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ........... | *5 USC Sec. 1009(e)* | June 11, 1946, ch 324, |

Sec. 10(e), 60 Stat. 243.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

Other provisions:

**Abbreviation of record.** Act Aug. 28, 1958, P.L. 85-791, § 35, 72 Stat. 941, which authorized the abbreviation of the record on the review or enforcement of orders of administrative agencies and review on the original papers, provided that: "This Act [for full classification of this Act, consult USCS Tables volumes] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [*5 USCS §§ 551* et seq.].".



UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-185, approved 10/6/14 ***

TITLE 21. FOOD AND DRUGS
CHAPTER 9. FEDERAL FOOD, DRUG, AND COSMETIC ACT
DRUGS AND DEVICES
DRUGS AND DEVICES

**Go to the United States Code Service Archive Directory**

*21 USCS § 355*

§ 355.   New drugs

(a) Necessity of effective approval of application.   No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.

(b) Filing application; contents.
   (1) Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a). Such person shall submit to the Secretary as a part of the application (A) full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use; (B) a full list of the articles used as components of such drug; (C) a full statement of the composition of such drug; (D) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (E) such samples of such drug and of the articles used as components thereof as the Secretary may require; (F) specimens of the labeling proposed to be used for such drug, and (G) any assessments required under section 505B [*21 USCS § 355c*]. The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If an application is filed under this subsection for a drug and a patent which claims such drug or a method of using such drug is issued after the filing date but before approval of the application, the applicant shall amend the application to include the information required by the preceding sentence. Upon approval of the application, the Secretary shall publish information submitted under the two preceding sentences. The Secretary shall, in consultation with the Director of the National Institutes of Health and with representatives of the drug manufacturing industry, review and develop guidance, as appropriate, on the inclusion of women and minorities in clinical trials required by clause (A).
   (2) An application submitted under paragraph (1) for a drug for which the investigations described in clause (A) of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted shall also include--
      (A) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for such drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under paragraph (1) or subsection (c)--

(i) that such patent information has not been filed,

(ii) that such patent has expired,

(iii) of the date on which such patent will expire, or

(iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(B) if with respect to the drug for which investigations described in paragraph (1)(A) were conducted information was filed under paragraph (1) or subsection (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

(3) Notice of opinion that patent is invalid or will not be infringed.

(A) Agreement to give notice. An applicant that makes a certification described in paragraph (2)(A)(iv) shall include in the application a statement that the applicant will give notice as required by this paragraph.

(B) Timing of notice. An applicant that makes a certification described in paragraph (2)(A)(iv) shall give notice as required under this paragraph--

(i) if the certification is in the application, not later than 20 days after the date on the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

(ii) if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

(C) Recipients of notice. An applicant required under this paragraph to give notice shall give notice to--

(i) each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(ii) the holder of the approved application under this subsection for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(D) Contents of notice. A notice required under this paragraph shall--

(i) state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

(ii) include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

(4) (A) An applicant may not amend or supplement an application referred to in paragraph (2) to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary.

(B) With respect to the drug for which such an application is submitted, nothing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

(5)

(A) The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1) or under section 351 of the Public Health Service Act [42 USCS § 262], which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

(B) The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection or section 351 of the Public Health Service Act [42 USCS § 262] if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size--

(i) (I) of clinical trials intended to form the primary basis of an effectiveness claim; or

(II) in the case where human efficacy studies are not ethical or feasible, of animal and any associated clinical trials which, in combination, are intended to form the primary basis of an effectiveness claim; or

(ii) with respect to an application for approval of a biological product under section 351(k) of the Public Health Service Act [42 USCS § 262(k)], of any necessary clinical study or studies.

The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of the clinical trials. Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant upon request.

(C) Any agreement regarding the parameters of the design and size of clinical trials of a new drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except--

(i) with the written agreement of the sponsor or applicant; or

(ii) pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

(D) A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

(E) The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance division personnel unless such field or compliance division personnel demonstrate to the reviewing division why such decision should be modified.

(F) No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G) For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection or section 351 of the Public Health Service Act [42 USCS § 262] (including all scientific and medical matters, chemistry, manufacturing, and controls).

(6) An application submitted under this subsection shall be accompanied by the certification required under section 402(j)(5)(B) of the Public Health Service Act [42 USCS § 282(j)(5)(B)]. Such certification shall not be considered an element of such application.

(c) Period for approval of application; period for, notice, and expedition of hearing; period for issuance of order.

(1) Within one hundred and eighty days after the filing of an application under subsection (b), or such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall either--

(A) approve the application if he then finds that none of the grounds for denying approval specified in subsection (d) applies, or

(B) give the applicant notice of an opportunity for a hearing before the Secretary under subsection (d) on the question whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(2) If the patent information described in subsection (b) could not be filed with the submission of an application under subsection (b) because the application was filed before the patent information was required under subsection (b) or a patent was issued after the application was approved under such subsection, the holder of an approved application shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If the holder of an approved application could not file patent information under subsection (b) because it was not required at the time the application was approved, the holder shall file such information under this subsection not later than thirty days after the date of the enactment of this sentence, and if the holder of an approved application could not file patent information under subsection (b) because no patent had been issued when an application was filed or approved, the holder shall file such information under this subsection not later than thirty days after the date the patent involved is issued. Upon the submission of patent information under this subsection, the Secretary shall publish it.

(3) The approval of an application filed under subsection (b) which contains a certification required by paragraph (2) of such subsection shall be made effective on the last applicable date determined by applying the following to each certification made under subsection (b)(2)(A):

(A) If the applicant only made a certification described in clause (i) or (ii) of subsection (b)(2)(A) or in both such clauses, the approval may be made effective immediately.

(B) If the applicant made a certification described in clause (iii) of subsection (b)(2)(A), the approval may be made effective on the date certified under clause (iii).

(C) If the applicant made a certification described in clause (iv) of subsection (b)(2)(A), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in subsection (b)(3) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under paragraph (2) or subsection (b)(1) before the date on which the application (excluding an amendment or supplement to the application) was submitted. If such an action is brought before the expiration of such days, the approval may be made effective upon the expiration of the thirty-month period

beginning on the date of the receipt of the notice provided under subsection (b)(3) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

    (i) if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--

        (I) the date on which the court enters judgment reflecting the decision; or

        (II) the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

    (ii) if before the expiration of such period the district court decides that the patent has been infringed--

        (I) if the judgment of the district court is appealed, the approval shall be made effective on--

            (aa) the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

            (bb) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

        (II) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under *section 271(e)(4)(A) of title 35, United States Code*;

    (iii) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in clause (i); or

    (iv) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in clause (ii).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(D) Civil action to obtain patent certainty.

    (i) Declaratory judgment absent infringement action.

        (I) In general. No action may be brought under *section 2201 of title 28, United States Code*, by an applicant referred to in subsection (b)(2) for a declaratory judgment with respect to a patent which is the subject of the certification referred to in subparagraph (C) unless--

        (aa) the 45-day period referred to in such subparagraph has expired;

        (bb) neither the owner of such patent nor the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brought a civil action against the applicant for infringement of the patent before the expiration of such period; and

            (cc) in any case in which the notice provided under paragraph (2)(B) relates to noninfringement, the notice was accompanied by a document described in subclause (III).

        (II) Filing of civil action. If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the applicant referred to in such subclause may, in accordance with *section 2201 of title 28, United States Code*, bring a civil action under such section against the owner or holder referred to in such subclause (but not against any owner or holder that has brought a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval, except that such civil action may be brought for a declaratory judgment that the patent will not be infringed only in a case in which the condition described in subclause (I)(cc) is applicable. A civil action referred to in this subclause shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

        (III) Offer of confidential access to application. For purposes of subclause (I)(cc), the document described in this subclause is a document providing an offer of confidential access to the application that is in the custody of the applicant referred to in subsection (b)(2) for the purpose of determining whether an action referred to in subparagraph (C) should be brought. The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review

the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under subsection (b)(2)(A)(iv) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement.

(ii) Counterclaim to infringement action.

(I) In general. If an owner of the patent or the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or this subsection on the ground that the patent does not claim either--

(aa) the drug for which the application was approved; or

(bb) an approved method of using the drug.

(II) No independent cause of action. Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).

(iii) No damages. An applicant shall not be entitled to damages in a civil action under clause (i) or a counterclaim under clause (ii).

(E) (i) If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection, the Secretary may not make the approval of another application for a drug for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted effective before the expiration of ten years from the date of the approval of the application previously approved under subsection (b).

(ii) If an application submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after the date of the enactment of this clause [enacted Sept. 24, 1984], no application which refers to the drug for which the subsection (b) application was submitted and for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted may be submitted under subsection (b) before the expiration of five years from the date of the approval of the application under subsection (b), except that such an application may be submitted under subsection (b) after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in clause (iv) of subsection (b)(2)(A). The approval of such an application shall be made effective in accordance with this paragraph except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (C) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(iii) If an application submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b), is approved after the date of the enactment of this clause [enacted Sept. 24, 1984] and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under subsection (b) for the conditions of approval of such drug in the approved subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) if the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

(iv) If a supplement to an application approved under subsection (b) is approved after the date of enactment of this clause [enacted Sept. 24, 1984] and the supplement contains reports of new clinical investigations (other than bioavailabilty [bioavailability] studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under subsection (b) for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b) if the investigations described in clause (A) of subsection (b)(1) and relied upon

by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

(v) If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this clause [enacted Sept. 24, 1984], the Secretary may not make the approval of an application submitted under this subsection and for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted and which refers to the drug for which the subsection (b) application was submitted effective before the expiration of two years from the date of enactment of this clause [enacted Sept. 24, 1984].

(4) A drug manufactured in a pilot or other small facility may be used to demonstrate the safety and effectiveness of the drug and to obtain approval for the drug prior to manufacture of the drug in a larger facility, unless the Secretary makes a determination that a full scale production facility is necessary to ensure the safety or effectiveness of the drug.

(d) Grounds for refusing application; approval of application; "substantial evidence" defined.   If the Secretary finds, after due notice to the applicant in accordance with subsection (c) and giving him an opportunity for a hearing, in accordance with said subsection, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b), do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; or (6) the application failed to contain the patent information prescribed by subsection (b); or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular; he shall issue an order refusing to approve the application. If, after such notice and opportunity for hearing, the Secretary finds that clauses (1) through (6) do not apply, he shall issue an order approving the application. As used in this subsection and subsection (e), the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. If the Secretary determines, based on relevant science, that data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence for purposes of the preceding sentence. The Secretary shall implement a structured risk-benefit assessment framework in the new drug approval process to facilitate the balanced consideration of benefits and risks, a consistent and systematic approach to the discussion and regulatory decisionmaking, and the communication of the benefits and risks of new drugs. Nothing in the preceding sentence shall alter the criteria for evaluating an application for premarket approval of a drug.

(e) Withdrawal of approval; grounds; immediate suspension upon finding imminent hazard to public health.   The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application with respect to any drug under this section if the Secretary finds (1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved; (2) that new evidence of clinical experience, not contained in such application or not available to the Secretary until after such application was approved, or tests by new methods, or tests by methods not deemed reasonably applicable when such application was approved, evaluated together with the evidence available to the Secretary when the application was approved, shows that such drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved; or (3) on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substan-

tial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof; or (4) the patent information prescribed by subsection (c) was not filed within thirty days after the receipt of written notice from the Secretary specifying the failure to file such information; or (5) that the application contains any untrue statement of a material fact: *Provided,* That if the Secretary (or in his absence the officer acting as Secretary) finds that there is an imminent hazard to the public health, he may suspend the approval of such application immediately, and give the applicant prompt notice of his action and afford the applicant the opportunity for an expedited hearing under this subsection; but the authority conferred by this proviso to suspend the approval of an application shall not be delegated. The Secretary may also, after due notice and opportunity for hearing to the applicant, withdraw the approval of an application submitted under subsection (b) or (j) with respect to any drug under this section if the Secretary finds (1) that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports, in accordance with a regulation or order under subsection (k) or to comply with the notice requirements of section 510(k)(2) [*21 USCS § 360(k)(2)*], or the applicant has refused to permit access to, or copying or verification of, such records as required by paragraph (2) of such subsection; or (2) that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to assure and preserve its identity, strength, quality, and purity and were not made adequate within a reasonable time after receipt of written notice from the Secretary specifying the matter complained of; or (3) that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the labeling of such drug, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary specifying the matter complained of. Any order under this subsection shall state the findings upon which it is based. The Secretary may withdraw the approval of an application submitted under this section, or suspend the approval of such an application, as provided under this subsection, without first ordering the applicant to submit an assessment of the approved risk evaluation and mitigation strategy for the drug under section 505-1(g)(2)(D) [*21 USCS § 355-1(g)(2)(D)*].

(f) Revocation of order refusing, withdrawing or suspending approval of application.   Whenever the Secretary finds that the facts so require, he shall revoke any previous order under subsection (d) or (e) refusing, withdrawing, or suspending approval of an application and shall approve such application or reinstate such approval, as may be appropriate.

(g) Service of orders.   Orders of the Secretary issued under this section shall be served (1) in person by any officer or employee of the department designated by the Secretary or (2) by mailing the order by registered mail or by certified mail addressed to the applicant or respondent at his last-known address in the records of the Secretary.

(h) Appeal from order.   An appeal may be taken by the applicant from an order of the Secretary refusing or withdrawing approval of an application under this section. Such appeal shall be taken by filing in the United States court of appeals for the circuit wherein such applicant resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a written petition praying that the order of the Secretary be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Secretary, or any officer designated by him for that purpose, and thereupon the Secretary shall certify and file in the court the record upon which the order complained of was entered, as provided in *section 2112 of title 28, United States Code.* Upon the filing of such petition such court shall have exclusive jurisdiction to affirm or set aside such order, except that until the filing of the record the Secretary may modify or set aside his order. No objection to the order of the Secretary shall be considered by the court unless such objection shall have been urged before the Secretary or unless there were reasonable grounds for failure so to do. The finding of the Secretary as to the facts, if supported by substantial evidence, shall be conclusive. If any person shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Secretary, the court may order such additional evidence to be taken before the Secretary and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Secretary may modify his findings as to the facts by reason of the additional evidence so taken, and he shall file with the court such modified findings which, if supported by substantial evidence, shall be conclusive, and his recommendation, if any, for the setting aside of the original order. The judgment of the court affirming or setting aside any such order of the Secretary shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in *section 1254 of title 28 of the United States*

*Code.* The commencement of proceedings under this subsection shall not, unless specifically ordered by the court to the contrary, operate as a stay of the Secretary's order.

(i) Exemptions of drugs for research; discretionary and mandatory conditions; direct reports to Secretary.

(1) The Secretary shall promulgate regulations for exempting from the operation of the foregoing subsections of this section drugs intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs. Such regulations may, within the discretion of the Secretary, among other conditions relating to the protection of the public health, provide for conditioning such exemption upon--

(A) the submission to the Secretary, before any clinical testing of a new drug is undertaken, of reports, by the manufacturer or the sponsor of the investigation of such drug, of preclinical tests (including tests on animals) of such drug adequate to justify the proposed clinical testing;

(B) the manufacturer or the sponsor of the investigation of a new drug proposed to be distributed to investigators for clinical testing obtaining a signed agreement from each of such investigators that patients to whom the drug is administered will be under his personal supervision, or under the supervision of investigators responsible to him, and that he will not supply such drug to any other investigator, or to clinics, for administration to human beings;

(C) the establishment and maintenance of such records, and the making of such reports to the Secretary, by the manufacturer or the sponsor of the investigation of such drug, of data (including but not limited to analytical reports by investigators) obtained as the result of such investigational use of such drug, as the Secretary finds will enable him to evaluate the safety and effectiveness of such drug in the event of the filing of an application pursuant to subsection (b); and

(D) the submission to the Secretary by the manufacturer or the sponsor of the investigation of a new drug of a statement of intent regarding whether the manufacturer or sponsor has plans for assessing pediatric safety and efficacy.

(2) Subject to paragraph (3), a clinical investigation of a new drug may begin 30 days after the Secretary has received from the manufacturer or sponsor of the investigation a submission containing such information about the drug and the clinical investigation, including--

(A) information on design of the investigation and adequate reports of basic information, certified by the applicant to be accurate reports, necessary to assess the safety of the drug for use in clinical investigation; and

(B) adequate information on the chemistry and manufacturing of the drug, controls available for the drug, and primary data tabulations from animal or human studies.

(3) (A) At any time, the Secretary may prohibit the sponsor of an investigation from conducting the investigation (referred to in this paragraph as a "clinical hold") if the Secretary makes a determination described in subparagraph (B). The Secretary shall specify the basis for the clinical hold, including the specific information available to the Secretary which served as the basis for such clinical hold, and confirm such determination in writing.

(B) For purposes of subparagraph (A), a determination described in this subparagraph with respect to a clinical hold is that--

(i) the drug involved represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation, taking into account the qualifications of the clinical investigators, information about the drug, the design of the clinical investigation, the condition for which the drug is to be investigated, and the health status of the subjects involved; or

(ii) the clinical hold should be issued for such other reasons as the Secretary may by regulation establish (including reasons established by regulation before the date of the enactment of the Food and Drug Administration Modernization Act of 1997 [enacted Nov. 21, 1997]).

(C) Any written request to the Secretary from the sponsor of an investigation that a clinical hold be removed shall receive a decision, in writing and specifying the reasons therefor, within 30 days after receipt of such request. Any such request shall include sufficient information to support the removal of such clinical hold.

(4) Regulations under paragraph (1) shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation, requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible or it is contrary to the best interests of such human beings. Nothing in this subsection shall be construed to require any clinical investigator to submit directly to the Secretary reports on the investigational use of drugs. The Secretary shall update such regulations to require inclusion in the informed consent documents and process a statement that clinical trial information for such clinical investigation has been or will be submitted for inclusion in the registry data bank pursuant to subsection (j) of section 402 of the Public Health Service Act [*42 USCS § 282*].

**A-14**

(j) Abbreviated new drug applications.

(1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2) (A) An abbreviated application for a new drug shall contain--

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii) (I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

(II) if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

(III) if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 201(p) [*21 USCS § 321(p)*], and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi) the items specified in clauses (B) through (F) of subsection (b)(1);

(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c)--

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) of the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii) if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

(B) Notice of opinion that patent is invalid or will not be infringed.

(i) Agreement to give notice. An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give notice as required by this subparagraph.

(ii) Timing of notice. An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall give notice as required under this subparagraph--

(I) if the certification is in the application, not later than 20 days after the date of the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

(II) if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

(iii) Recipients of notice. An applicant required under this subparagraph to give notice shall give notice to--

(I) each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(II) the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(iv) Contents of notice. A notice required under this subparagraph shall--

(I) state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

(II) include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

(C) If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application. The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds--

(i) that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug; or

(ii) that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

(D) (i) An applicant may not amend or supplement an application to seek approval of a drug referring to a different listed drug from the listed drug identified in the application as submitted to the Secretary.

(ii) With respect to the drug for which an application is submitted, nothing in this subsection prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

(iii) Within 60 days after the date of the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 [enacted Dec. 8, 2003], the Secretary shall issue guidance defining the term "listed drug" for purposes of this subparagraph.

(3) (A) The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1), which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

(B) The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of bioavailability and bioequivalence studies needed for approval of such application. The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of such studies. Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant.

(C) Any agreement regarding the parameters of design and size of bioavailability and bioequivalence studies of a drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except--

(i) with the written agreement of the sponsor or applicant; or

(ii) pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

(D) A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

(E) The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance office personnel unless such field or compliance office personnel demonstrate to the reviewing division why such decision should be modified.

(F) No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G) For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection (including scientific matters, chemistry, manufacturing, and controls).

(4) Subject to paragraph (5), the Secretary shall approve an application for a drug unless the Secretary finds--

(A) the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

(B) information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

(C) (i) if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

(ii) if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

(iii) if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show--

(I) that the other active ingredients are the same as the active ingredients of the listed drug, or

(II) that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 201(p) [*21 USCS § 321(p)*],

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

(D) (i) if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

(ii) if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

(E) if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

(F) information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

(G) information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

(H) information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

(I) the approval under subsection (c) of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e), the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) for grounds described in the first sentence of subsection (e), the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

(J) the application does not meet any other requirement of paragraph (2)(A); or

(K) the application contains an untrue statement of material fact.

(5) (A) Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

(B) The approval of an application submitted under paragraph (2) shall made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):

(i) If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

(ii) If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

(iii) If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to be substantially complete, was submitted. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

(I) if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--

(aa) the date on which the court enters judgment reflecting the decision; or

(bb) the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

(II) if before the expiration of such period the district court decides that the patent has been infringed--

(aa) if the judgment of the district court is appealed, the approval shall be made effective on--

(AA) the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

(BB) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

(bb) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under *section 271(e)(4)(A) of title 35, United States Code*;

(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in subclause (I); or

(IV) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in subclause (II).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(iv) 180-day exclusivity period.

(I) Effectiveness of application. Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

(II) Definitions. In this paragraph:

(aa) 180-day exclusivity period. The term "180-day exclusivity period" means the 180-day period ending on the day before the date on which an application submitted by an applicant other than a first applicant could become effective under this clause.

(bb) First applicant. As used in this subsection, the term "first applicant" means an applicant that, on the first day on which a substantially complete application containing a certification described in paragraph (2)(A)(vii)(IV) is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a certification described in paragraph (2)(A)(vii)(IV) for the drug.

(cc) Substantially complete application. As used in this subsection, the term "substantially complete application" means an application under this subsection that on its face is sufficiently complete to permit a substantive review and contains all the information required by paragraph (2)(A).

(dd) Tentative approval.

(AA) In general. The term "tentative approval" means notification to an applicant by the Secretary that an application under this subsection meets the requirements of paragraph (2)(A), but cannot receive effective approval because the application does not meet the requirements of this subparagraph, there is a period of exclusivity for the listed drug under subparagraph (F) or section 505A [*21 USCS § 355a*], or there is a 7-year period of exclusivity for the listed drug under section 527 [*21 USCS § 360cc*].

(BB) Limitation. A drug that is granted tentative approval by the Secretary is not an approved drug and shall not have an effective approval until the Secretary issues an approval after any necessary additional review of the application.

(C) Civil action to obtain patent certainty.

(i) Declaratory judgment absent infringement action.

(I) In general. No action may be brought under *section 2201 of title 28, United States Code*, by an applicant under paragraph (2) for a declaratory judgment with respect to a patent which is the subject of the certification referred to in subparagraph (B)(iii) unless--

(aa) the 45-day period referred to in such subparagraph has expired;

(bb) neither the owner of such patent nor the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brought a civil action against the applicant for infringement of the patent before the expiration of such period; and

(cc) in any case in which the notice provided under paragraph (2)(B) relates to noninfringement, the notice was accompanied by a document described in subclause (III).

(II) Filing of civil action. If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the applicant referred to in such subclause may, in accordance with *section 2201 of title 28, United States Code*, bring a civil action under such section against the owner or holder referred to in such subclause (but not against any owner or holder that has brought a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval, except that such civil action may be brought for a declaratory judgment that the patent will not be infringed only in a case in which the condition described in subclause (I)(cc) is applicable. A civil action referred to in this subclause shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

(III) Offer of confidential access to application. For purposes of subclause (I)(cc), the document described in this subclause is a document providing an offer of confidential access to the application that is in the custody of the applicant under paragraph (2) for the purpose of determining whether an action referred to in subparagraph (B)(iii) should be brought. The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement.

(ii) Counterclaim to infringement action.

(I) In general. If an owner of the patent or the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or (c) on the ground that the patent does not claim either--

(aa) the drug for which the application was approved; or

(bb) an approved method of using the drug.

(II) No independent cause of action. Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).

(iii) No damages. An applicant shall not be entitled to damages in a civil action under clause (i) or a counterclaim under clause (ii).

(D) Forfeiture of 180-day exclusivity period.

(i) Definition of forfeiture event. In this subparagraph, the term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:

(I) Failure to market. The first applicant fails to market the drug by the later of--

(aa) the earlier of the date that is--

(AA) 75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or

(BB) 30 months after the date of submission of the application of the first applicant; or

(bb) with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

(AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

(II) Withdrawal of application. The first applicant withdraws the application or the Secretary considers the application to have been withdrawn as a result of a determination by the Secretary that the application does not meet the requirements for approval under paragraph (4).

(III) Amendment of certification. The first applicant amends or withdraws the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period.

(IV) Failure to obtain tentative approval. The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

(V) Agreement with another applicant, the listed drug application holder, or a patent owner. The first applicant enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV), the Federal Trade Commission or the Attorney General files a complaint, and there is a final decision of the Federal Trade Commission or the court with regard to the complaint from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the agreement has violated the antitrust laws (as defined in section 1 of the Clayton Act (*15 U.S.C. 12*), except that the term includes section 5 of the Federal Trade Commission Act (*15 U.S.C. 45*) to the extent that that section applies to unfair methods of competition).

(VI) Expiration of all patents. All of the patents as to which the applicant submitted a certification qualifying it for the 180-day exclusivity period have expired.

(ii) Forfeiture. The 180-day exclusivity period described in subparagraph (B)(iv) shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant.

(iii) Subsequent applicant. If all first applicants forfeit the 180-day exclusivity period under clause (ii)--

(I) approval of any application containing a certification described in paragraph (2)(A)(vii)(IV) shall be made effective in accordance with subparagraph (B)(iii); and

(II) no applicant shall be eligible for a 180-day exclusivity period.

(E) If the Secretary decides to disapprove an application, the Secretary shall give the applicant notice of an opportunity for a hearing before the Secretary on the question of whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant oth-

erwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(F) (i) If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection [enacted Sept. 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b).

(ii) If an application submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after the date of the enactment of this subsection, no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration of five years from the date of the approval of the application under subsection (b), except that such an application may be submitted under this subsection after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in subclause (IV) of paragraph (2)(A)(vii). The approval of such an application shall be made effective in accordance with subparagraph (B) except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (B)(iii) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(iii) If an application submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b), is approved after the date of enactment of this subsection and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) for such drug.

(iv) If a supplement to an application approved under subsection (b) is approved after the date of enactment of this subsection [enacted Sept. 24, 1984] and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b).

(v) If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection [enacted Sept. 24, 1984], the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from the date of enactment of this subsection [enacted Sept. 24, 1984].

(6) If a drug approved under this subsection refers in its approved application to a drug the approval of which was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under this paragraph or which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons, the approval of the drug under this subsection shall be withdrawn or suspended--

(A) for the same period as the withdrawal or suspension under subsection (e) of this paragraph, or

(B) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

(7) (A) (i) Within sixty days of the date of the enactment of this subsection [enacted Sept. 24, 1984] the Secretary shall publish and make available to the public--

(I) a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness under subsection (c) before the date of the enactment of this subsection [enacted Sept. 24, 1984];

(II) the date of approval if the drug is approved after 1981 and the number of the application which was approved; and

(III) whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection which will refer to the drug published.

(ii) Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list to include each drug which has been approved for safety and effectiveness under subsection (c) or approved under this subsection during the thirty-day period.

(iii) When patent information submitted under subsection (b) or (c) respecting a drug included on the list is to be published by the Secretary, the Secretary shall, in revisions made under clause (ii), include such information for such drug.

(B) A drug approved for safety and effectiveness under subsection (c) or approved under this subsection shall, for purposes of this subsection, be considered to have been published under subparagraph (A) on the date of its approval or the date of enactment [enacted Sept. 24, 1984], whichever is later.

(C) If the approval of a drug was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under paragraph (6) or if the Secretary determines that a drug has been withdrawn from sale for safety or effectiveness reasons, it may not be published in the list under subparagraph (A) or, if the withdrawal or suspension occurred after its publication in such list, it shall be immediately removed from such list--

(i) for the same period as the withdrawal or suspension under subsection (e) or paragraph (6), or

(ii) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

A notice of the removal shall be published in the Federal Register.

(8) For purposes of this subsection:

(A) (i) The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

(ii) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may assess bioavailability by scientifically valid measurements intended to reflect the rate and extent to which the active ingredient or therapeutic ingredient becomes available at the site of drug action.

(B) A drug shall be considered to be bioequivalent to a listed drug if--

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

(C) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

(9) The Secretary shall, with respect to each application submitted under this subsection, maintain a record of--

(A) the name of the applicant,

(B) the name of the drug covered by the application,

(C) the name of each person to whom the review of the chemistry of the application was assigned and the date of such assignment, and

(D) the name of each person to whom the bioequivalence review for such application was assigned and the date of such assignment.

The information the Secretary is required to maintain under this paragraph with respect to an application submitted under this subsection shall be made available to the public after the approval of such application.

(10) (A) If the proposed labeling of a drug that is the subject of an application under this subsection differs from the listed drug due to a labeling revision described under clause (i), the drug that is the subject of such application shall, notwithstanding any other provision of this Act [21 USCS §§ 301 et seq.], be eligible for approval and shall not be considered misbranded under section 502 [21 USCS § 352] if--

(i) the application is otherwise eligible for approval under this subsection but for expiration of patent, an exclusivity period, or of a delay in approval described in paragraph (5)(B)(iii), and a revision to the labeling of the listed drug has been approved by the Secretary within 60 days of such expiration;

(ii) the labeling revision described under clause (i) does not include a change to the "Warnings" section of the labeling;

(iii) the sponsor of the application under this subsection agrees to submit revised labeling of the drug that is the subject of such application not later than 60 days after the notification of any changes to such labeling required by the Secretary; and

(iv) such application otherwise meets the applicable requirements for approval under this subsection.

(B) If, after a labeling revision described in subparagraph (A)(i), the Secretary determines that the continued presence in interstate commerce of the labeling of the listed drug (as in effect before the revision described in subparagraph (A)(ii)) adversely impacts the safe use of the drug, no application under this subsection shall be eligible for approval with such labeling.

(k) Records and reports; required information; regulations and orders; access to records.

(1) In the case of any drug for which an approval of an application filed under subsection (b) or (j) is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, of data relating to clinical experience and other data or information, received or otherwise obtained by such applicant with respect to such drug, as the Secretary may by general regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination, whether there is or may be ground for invoking subsection (e) of this section. Regulations and orders issued under this subsection and under subsection (i) shall have due regard for the professional ethics of the medical profession and the interests of patients and shall provide, where the Secretary deems it to be appropriate, for the examination, upon request, by the persons to whom such regulations or orders are applicable, of similar information received or otherwise obtained by the Secretary.

(2) Every person required under this section to maintain records, and every person in charge or custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

(3) Active postmarket risk identification.

(A) Definition. In this paragraph, the term "data" refers to information with respect to a drug approved under this section or under section 351 of the Public Health Service Act [42 USCS § 262], including claims data, patient survey data, standardized analytic files that allow for the pooling and analysis of data from disparate data environments, and any other data deemed appropriate by the Secretary.

(B) Development of postmarket risk identification and analysis methods. The Secretary shall, not later than 2 years after the date of the enactment of the Food and Drug Administration Amendments Act of 2007 [enacted Sept. 27, 2007], in collaboration with public, academic, and private entities--

(i) develop methods to obtain access to disparate data sources including the data sources specified in subparagraph (C);

(ii) develop validated methods for the establishment of a postmarket risk identification and analysis system to link and analyze safety data from multiple sources, with the goals of including, in aggregate--

(I) at least 25,000,000 patients by July 1, 2010; and

(II) at least 100,000,000 patients by July 1, 2012; and

(iii) convene a committee of experts, including individuals who are recognized in the field of protecting data privacy and security, to make recommendations to the Secretary on the development of tools and methods for the ethical and scientific uses for, and communication of, postmarketing data specified under subparagraph (C), including recommendations on the development of effective research methods for the study of drug safety questions.

(C) Establishment of the postmarket risk identification and analysis system.

(i) In general. The Secretary shall, not later than 1 year after the development of the risk identification and analysis methods under subparagraph (B), establish and maintain procedures--

(I) for risk identification and analysis based on electronic health data, in compliance with the regulations promulgated under section 264(c) of the Health Insurance Portability and Accountability Act of 1996 [42 USCS § 1320d-2 note], and in a manner that does not disclose individually identifiable health information in violation of paragraph (4)(B);

(II) for the reporting (in a standardized form) of data on all serious adverse drug experiences (as defined in section 505-1(b) [21 USCS § 355-1(b)]) submitted to the Secretary under paragraph (1), and those adverse events submitted by patients, providers, and drug sponsors, when appropriate;

(III) to provide for active adverse event surveillance using the following data sources, as available:

(aa) Federal health-related electronic data (such as data from the Medicare program and the health systems of the Department of Veterans Affairs);

(bb) private sector health-related electronic data (such as pharmaceutical purchase data and health insurance claims data); and

(cc) other data as the Secretary deems necessary to create a robust system to identify adverse events and potential drug safety signals;

(IV) to identify certain trends and patterns with respect to data accessed by the system;

(V) to provide regular reports to the Secretary concerning adverse event trends, adverse event patterns, incidence and prevalence of adverse events, and other information the Secretary determines appropriate, which may include data on comparative national adverse event trends; and

(VI) to enable the program to export data in a form appropriate for further aggregation, statistical analysis, and reporting.

(ii) Timeliness of reporting. The procedures established under clause (i) shall ensure that such data are accessed, analyzed, and reported in a timely, routine, and systematic manner, taking into consideration the need for data completeness, coding, cleansing, and standardized analysis and transmission.

(iii) Private sector resources. To ensure the establishment of the active postmarket risk identification and analysis system under this subsection not later than 1 year after the development of the risk identification and analysis methods under subparagraph (B), as required under clause (i), the Secretary may, on a temporary or permanent basis, implement systems or products developed by private entities.

(iv) Complementary approaches. To the extent the active postmarket risk identification and analysis system under this subsection is not sufficient to gather data and information relevant to a priority drug safety question, the Secretary shall develop, support, and participate in complementary approaches to gather and analyze such data and information, including--

(I) approaches that are complementary with respect to assessing the safety of use of a drug in domestic populations not included, or underrepresented, in the trials used to approve the drug (such as older people, people with comorbidities, pregnant women, or children); and

(II) existing approaches such as the Vaccine Adverse Event Reporting System and the Vaccine Safety Datalink or successor databases.

(v) Authority for contracts. The Secretary may enter into contracts with public and private entities to fulfill the requirements of this subparagraph.

(4) Advanced analysis of drug safety data.

(A) Purpose. The Secretary shall establish collaborations with public, academic, and private entities, which may include the Centers for Education and Research on Therapeutics under section 912 of the Public Health Service Act [*42 USCS § 299b-1*], to provide for advanced analysis of drug safety data described in paragraph (3)(C) and other information that is publicly available or is provided by the Secretary, in order to--

(i) improve the quality and efficiency of postmarket drug safety risk-benefit analysis;

(ii) provide the Secretary with routine access to outside expertise to study advanced drug safety questions; and

(iii) enhance the ability of the Secretary to make timely assessments based on drug safety data.

(B) Privacy. Such analysis shall not disclose individually identifiable health information when presenting such drug safety signals and trends or when responding to inquiries regarding such drug safety signals and trends.

(C) Public process for priority questions. At least biannually, the Secretary shall seek recommendations from the Drug Safety and Risk Management Advisory Committee (or any successor committee) and from other advisory committees, as appropriate, to the Food and Drug Administration on--

(i) priority drug safety questions; and

(ii) mechanisms for answering such questions, including through--

(I) active risk identification under paragraph (3); and

(II) when such risk identification is not sufficient, postapproval studies and clinical trials under subsection (o)(3).

(D) Procedures for the development of drug safety collaborations.

(i) In general. Not later than 180 days after the date of the establishment of the active postmarket risk identification and analysis system under this subsection, the Secretary shall establish and implement procedures under which the Secretary may routinely contract with one or more qualified entities to--

(I) classify, analyze, or aggregate data described in paragraph (3)(C) and information that is publicly available or is provided by the Secretary;

(II) allow for prompt investigation of priority drug safety questions, including--

(aa) unresolved safety questions for drugs or classes of drugs; and

(bb) for a newly-approved drugs [drug], safety signals from clinical trials used to approve the drug and other preapproval trials; rare, serious drug side effects; and the safety of use in domestic populations not included, or underrepresented, in the trials used to approve the drug (such as older people, people with comorbidities, pregnant women, or children);

(III) perform advanced research and analysis on identified drug safety risks;

(IV) focus postapproval studies and clinical trials under subsection (o)(3) more effectively on cases for which reports under paragraph (1) and other safety signal detection is not sufficient to resolve whether there is an elevated risk of a serious adverse event associated with the use of a drug; and

(V) carry out other activities as the Secretary deems necessary to carry out the purposes of this paragraph.

(ii) Request for specific methodology. The procedures described in clause (i) shall permit the Secretary to request that a specific methodology be used by the qualified entity. The qualified entity shall work with the Secretary to finalize the methodology to be used.

(E) Use of analyses. The Secretary shall provide the analyses described in this paragraph, including the methods and results of such analyses, about a drug to the sponsor or sponsors of such drug.

(F) Qualified entities.

(i) In general. The Secretary shall enter into contracts with a sufficient number of qualified entities to develop and provide information to the Secretary in a timely manner.

(ii) Qualification. The Secretary shall enter into a contract with an entity under clause (i) only if the Secretary determines that the entity has a significant presence in the United States and has one or more of the following qualifications:

(I) The research, statistical, epidemiologic, or clinical capability and expertise to conduct and complete the activities under this paragraph, including the capability and expertise to provide the Secretary de-identified data consistent with the requirements of this subsection.

(II) An information technology infrastructure in place to support electronic data and operational standards to provide security for such data.

(III) Experience with, and expertise on, the development of drug safety and effectiveness research using electronic population data.

(IV) An understanding of drug development or risk/benefit balancing in a clinical setting.

(V) Other expertise which the Secretary deems necessary to fulfill the activities under this paragraph.

(G) Contract requirements. Each contract with a qualified entity under subparagraph (F)(i) shall contain the following requirements:

(i) Ensuring privacy. The qualified entity shall ensure that the entity will not use data under this subsection in a manner that--

(I) violates the regulations promulgated under section 264(c) of the Health Insurance Portability and Accountability Act of 1996 [*42 USCS § 1320d-2* note];

(II) violates sections 552 or 552a of title 5, United States Code, with regard to the privacy of individually-identifiable beneficiary health information; or

(III) discloses individually identifiable health information when presenting drug safety signals and trends or when responding to inquiries regarding drug safety signals and trends.

Nothing in this clause prohibits lawful disclosure for other purposes.

(ii) Component of another organization. If a qualified entity is a component of another organization--

(I) the qualified entity shall establish appropriate security measures to maintain the confidentiality and privacy of such data; and

(II) the entity shall not make an unauthorized disclosure of such data to the other components of the organization in breach of such confidentiality and privacy requirement.

(iii) Termination or nonrenewal. If a contract with a qualified entity under this subparagraph is terminated or not renewed, the following requirements shall apply:

(I) Confidentiality and privacy protections. The entity shall continue to comply with the confidentiality and privacy requirements under this paragraph with respect to all data disclosed to the entity.

(II) Disposition of data. The entity shall return any data disclosed to such entity under this subsection to which it would not otherwise have access or, if returning the data is not practicable, destroy the data.

(H) Competitive procedures. The Secretary shall use competitive procedures (as defined in section 4(5) of the Federal Procurement Policy Act [Office of Federal Procurement Policy Act] [*41 USCS § 132*]) to enter into contracts under subparagraph (G).

(I) Review of contract in the event of a merger or acquisition. The Secretary shall review the contract with a qualified entity under this paragraph in the event of a merger or acquisition of the entity in order to ensure that the requirements under this paragraph will continue to be met.

(J) Coordination. In carrying out this paragraph, the Secretary shall provide for appropriate communications to the public, scientific, public health, and medical communities, and other key stakeholders, and to the extent practicable shall coordinate with the activities of private entities, professional associations, or other entities that may have sources of drug safety data.

(5) The Secretary shall--

(A) conduct regular, bi-weekly screening of the Adverse Event Reporting System database and post a quarterly report on the Adverse Event Reporting System Web site of any new safety information or potential signal of a serious risk identified by [the] Adverse Event Reporting System within the last quarter;

(B) report to Congress not later than 2 year [years] after the date of the enactment of the Food and Drug Administration Amendments Act of 2007 [enacted Sept. 27, 2007] on procedures and processes of the Food and Drug Administration for addressing ongoing post market safety issues identified by the Office of Surveillance and Epidemiology and how recommendations of the Office of Surveillance and Epidemiology are handled within the agency; and

(C) on an annual basis, review the entire backlog of postmarket safety commitments to determine which commitments require revision or should be eliminated, report to the Congress on these determinations, and assign start dates and estimated completion dates for such commitments.

(l) Public disclosure of safety and effectiveness data and action package.

(1) Safety and effectiveness data and information which has been submitted in an application under subsection (b) for a drug and which has not previously been disclosed to the public shall be made available to the public, upon request, unless extraordinary circumstances are shown--

(A) if no work is being or will be undertaken to have the application approved,

(B) if the Secretary has determined that the application is not approvable and all legal appeals have been exhausted,

(C) if approval of the application under subsection (c) is withdrawn and all legal appeals have been exhausted,

(D) if the Secretary has determined that such drug is not a new drug, or

(E) upon the effective date of the approval of the first application under subsection (j) which refers to such drug or upon the date upon which the approval of an application under subsection (j) which refers to such drug could be made effective if such an application had been submitted.

(2) Action package for approval.

(A) Action package. The Secretary shall publish the action package for approval of an application under subsection (b) or section 351 of the Public Health Service Act [*42 USCS § 262*] on the Internet Web site of the Food and Drug Administration--

(i) not later than 30 days after the date of approval of such application for a drug no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under this section or section 351 of the Public Health Service Act [*42 USCS § 262*]; and

(ii) not later than 30 days after the third request for such action package for approval received under *section 552 of title 5, United States Code*, for any other drug.

(B) Immediate publication of summary review. Notwithstanding subparagraph (A), the Secretary shall publish, on the Internet Web site of the Food and Drug Administration, the materials described in subparagraph (C)(iv) not later than 48 hours after the date of approval of the drug, except where such materials require redaction by the Secretary.

(C) Contents. An action package for approval of an application under subparagraph (A) shall be dated and shall include the following:

(i) Documents generated by the Food and Drug Administration related to review of the application.

(ii) Documents pertaining to the format and content of the application generated during drug development.

(iii) Labeling submitted by the applicant.

(iv) A summary review that documents conclusions from all reviewing disciplines about the drug, noting any critical issues and disagreements with the applicant and within the review team and how they were resolved, recommendations for action, and an explanation of any nonconcurrence with review conclusions.

(v) The Division Director and Office Director's decision document which includes--

(I) a brief statement of concurrence with the summary review;

(II) a separate review or addendum to the review if disagreeing with the summary review; and

(III) a separate review or addendum to the review to add further analysis.

(vi) Identification by name of each officer or employee of the Food and Drug Administration who--

(I) participated in the decision to approve the application; and

(II) consents to have his or her name included in the package.

(D) Review. A scientific review of an application is considered the work of the reviewer and shall not be altered by management or the reviewer once final.

(E) Confidential information. This paragraph does not authorize the disclosure of any trade secret, confidential commercial or financial information, or other matter listed in *section 552(b) of title 5, United States Code*.

(m) "Patent" defined.   For purposes of this section, the term "patent" means a patent issued by the United States Patent and Trademark Office.

(n) Scientific advisory panels.

(1) For the purpose of providing expert scientific advice and recommendations to the Secretary regarding a clinical investigation of a drug or the approval for marketing of a drug under section 505 [this section] or section 351 of the Public Health Service Act [*42 USCS § 262*], the Secretary shall establish panels of experts or use panels of experts established before the date of enactment of the Food and Drug Administration Modernization Act of 1997 [enacted Nov. 21, 1997], or both.

(2) The Secretary may delegate the appointment and oversight authority granted under section 1004 [*21 USCS § 394*] to a director of a center or successor entity within the Food and Drug Administration.

(3) The Secretary shall make appointments to each panel established under paragraph (1) so that each panel shall consist of--

(A) members who are qualified by training and experience to evaluate the safety and effectiveness of the drugs to be referred to the panel and who, to the extent feasible, possess skill and experience in the development, manufacture, or utilization of such drugs;

(B) members with diverse expertise in such fields as clinical and administrative medicine, pharmacy, pharmacology, pharmacoeconomics, biological and physical sciences, and other related professions;

(C) a representative of consumer interests, and a representative of interests of the drug manufacturing industry not directly affected by the matter to be brought before the panel; and

(D) two or more members who are specialists or have other expertise in the particular disease or condition for which the drug under review is proposed to be indicated.

Scientific, trade, and consumer organizations shall be afforded an opportunity to nominate individuals for appointment to the panels. No individual who is in the regular full-time employ of the United States and engaged in the administration of this Act [*21 USCS §§ 301* et seq.] may be a voting member of any panel. The Secretary shall designate one of the members of each panel to serve as chairman thereof.

(4) The Secretary shall, as appropriate, provide education and training to each new panel member before such member participates in a panel's activities, including education regarding requirements under this Act [*21 USCS §§ 301* et seq.] and related regulations of the Secretary, and the administrative processes and procedures related to panel meetings.

(5) Panel members (other than officers or employees of the United States), while attending meetings or conferences of a panel or otherwise engaged in its business, shall be entitled to receive compensation for each day so engaged, including traveltime, at rates to be fixed by the Secretary, but not to exceed the daily equivalent of the rate in effect for positions classified above grade GS-15 of the General Schedule. While serving away from their homes or regular places of business, panel members may be allowed travel expenses (including per diem in lieu of subsistence) as authorized by *section 5703 of title 5, United States Code*, for persons in the Government service employed intermittently.

(6) The Secretary shall ensure that scientific advisory panels meet regularly and at appropriate intervals so that any matter to be reviewed by such a panel can be presented to the panel not more than 60 days after the matter is ready for such review. Meetings of the panel may be held using electronic communication to convene the meetings.

(7) Within 90 days after a scientific advisory panel makes recommendations on any matter under its review, the Food and Drug Administration official responsible for the matter shall review the conclusions and recommendations of the panel, and notify the affected persons of the final decision on the matter, or of the reasons that no such decision has been reached. Each such final decision shall be documented including the rationale for the decision.

(o) Postmarket studies and clinical trials; labeling.

(1) In general. A responsible person may not introduce or deliver for introduction into interstate commerce the new drug involved if the person is in violation of a requirement established under paragraph (3) or (4) with respect to the drug.

(2) Definitions. For purposes of this subsection:

(A) Responsible person. The term "responsible person" means a person who--

(i) has submitted to the Secretary a covered application that is pending; or

(ii) is the holder of an approved covered application.

(B) Covered application. The term "covered application" means--

(i) an application under subsection (b) for a drug that is subject to section 503(b) [*21 USCS § 353(b)*]; and

(ii) an application under section 351 of the Public Health Service Act [*42 USCS § 262*].

(C) New safety information; serious risk. The terms "new safety information", "serious risk", and "signal of a serious risk" have the meanings given such terms in section 505-1(b) [*21 USCS § 355-1(b)*].

(3) Studies and clinical trials.

(A) In general. For any or all of the purposes specified in subparagraph (B), the Secretary may, subject to subparagraph (D), require a responsible person for a drug to conduct a postapproval study or studies of the drug, or a postapproval clinical trial or trials of the drug, on the basis of scientific data deemed appropriate by the Secretary, including information regarding chemically-related or pharmacologically-related drugs.

(B) Purposes of study or clinical trial. The purposes referred to in this subparagraph with respect to a postapproval study or postapproval clinical trial are the following:

(i) To assess a known serious risk related to the use of the drug involved.

(ii) To assess signals of serious risk related to the use of the drug.

(iii) To identify an unexpected serious risk when available data indicates the potential for a serious risk.

(C) Establishment of requirement after approval of covered application. The Secretary may require a postapproval study or studies or postapproval clinical trial or trials for a drug for which an approved covered application is in effect as of the date on which the Secretary seeks to establish such requirement only if the Secretary becomes aware of new safety information.

(D) Determination by Secretary.

(i) Postapproval studies. The Secretary may not require the responsible person to conduct a study under this paragraph, unless the Secretary makes a determination that the reports under subsection (k)(1) and the active postmarket risk identification and analysis system as available under subsection (k)(3) will not be sufficient to meet the purposes set forth in subparagraph (B).

(ii) Postapproval clinical trials. The Secretary may not require the responsible person to conduct a clinical trial under this paragraph, unless the Secretary makes a determination that a postapproval study or studies will not be sufficient to meet the purposes set forth in subparagraph (B).

(E) Notification; timetables; periodic reports.

(i) Notification. The Secretary shall notify the responsible person regarding a requirement under this paragraph to conduct a postapproval study or clinical trial by the target dates for communication of feedback from the review team to the responsible person regarding proposed labeling and postmarketing study commitments as set forth in the letters described in section 101(c) of the Food and Drug Administration Amendments Act of 2007 [*21 USCS § 379g* note].

(ii) Timetable; periodic reports. For each study or clinical trial required to be conducted under this paragraph, the Secretary shall require that the responsible person submit a timetable for completion of the study or clinical trial. With respect to each study required to be conducted under this paragraph or otherwise undertaken by the responsible person to investigate a safety issue, the Secretary shall require the responsible person to periodically report to the Secretary on the status of such study including whether any difficulties in completing the study have been encountered. With respect to each clinical trial required to be conducted under this paragraph or otherwise undertaken by the responsible person to investigate a safety issue, the Secretary shall require the responsible person to periodically report to the Secretary on the status of such clinical trial including whether enrollment has begun, the number of participants enrolled, the expected completion date, whether any difficulties completing the clinical trial have been encountered, and registration information with respect to the requirements under section 402(j) of the Public Health Service Act [*42 USCS § 282(j)*]. If the responsible person fails to comply with such timetable or violates any other requirement of this subparagraph, the responsible person shall be considered in violation of this subsection, unless the responsible person demonstrates good cause for such noncompliance or such other violation. The Secretary shall determine what constitutes good cause under the preceding sentence.

(F) Dispute resolution. The responsible person may appeal a requirement to conduct a study or clinical trial under this paragraph using dispute resolution procedures established by the Secretary in regulation and guidance.

(4) Safety labeling changes requested by Secretary.

(A) New safety information. If the Secretary becomes aware of new safety information that the Secretary believes should be included in the labeling of the drug, the Secretary shall promptly notify the responsible person or, if the same

drug approved under section 505(b) [subsec. (b) of this section] is not currently marketed, the holder of an approved application under 505(j) [subsec. (j) of this section].

(B) Response to notification. Following notification pursuant to subparagraph (A), the responsible person or the holder of the approved application under section 505(j) [subsec. (j) of this section] shall within 30 days--

(i) submit a supplement proposing changes to the approved labeling to reflect the new safety information, including changes to boxed warnings, contraindications, warnings, precautions, or adverse reactions; or

(ii) notify the Secretary that the responsible person or the holder of the approved application under section 505(j) [subsec. (j) of this section] does not believe a labeling change is warranted and submit a statement detailing the reasons why such a change is not warranted.

(C) Review. Upon receipt of such supplement, the Secretary shall promptly review and act upon such supplement. If the Secretary disagrees with the proposed changes in the supplement or with the statement setting forth the reasons why no labeling change is necessary, the Secretary shall initiate discussions to reach agreement on whether the labeling for the drug should be modified to reflect the new safety information, and if so, the contents of such labeling changes.

(D) Discussions. Such discussions shall not extend for more than 30 days after the response to the notification under subparagraph (B), unless the Secretary determines an extension of such discussion period is warranted.

(E) Order. Within 15 days of the conclusion of the discussions under subparagraph (D), the Secretary may issue an order directing the responsible person or the holder of the approved application under section 505(j) [subsec. (j) of this section] to make such a labeling change as the Secretary deems appropriate to address the new safety information. Within 15 days of such an order, the responsible person or the holder of the approved application under section 505(j) [subsec. (j) of this section] shall submit a supplement containing the labeling change.

(F) Dispute resolution. Within 5 days of receiving an order under subparagraph (E), the responsible person or the holder of the approved application under section 505(j) may appeal using dispute resolution procedures established by the Secretary in regulation and guidance.

(G) Violation. If the responsible person or the holder of the approved application under section 505(j) [subsec. (j) of this section] has not submitted a supplement within 15 days of the date of such order under subparagraph (E), and there is no appeal or dispute resolution proceeding pending, the responsible person or holder shall be considered to be in violation of this subsection. If at the conclusion of any dispute resolution procedures the Secretary determines that a supplement must be submitted and such a supplement is not submitted within 15 days of the date of that determination, the responsible person or holder shall be in violation of this subsection.

(H) Public health threat. Notwithstanding subparagraphs (A) through (F), if the Secretary concludes that such a labeling change is necessary to protect the public health, the Secretary may accelerate the timelines in such subparagraphs.

(I) Rule of construction. This paragraph shall not be construed to affect the responsibility of the responsible person or the holder of the approved application under section 505(j) [subsec. (j) of this section] to maintain its label in accordance with existing requirements, including subpart B of part 201 and *sections 314.70* and *601.12 of title 21, Code of Federal* Regulations (or any successor regulations).

(5) Non-delegation. Determinations by the Secretary under this subsection for a drug shall be made by individuals at or above the level of individuals empowered to approve a drug (such as division directors within the Center for Drug Evaluation and Research).

(p) Risk evaluation and mitigation strategy.

(1) In general. A person may not introduce or deliver for introduction into interstate commerce a new drug if--

(A) (i) the application for such drug is approved under subsection (b) or (j) and is subject to section 503(b) [*21 USCS § 353(b)*]; or

(ii) the application for such drug is approved under section 351 of the Public Health Service Act [*42 USCS § 262*]; and

(B) a risk evaluation and mitigation strategy is required under section 505-1 [*21 USCS § 355-1*] with respect to the drug and the person fails to maintain compliance with the requirements of the approved strategy or with other requirements under section 505-1 [*21 USCS § 355-1*], including requirements regarding assessments of approved strategies.

(2) Certain postmarket studies. The failure to conduct a postmarket study under section 506 [*21 USCS § 356*], subpart H of part 314, or subpart E of part 601 of title 21, Code of Federal Regulations (or any successor regulations), is deemed to be a violation of paragraph (1).

(q) Petitions and civil actions regarding approval of certain applications.

(1) In general.

(A) Determination. The Secretary shall not delay approval of a pending application submitted under subsection (b)(2) or (j) of this section or section 351(k) of the Public Health Service Act [*42 USCS § 262(k)*] because of any request to take any form of action relating to the application, either before or during consideration of the request, unless--

(i) the request is in writing and is a petition submitted to the Secretary pursuant to *section 10.30* or *10.35 of title 21, Code of Federal R*egulations (or any successor regulations); and

(ii) the Secretary determines, upon reviewing the petition, that a delay is necessary to protect the public health. Consideration of the petition shall be separate and apart from review and approval of any application.

(B) Notification. If the Secretary determines under subparagraph (A) that a delay is necessary with respect to an application, the Secretary shall provide to the applicant, not later than 30 days after making such determination, the following information:

(i) Notification of the fact that a determination under subparagraph (A) has been made.

(ii) If applicable, any clarification or additional data that the applicant should submit to the docket on the petition to allow the Secretary to review the petition promptly.

(iii) A brief summary of the specific substantive issues raised in the petition which form the basis of the determination.

(C) Format. The information described in subparagraph (B) shall be conveyed via either, at the discretion of the Secretary--

(i) a document; or

(ii) a meeting with the applicant involved.

(D) Public disclosure. Any information conveyed by the Secretary under subparagraph (C) shall be considered part of the application and shall be subject to the disclosure requirements applicable to information in such application.

(E) Denial based on intent to delay. If the Secretary determines that a petition or a supplement to the petition was submitted with the primary purpose of delaying the approval of an application and the petition does not on its face raise valid scientific or regulatory issues, the Secretary may deny the petition at any point based on such determination. The Secretary may issue guidance to describe the factors that will be used to determine under this subparagraph whether a petition is submitted with the primary purpose of delaying the approval of an application.

(F) Final agency action. The Secretary shall take final agency action on a petition not later than 150 days after the date on which the petition is submitted. The Secretary shall not extend such period for any reason, including--

(i) any determination made under subparagraph (A);

(ii) the submission of comments relating to the petition or supplemental information supplied by the petitioner; or

(iii) the consent of the petitioner.

(G) Extension of 30-month period. If the filing of an application resulted in first-applicant status under subsection (j)(5)(D)(i)(IV) and approval of the application was delayed because of a petition, the 30-month period under such subsection is deemed to be extended by a period of time equal to the period beginning on the date on which the Secretary received the petition and ending on the date of final agency action on the petition (inclusive of such beginning and ending dates), without regard to whether the Secretary grants, in whole or in part, or denies, in whole or in part, the petition.

(H) Certification. The Secretary shall not consider a petition for review unless the party submitting such petition does so in written form and the subject document is signed and contains the following certification: 'I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date: _____. If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: _____. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.', with the date on which such information first became known to such party and the names of such persons or organizations inserted in the first and second blank space, respectively.

(I) Verification. The Secretary shall not accept for review any supplemental information or comments on a petition unless the party submitting such information or comments does so in written form and the subject document is signed and contains the following verification: 'I certify that, to my best knowledge and belief: (a) I have not intentionally delayed submission of this document or its contents; and (b) the information upon which I have based the action requested herein first became known to me on or about _____. If I received or expect to receive payments,

including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: _____. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.', with the date on which such information first became known to the party and the names of such persons or organizations inserted in the first and second blank space, respectively.

(2) Exhaustion of administrative remedies.

(A) Final agency action within 150 days. The Secretary shall be considered to have taken final agency action on a petition if--

(i) during the 150-day period referred to in paragraph (1)(F), the Secretary makes a final decision within the meaning of *section 10.45(d) of title 21, Code of Federal R*egulations (or any successor regulation); or

(ii) such period expires without the Secretary having made such a final decision.

(B) Dismissal of certain civil actions. If a civil action is filed against the Secretary with respect to any issue raised in the petition before the Secretary has taken final agency action on the petition within the meaning of subparagraph (A), the court shall dismiss without prejudice the action for failure to exhaust administrative remedies.

(C) Administrative record. For purposes of judicial review related to the approval of an application for which a petition under paragraph (1) was submitted, the administrative record regarding any issue raised by the petition shall include--

(i) the petition filed under paragraph (1) and any supplements and comments thereto;

(ii) the Secretary's response to such petition, if issued; and

(iii) other information, as designated by the Secretary, related to the Secretary's determinations regarding the issues raised in such petition, as long as the information was considered by the agency no later than the date of final agency action as defined under subparagraph (2)(A), and regardless of whether the Secretary responded to the petition at or before the approval of the application at issue in the petition.

(3) Annual report on delays in approvals per petitions. The Secretary shall annually submit to the Congress a report that specifies--

(A) the number of applications that were approved during the preceding 12-month period;

(B) the number of such applications whose effective dates were delayed by petitions referred to in paragraph (1) during such period;

(C) the number of days by which such applications were so delayed; and

(D) the number of such petitions that were submitted during such period.

(4) Exceptions.

(A) This subsection does not apply to--

(i) a petition that relates solely to the timing of the approval of an application pursuant to subsection (j)(5)(B)(iv); or

(ii) a petition that is made by the sponsor of an application and that seeks only to have the Secretary take or refrain from taking any form of action with respect to that application.

(B) Paragraph (2) does not apply to a petition addressing issues concerning an application submitted pursuant to section 351(k) of the Public Health Service Act [*42 USCS § 262(k)*].

(5) Definitions.

(A) Application. For purposes of this subsection, the term "application" means an application submitted under subsection (b)(2) or (j) of this section or section 351(k) of the Public Health Service Act [*42 USCS § 262(k)*].

(B) Petition. For purposes of this subsection, other than paragraph (1)(A)(i), the term "petition" means a request described in paragraph (1)(A)(i).


(r) Postmarket drug safety information for patients and providers.

(1) Establishment. Not later than 1 year after the date of the enactment of the Food and Drug Administration Amendments Act of 2007 [enacted Sept. 27, 2007], the Secretary shall improve the transparency of information about drugs and allow patients and health care providers better access to information about drugs by developing and maintaining an Internet Web site that--

(A) provides links to drug safety information listed in paragraph (2) for prescription drugs that are approved under this section or licensed under section 351 of the Public Health Service Act [*42 USCS § 262*]; and

(B) improves communication of drug safety information to patients and providers.

(2) Internet web site. The Secretary shall carry out paragraph (1) by--

(A) developing and maintaining an accessible, consolidated Internet Web site with easily searchable drug safety information, including the information found on United States Government Internet Web sites, such as the United States

National Library of Medicine's Daily Med and Medline Plus Web sites, in addition to other such Web sites maintained by the Secretary;

(B) ensuring that the information provided on the Internet Web site is comprehensive and includes, when available and appropriate--

(i) patient labeling and patient packaging inserts;

(ii) a link to a list of each drug, whether approved under this section or licensed under such section 351 [*42 USCS § 262*], for which a Medication Guide, as provided for under part 208 of title 21, Code of Federal Regulations (or any successor regulations), is required;

(iii) a link to the registry and results data bank provided for under subsections (i) and (j) of section 402 of the Public Health Service Act [*42 USCS § 282*];

(iv) the most recent safety information and alerts issued by the Food and Drug Administration for drugs approved by the Secretary under this section, such as product recalls, warning letters, and import alerts;

(v) publicly available information about implemented RiskMAPs and risk evaluation and mitigation strategies under subsection (o);

(vi) guidance documents and regulations related to drug safety; and

(vii) other material determined appropriate by the Secretary;

(C) providing access to summaries of the assessed and aggregated data collected from the active surveillance infrastructure under subsection (k)(3) to provide information of known and serious side-effects for drugs approved under this section or licensed under such section 351 [*42 USCS § 262*];

(D) preparing, by 18 months after approval of a drug or after use of the drug by 10,000 individuals, whichever is later, a summary analysis of the adverse drug reaction reports received for the drug, including identification of any new risks not previously identified, potential new risks, or known risks reported in unusual number;

(E) enabling patients, providers, and drug sponsors to submit adverse event reports through the Internet Web site;

(F) providing educational materials for patients and providers about the appropriate means of disposing of expired, damaged, or unusable medications; and

(G) supporting initiatives that the Secretary determines to be useful to fulfill the purposes of the Internet Web site.

(3) Posting of drug labeling. The Secretary shall post on the Internet Web site established under paragraph (1) the approved professional labeling and any required patient labeling of a drug approved under this section or licensed under such section 351 [*42 USCS § 262*] not later than 21 days after the date the drug is approved or licensed, including in a supplemental application with respect to a labeling change.

(4) Private sector resources. To ensure development of the Internet Web site by the date described in paragraph (1), the Secretary may, on a temporary or permanent basis, implement systems or products developed by private entities.

(5) Authority for contracts. The Secretary may enter into contracts with public and private entities to fulfill the requirements of this subsection.

(6) Review. The Advisory Committee on Risk Communication under section 567 [*21 USCS § 360bbb-6*] shall, on a regular basis, perform a comprehensive review and evaluation of the types of risk communication information provided on the Internet Web site established under paragraph (1) and, through other means, shall identify, clarify, and define the purposes and types of information available to facilitate the efficient flow of information to patients and providers, and shall recommend ways for the Food and Drug Administration to work with outside entities to help facilitate the dispensing of risk communication information to patients and providers.

(s) Referral to advisory committee.   Prior to the approval of a drug no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under this section or section 351 of the Public Health Service Act [*42 USCS § 262*], the Secretary shall--

(1) refer such drug to a Food and Drug Administration advisory committee for review at a meeting of such advisory committee; or

(2) if the Secretary does not refer such a drug to a Food and Drug Administration advisory committee prior to the approval of the drug, provide in the action letter on the application for the drug a summary of the reasons why the Secretary did not refer the drug to an advisory committee prior to approval.

(t) Database for authorized generic drugs.

(1) In general.

(A) Publication. The Commissioner shall--

(i) not later than 9 months after the date of the enactment of the Food and Drug Administration Amendments Act of 2007 [enacted Sept. 27, 2007], publish a complete list on the Internet Web site of the Food and Drug Administra-

tion of all authorized generic drugs (including drug trade name, brand company manufacturer, and the date the authorized generic drug entered the market); and

　　　(ii) update the list quarterly to include each authorized generic drug included in an annual report submitted to the Secretary by the sponsor of a listed drug during the preceding 3-month period.

　　(B) Notification. The Commissioner shall notify relevant Federal agencies, including the Centers for Medicare & Medicaid Services and the Federal Trade Commission, when the Commissioner first publishes the information described in subparagraph (A) that the information has been published and that the information will be updated quarterly.

　(2) Inclusion. The Commissioner shall include in the list described in paragraph (1) each authorized generic drug included in an annual report submitted to the Secretary by the sponsor of a listed drug after January 1, 1999.

　(3) Authorized generic drug. In this section, the term "authorized generic drug" means a listed drug (as that term is used in subsection (jj)) that--

　　(A) has been approved under subsection (c); and

　　(B) is marketed, sold, or distributed directly or indirectly to retail class of trade under a different labeling, packaging (other than repackaging as the listed drug in blister packs, unit doses, or similar packaging for use in institutions), product code, labeler code, trade name, or trade mark than the listed drug.

(u) Certain drugs containing single enantiomers.

　(1) In general. For purposes of subsections (c)(3)(E)(ii) and (jj)(5)(F)(ii), if an application is submitted under subsection (b) for a non-racemic drug containing as an active ingredient (including any ester or salt of the active ingredient) a single enantiomer that is contained in a racemic drug approved in another application under subsection (b), the applicant may, in the application for such non-racemic drug, elect to have the single enantiomer not be considered the same active ingredient as that contained in the approved racemic drug, if--

　　(A)

　　　(i) the single enantiomer has not been previously approved except in the approved racemic drug; and

　　　(ii) the application submitted under subsection (b) for such non-racemic drug--

　　　　(I) includes full reports of new clinical investigations (other than bioavailability studies)--

　　　　　(aa) necessary for the approval of the application under subsections (c) and (d); and

　　　　　(bb) conducted or sponsored by the applicant; and

　　　　(II) does not rely on any clinical investigations that are part of an application submitted under subsection (b) for approval of the approved racemic drug; and

　　(B) the application submitted under subsection (b) for such non-racemic drug is not submitted for approval of a condition of use--

　　　(i) in a therapeutic category in which the approved racemic drug has been approved; or

　　　(ii) for which any other enantiomer of the racemic drug has been approved.

　(2) Limitation.

　　(A) No approval in certain therapeutic categories. Until the date that is 10 years after the date of approval of a non-racemic drug described in paragraph (1) and with respect to which the applicant has made the election provided for by such paragraph, the Secretary shall not approve such non-racemic drug for any condition of use in the therapeutic category in which the racemic drug has been approved.

　　(B) Labeling. If applicable, the labeling of a non-racemic drug described in paragraph (1) and with respect to which the applicant has made the election provided for by such paragraph shall include a statement that the non-racemic drug is not approved, and has not been shown to be safe and effective, for any condition of use of the racemic drug.

　(3) Definition.

　　(A) In general. For purposes of this subsection, the term "therapeutic category" means a therapeutic category identified in the list developed by the United States Pharmacopeia pursuant to section 1860D-4(b)(3)(C)(ii) of the Social Security Act [*42 USCS § 1395w-104(b)(3)(C)(ii)*] and as in effect on the date of the enactment of this subsection [enacted Sept. 27, 2007].

　　(B) Publication by Secretary. The Secretary shall publish the list described in subparagraph (A) and may amend such list by regulation.

　(4) Availability. The election referred to in paragraph (1) may be made only in an application that is submitted to the Secretary after the date of the enactment of this subsection [enacted Sept. 27, 2007] and before October 1, 2017.

(v) Antibiotic drugs submitted before November 21, 1997.

　(1) Antibiotic drugs approved before November 21, 1997.

(A) In general. Notwithstanding any provision of the Food and Drug Administration Modernization Act of 1997 or any other provision of law, a sponsor of a drug that is the subject of an application described in subparagraph (B)(i) shall be eligible for, with respect to the drug, the 3-year exclusivity period referred to under clauses (iii) and (iv) of subsection (c)(3)(E) and under clauses (iii) and (iv) of subsection (j)(5)(F), subject to the requirements of such clauses, as applicable.

(B) Application; antibiotic drug described.

(i) Application. An application described in this clause is an application for marketing submitted under this section after the date of the enactment of this subsection in which the drug that is the subject of the application contains an antibiotic drug described in clause (ii).

(ii) Antibiotic drug. An antibiotic drug described in this clause is an antibiotic drug that was the subject of an application approved by the Secretary under section 507 of this Act [former *21 USCS § 357*] (as in effect before November 21, 1997).

(2) Antibiotic drugs submitted before November 21, 1997, but not approved.

(A) In general. Notwithstanding any provision of the Food and Drug Administration Modernization Act of 1997 or any other provision of law, a sponsor of a drug that is the subject of an application described in subparagraph (B)(i) may elect to be eligible for, with respect to the drug--

(i) (I) the 3-year exclusivity period referred to under clauses (iii) and (iv) of subsection (c)(3)(E) and under clauses (iii) and (iv) of subsection (j)(5)(F), subject to the requirements of such clauses, as applicable; and

(II) the 5-year exclusivity period referred to under clause (ii) of subsection (c)(3)(E) and under clause (ii) of subsection (j)(5)(F), subject to the requirements of such clauses, as applicable; or

(ii) a patent term extension under *section 156 of title 35, United States Code*, subject to the requirements of such section.

(B) Application; antibiotic drug described.

(i) Application. An application described in this clause is an application for marketing submitted under this section after the date of the enactment of this subsection in which the drug that is the subject of the application contains an antibiotic drug described in clause (ii).

(ii) Antibiotic drug. An antibiotic drug described in this clause is an antibiotic drug that was the subject of 1 or more applications received by the Secretary under section 507 of this Act [former *21 USCS § 357*] (as in effect before November 21, 1997), none of which was approved by the Secretary under such section.

(3) Limitations.

(A) Exclusivities and extensions. Paragraphs (1)(A) and (2)(A) shall not be construed to entitle a drug that is the subject of an approved application described in subparagraphs [subparagraph] (1)(B)(i) or (2)(B)(i), as applicable, to any market exclusivities or patent extensions other than those exclusivities or extensions described in paragraph (1)(A) or (2)(A).

(B) Conditions of use. Paragraphs (1)(A) and (2)(A)(i) shall not apply to any condition of use for which the drug referred to in subparagraph (1)(B)(i) or (2)(B)(i), as applicable, was approved before the date of the enactment of this subsection.

(4) Application of certain provisions. Notwithstanding section 125, or any other provision, of the Food and Drug Administration Modernization Act of 1997, or any other provision of law, and subject to the limitations in paragraphs (1), (2), and (3), the provisions of the shall apply to any drug subject to paragraph (1) or any drug with respect to which an election is made under paragraph (2)(A).

(w) Deadline for determination on certain petitions.   The Secretary shall issue a final, substantive determination on a petition submitted pursuant to subsection (b) of *section 314.161 of title 21, Code of Federal R*egulations (or any successor regulations), no later than 270 days after the date the petition is submitted.

**HISTORY:**

(June 25, 1938, ch 675, Ch. V, Subch A, § 505, 52 Stat. 1052; June 11, 1960, P.L. 86-507, § 1(18), 74 Stat. 201; Oct. 10, 1962, P.L. 87-781, Title I, Part A, §§ 102(b)-(d), 103(a), (b), 104(a)-(d)(2), 76 Stat. 781-783, 784, 785; Aug. 16, 1972, P.L. 92-387, § 4(d), 86 Stat. 562; Jan. 4, 1983, P.L. 97-414, § 2(b), 96 Stat. 2051; Sept. 24, 1984, P.L. 98-417, Title I, §§ 101, 102(a), (b)(1)-(5), 103, 104, 98 Stat. 1585, 1592, 1593, 1597; May 13, 1992, P.L. 102-282, § 5, 106 Stat. 161; Aug. 13, 1993, P.L. 103-80, § 3(n), 107 Stat. 777; Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, §§ 115, 117, 119, 120, 124(a), 111 Stat. 2313, 2315-2318, 2324; Nov. 29, 1999, P.L. 106-113, Div B, § 1000(a)(9), 113 Stat. 1536; Jan. 4, 2002, P.L. 107-109, § 15(c)(1), 115 Stat. 1420; Dec. 3, 2003, P.L. 108-155, § 2(b)(1), 117 Stat. 1941; Dec. 8, 2003, P.L. 108-173, Title XI, Subtitle A, §§ 1101(a), (b), 1102(a), 1103(a), 117 Stat. 2448, 2457, 2460; Sept. 27, 2007,

P.L. 110-85, Title VII, § 701(b), Title VIII, § 801(b)(3)(A), (B), Title IX, Subtitle A, §§ 901(a), 903, 905(a), Subtitle B, §§ 914(a), 915, 916, 918, 920, 921, Title XI, Subtitle B, § 1113, 121 Stat. 903, 921, 922, 943, 944, 953, 957, 960, 961, 976; Aug. 14, 2008, P.L. 110-316, Title III, § 301, 122 Stat. 3524; Oct. 8, 2008, P.L. 110-379, § 4(a), 122 Stat. 4076; June 22, 2009, P.L. 111-31, Div A, Title I, § 103(e), 123 Stat. 1837; March 23, 2010, P.L. 111-148, Title VII, Subtitle A, § 7002(d)(1), Title X, Subtitle F, § 10609, 124 Stat. 816, 1014.)

(As amended July 9, 2012, P.L. 112-144, Title IX, § 905, Title XI, Subtitle A, § 1101, Subtitle C, §§ 1134(a), 1135, 126 Stat. 1092, 1108, 1123; March 13, 2013, P.L. 113-5, Title III, § 301, 127 Stat. 179.)

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

References in text:

As used in subpara. (D) of subsec. (c)(3), the "date of the enactment of this subsection", probably refers to September 24, 1984, which is the date of enactment of such subparagraph.

For information as to the rate for "positions classified above grade GS-15 of the General Schedule", see *5 USCS § 5332* note.

The "Drug Price Competition and Patent Term Restoration Act of 1984", referred to in subsec. (v)(4), is Act Sept. 24, 1984, P.L. 98-417. For full classification of such Act, consult USCS Tables volumes.

The "Food and Drug Administration Modernization Act of 1997", referred to in subsec. (v), is Act Nov. 21, 1997, P.L. 105-115. For full classification of such Act, consult USCS Tables volumes.

"Section 125 . . . of the Food and Drug Administration Modernization Act of 1997", referred to in subsec. (v)(4), is § 125 of Act Nov. 21, 1997, P.L. 105-115. For full classification of such section, consult USCS Tables volumes.

Explanatory notes:

The bracketed word "bioavailability" has been inserted in subsec. (c)(3)(E)(iv) to indicate the spelling probably intended by Congress.

The bracketed word "drug" has been inserted in subsec. (k)(4)(D)(i)(II)(bb) to indicate the word probably intended by Congress.

"Office of Federal Procurement Policy Act" has been inserted in brackets in subsec. (k)(4)(H) to indicate the Act probably intended by Congress.

In subsec. (k)(4)(H), "*41 USCS § 132*" has been inserted in brackets pursuant to § 6(c) of Act Jan. 4, 2011, P.L. 111-350, which appears as a note preceding *41 USCS § 101*. Section 3 of such Act enacted Title 41 as positive law, and and § 6(c) of such Act provided that a reference to a law replaced by such Act is deemed to refer to the corresponding provision enacted by such Act.

The bracketed word "the" has been inserted in subsec. (k)(5)(A) to indicate the probable intent of Congress to include it.

The bracketed word "years" has been inserted in subsec. (k)(5)(B) as the word probably intended by Congress.

The bracketed word "subparagraph" has been inserted in subsec. (v)(3)(A) to indicate the word probably intended by Congress.

The amendment made by § 1000(a)(9) of Act Nov. 29, 1999, P.L. 106-113, is based on § 4732(b)(11) of Chapter 2 of Subtitle G of Title IV of S. 1948 (113 Stat. 1501A-584), as introduced on Nov. 17, 1999, which was enacted into law by such § 1000(a)(9).

Effective date of section:

For the effective date of this section, see *21 USCS § 301* notes.

Amendments:

1960. Act June 11, 1960, in subsec. (g), inserted "or by certified mail".

1962. Act Oct. 10, 1962 (effective on the first day of the seventh calendar month following enactment, as provided by § 107 of such Act, which appears as *21 USCS § 321* note), in subsec. (a), inserted "an approval of"; in subsec. (b)(1), inserted "and whether such drug is effective in use"; substituted subsec. (c) for one which read: "An application provided for in subsection (b) shall become effective on the sixtieth day after the filing thereof unless prior to such day the Secretary by notice to the applicant in writing postpones the effective date of the application to such time (not more than one hundred and eighty days after the filing thereof) as the Secretary deems necessary to enable him to study and investigate the application."; substituted subsec. (d) for one which read: "If the Secretary finds, after due notice to the applicant and giving him an opportunity for a hearing, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b), do not include adequate test by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; or (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions, he shall, prior to the effective date of the application issue an order refusing to permit the application to become effective."; substituted subsec. (e) for one which read: "The effectiveness of an application with respect to any drug shall, after due notice and opportunity for hearing to the applicant, by order of the Secretary be suspended if the Secretary finds (1) that clinical experience, tests by new methods, or tests by methods not deemed reasonably applicable when such application became effective show that such drug is unsafe for use under the conditions of use upon the basis of which the application became effective, or (2) that the application contains any untrue statement of a material fact. The order shall state the findings upon which it is based."; substituted subsec. (f) for one which read: "An order refusing to permit an application with respect to any drug to become effective shall be revoked whenever the Secretary finds that the facts so require."; in subsec. (h), substituted "An appeal may be taken by the applicant from an order of the Secretary refusing or withdrawing approval of an application under this section. Such appeal shall be taken by filing in the United States court of appeals for the circuit wherein such applicant resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a written petition praying that the order of the Secretary be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Secretary, or any officer designated by him for that purpose, and thereupon the Secretary shall certify and file in the court the record upon which the order complained of was entered, as provided in *section 2112 of title 28, United States Code.* Upon the filing of such petition such court shall have exclusive jurisdiction to affirm or set aside such order, except that until the filing of the record the Secretary may modify or set aside his order." for "An appeal may be taken by the applicant from an order of the Secretary refusing to permit the application to become effective, or suspending the effectiveness of the application. Such appeal shall be taken by filing in the district court of the United States within any district wherein such applicant resides or has his principal place of business, or in the District Court of the United States for the District of Columbia, within sixty days after the entry of such order, a written petition praying that the order of the Secretary be set aside. A copy of such petition shall be forthwith served upon the Secretary, or upon any officer designated by him for that purpose, and thereupon the Secretary shall certify and file in the court a transcript of the record upon which the order complained of was entered. Upon the filing of such transcript such court shall have exclusive jurisdiction to affirm or set aside such order." and substituted "The judgment of the court affirming or setting aside any such order of the Secretary shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in *section 1254 of title 28 of the United States Code.*" for "The judgment and decree of the court affirming or setting aside any such order of the Secretary shall be final, subject to review as provided in sections 128, 239, and 240 of the Judicial Code, as amended, and in section 7, as amended, of the Act entitled 'An Act to establish a Court of Appeals for the District of Columbia,' approved February 9, 1893 (D. C. Code, title 18, sec. 26)."; in subsec. (i), inserted "the foregoing subsections of" and "and effectiveness", and added the sentence beginning "Such regulations may . . ." and added the concluding matter; and added subsec. (j).

1972. Act Aug. 16, 1972 (effective on the first day of the sixth month beginning after enactment on Aug. 16, 1972, as provided by § 5 of such Act, which appears as *21 USCS § 360* note), in subsec. (e), inserted "or to comply with the notice requirements of section 510(j)(2)".

1984. Act Sept. 24, 1984, in subsec. (a), inserted "or (j)"; in subsec. (b), designated the existing matter as para. (1), and redesignated former cls. (1)-(6) as cls. (A)-(F) respectively, inserted the concluding matter which begins "The applicant shall file . . .", and added paras. (2) and (3); in subsec. (c), designated the existing matter as para. (1) and in para. (1), as redesignated, subtitled "subsection (b)" for "this subsection", redesignated former paras. (1) and (2) as subparas. (A) and (B) respectively, and added paras. (2) and (3); in subsec. (d), redesignated cl. (6) as cl. (7), and added a new cl. (6); in subsec. (e), inserted "submitted under section (b) or (j)", redesignated cl. (4) as cl. (5), and added a new cl. (4), in cl. (5) as so redesignated, substituted "(k)" for "(j)" wherever appearing; redesignated subsec. (j) as subsec. (k), and added a new subsec. (j); in subsec. (k) as so redesignated, substituted "under subsection (b) or (j)" for "pursuant to this section"; and added subsecs. (l) and (m).

1992. Act May 13, 1992, in subsec. (j), added para. (8).

1993. Act Aug. 13, 1993, in subsec. (j)(6)(A), in cl. (ii), substituted "Secretary" for "Secretry" and, in cl. (iii), inserted a comma after "Secretary"; and, in subsec. (k)(1), substituted ". Regulations" for ": *Provided, however,* That regulations".

1997. Act Nov. 21, 1997 (effective 90 days after enactment, as provided by § 501 of such Act, which appears as *21 USCS § 321* note), in subsec. (b), in para. (1), added the sentence beginning "The Secretary shall, in consultation . . .", and added para. (4); in subsec. (c), added para. (4); and, in subsec. (d), added the sentence beginning "If the Secretary determines, based . . ."; in subsec. (i), redesignated paras. (1)-(3) as subparas. (A)-(C), respectively, designated the introductory matter as para. (1), deleted the concluding matter, which read: "Such regulations shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation, requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where they deem it not feasible or, in their professional judgment, contrary to the best interests of such human beings. Nothing in this subsection shall be construed to require any clinical investigator to submit directly to the Secretary reports on the investigational use of drugs.", and added paras. (2)-(4); in subsec. (j), in para. (2)(A)(i), substituted "(7)" for "(6)", redesignated paras. (3)-(8) as paras. (4)-(9), respectively, added new para. (3), in para. (4) as redesignated, in the introductory matter, substituted "(5)" for "(4)" and, in subpara. (I), substituted "(6)" for "(5)" and, in para. (7)(C) as redesignated, substituted "(6)" for "(5)" in two places; and added subsec. (n).

1999. Act Nov. 29, 1999 (effective 4 months after enactment, as provided by § 4731 of S. 1948, as enacted into law by such Act, which appears as *35 USCS § 1* note), in subsec. (m), substituted "United States Patent and Trademark Office" for "Patent and Trademark Office of the Department of Commerce".

2002. Act Jan. 4, 2002, in subsec. (i)(1), in subpara. (B), deleted "and" after the concluding semicolon, in subpara (C), substituted "; and" for a concluding period, and added subpara (D).

2003. Act Dec. 3, 2003 (effective and applicable as provided by § 4 of such Act, which appears as *21 USCS § 355c* note), in subsec. (b)(1), substituted "(F)" for "and (F)", and inserted ", and (G) any assessments required under section 505B.".

   Act Dec. 8, 2003 (applicable as provided by § 1101(c) of such Act, which appears as a note to this section), in subsec. (b), substituted para. (3) for one which read:

      "(3)

(A) An applicant who makes a certification described in paragraph (2)(A)(iv) shall include in the application a statement that the applicant will give the notice required by subparagraph (B) to--

"(i) each owner of the patent which is the subject of the certification or the representative of such owner designated to receive such notice, and

"(ii) the holder of the approved application under subsection (b) for the drug which is claimed by the patent or a use of which is claimed by the patent or the representative of such holder designated to receive such notice.

"(B) The notice referred to in subparagraph (A) shall state that an application has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification. Such notice shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed.

"(C) If an application is amended to include a certification described in paragraph (2)(A)(iv), the notice required by subparagraph (B) shall be given when the amended application is submitted.",

redesignated para. (4) as para. (5), and inserted new para. (4); in subsec. (c)(3), in the introductory matter, substituted "by applying the following to each certification made under subsection (b)(2)(A)" for "under the following", in subpara.(C), in the introductory matter, substituted "unless, before the expiration of 45 days after the date on which the notice described in subsection (b)(3) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under paragraph (2) or subsection (b)(1) before the date on which the application (excluding an amendment or supplement to the application) was submitted." for "unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (3)(B) is received.", and substituted "subsection (b)(3)" for "paragraph (3)(B)", substituted cls. (i) and (ii) for ones which read:

"(i) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval may be made effective on the date of the court decision,

"(ii) if before the expiration of such period the court decides that such patent has been infringed, the approval may be made effective on such date as the court orders under *section 271(e)(4)(A) of title 35, United States Code,* or",

in cl. (iii), substituted "as provided in clause (i); or" for "on the date of such court decision.", and inserted cl. (iv), and, in the concluding matter, deleted "Until the expiration of forty-five days from the date the notice made under paragraph (3)(B) is received, no action may be brought under *section 2201 of title 28, United States Code,* for a declaratory judgment with respect to the patent. Any action brought under such section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business." following "the action.", redesignated subpara. (D) as subpara. (E), and inserted new subpara. (D); and, in subsec. (j), in para. (2), substituted subpara. (B) for one which read:

"(B)

(i) An applicant who makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give the notice required by clause (ii) to--

"(I) each owner of the patent which is the subject of the certification or the representative of such owner designated to receive such notice, and

"(II) the holder of the approved application under subsection (b) for the drug which is claimed by the patent or a use of which is claimed by the patent or the representative of such holder designated to receive such notice.

"(ii) The notice referred to in clause (i) shall state that an application, which contains data from bioavailability or bioequivalence studies, has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of such drug before the expiration of the patent referred to in the certification. Such notice shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed.

"(iii) If an application is amended to include a certification described in subparagraph (A)(vii)(IV), the notice required by clause (ii) shall be given when the amended application is submitted.",

and added subpara. (D), and, in para. (5), in subpara. (B), in the introductory matter, substituted "by applying the following to each certification made under paragraph (2)(A)(vii)" for "under the following", in cl. (iii), in the introductory matter, substituted "unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to be substantially complete, was submitted." for "unless an action is brought for infringement of a patent which is the subject of the

A-38

certification before the expiration of forty-five days from the date the notice provided under paragraph (2)(B)(i) is received.", substituted subcls.(I) and (II) for ones which read:

"(I) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision,

"(II) if before the expiration of such period the court decides that such patent has been infringed, the approval shall be made effective on such date as the court orders under *section 271(e)(4)(A) of title 35, United States Code*, or",

in subcl. (III), substituted "as provided in subclause (I); or" for "on the date of such court decision.", added subcl. (IV), and, in the concluding matter, deleted "Until the expiration of forty-five days from the date the notice made under paragraph (2)(B)(i) is received, no action may be brought under *section 2201 of title 28, United States Code*, for a declaratory judgment with respect to the patent. Any action brought under section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business." following "the action.", redesignated subparas. (C) and (D) as subparas. (E) and (F), respectively, and inserted new subpara. (C).

Such Act further (applicable as above) purported to amend subsec. (c)(3) by substituting "subsection (b)(3)" for "paragraph (3)(B)" in the concluding matter; however, because of prior amendments, this amendment could not be executed.

Such Act further (effective as provided by § 1102(b) of such Act, which appears as a note to this section), in subsec. (j)(5), in subpara. (B), substituted cl. (iv) for one which read:

"(iv) If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection continuing such a certification, the application shall be made effective not earlier than one hundred and eighty days after--

"(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

"(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.",

and inserted new subpara. (D).

Such Act further, in subsec. (j)(8), substituted subpara. (A) for one which read: "(A) The term 'bioavailability' means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.", and added subpara. (C).


2007. Act Sept. 27, 2007 (effective 10/1/2007, as provided by § 901(b) of such Act, which appears as a note to this section), in subsec. (n), deleted para. (4), which read: "(4) Each member of a panel shall publicly disclose all conflicts of interest that member may have with the work to be undertaken by the panel. No member of a panel may vote on any matter where the member or the immediate family of such member could gain financially from the advice given to the Secretary. The Secretary may grant a waiver of any conflict of interest requirement upon public disclosure of such conflict of interest if such waiver is necessary to afford the panel essential expertise, except that the Secretary may not grant a waiver for a member of a panel when the member's own scientific work is involved.", and redesignated paras. (5)-(8) as paras. (4)-(7), respectively.

Such Act further added subsec. (b)(6); in subsec. (i)(4), added the sentence beginning "The Secretary shall update . . ."; in subsec. (k), added para. (5); in subsec. (l), redesignated paras. (1)-(5) as subparas. (A)-(E), respectively, inserted "(1)" before "Safety and" in the introductory matter, and added new para. (2); and added subsecs. (q)-(u).

Such Act further (effective 180 days after enactment, as provided by § 909(a) of such Act, which appears as *21 USCS § 331* note), in subsec. (e), added the sentence beginning "The Secretary may withdraw . . ."; in subsec. (k), added paras. (3) and (4); and added subsecs. (o) and (p).


2008. Act Aug. 14, 2008, in subsec. (q)(1)(A), added the concluding matter.

Act Oct. 8, 2008, added subsec. (v).


2009. Act June 22, 2009, in subsec. (n)(2), substituted "section 1004" for "section 904".

2010. Act March 23, 2010, in subsec. (b)(5)(B), inserted "or, with respect to an applicant for approval of a biological product under section 351(k) of the Public Health Service Act, any necessary clinical study or studies"; and added subsec. (j)(10).

2012. Act July 9, 2012, in subsec. (d), added the sentences beginning "The Secretary shall implement . . ." and "Nothing in the preceding sentence . . ."; in subsec. (q), in para. (1), in subpara. (A), inserted "of this section or section 351(k) of the Public Health Service Act", and in subpara. (F), substituted "150 days" for "180 days", in para. (2)(A), in the heading substituted "150" for "180", and in the text, substituted "150-day" for "180-day", in para. (4), designated the existing provisions as subpara. (A), redesignated former subpara. (A) and (B) as cls. (i) an (ii), and added new subpara. (B), and in para. (5), inserted "of this section or section 351(k) of the Public Health Service Act"; and in subsec. (u), in para. (1)(A)(ii)(II), inserted "clinical", and in para. (4), substituted "2017" for "2012".

Such Act further (applicable to petitions submitted on or after the date of enactment, as provided by § 1134(b) of such Act, which appears as a note to this section), added subsec. (w).

2013. Act March 13, 2013, in subsec. (b)(5)(B), substituted "size--" and cls. (i) and (ii) for "size of clinical trials intended to form the primary basis of an effectiveness claim or, with respect to an applicant for approval of a biological product under section 351(k) of the Public Health Service Act, any necessary clinical study or studies.".

Redesignation:

This section, enacted as part of Chapter V of Act June 25, 1938, ch 675, became part of Subchapter A of such Chapter as the result of the amendment made by § 2(b) of Act Jan. 4, 1983, P.L. 97-414, which inserted the Subchapter A heading preceding § 501 of Act June 25, 1938, ch 675 (*21 USCS § 351*).

Transfer of functions:

For transfer of the Food and Drug Administration from the Department of Agriculture to the Federal Security Agency and later to the Department of Health, Education and Welfare (now the Department of Health and Human Services), see *21 USCS § 321* notes.

Other provisions:

**Appeals taken prior to October 10, 1962.** Act Oct. 10, 1962, P.L. 87-781, Title I, Part A, § 104(d)(3), 76 Stat. 785, effective on enactment on Oct. 10, 1962, as provided by § 107 of such Act, which appears as *21 USCS § 321* note, provided that the amendments made to subsec. (h) of this section "shall not apply to any appeal taken prior to the date of enactment of this Act.".

**Termination of advisory councils.** For the termination of advisory councils established after Jan. 5, 1973, see Act Oct. 6, 1972, P.L. 92-463, §§ 3(2) and 14, 86 Stat. 770, 776, which are classified as *5 USCS Appx §§ 3(2), 14*.

**Regulations.** Act Sept. 24, 1984, P.L. 98-417, Title I, § 105, 98 Stat. 1597, provides:

"(a) The Secretary of Health and Human Services shall promulgate, in accordance with the notice and comment requirements of *section 553 of title 5, United States Code*, such regulations as may be necessary for the administration of section 505 of the Federal Food, Drug, and Cosmetic Act [this section], as amended by sections 101, 102, and 103 of this Act, within one year of the date of enactment of this Act.

"(b) During the period beginning sixty days after the date of the enactment of this Act and ending on the date regulations promulgated under subsection (a) take effect, abbreviated new drug applications may be submitted in accordance with the provisions of *section 314.2 of title 21 of the Code of Federal Re*gulations and shall be considered as suitable for any drug which has been approved for safety and effectiveness under section 505(c) of the Federal Food, Drug, and Cosmetic Act [subsec. (c) of this section] before the date of the enactment of this Act. If any such provision is inconsistent with the requirements of section 505(j) of the Federal Food, Drug, and Cosmetic Act [subsec. (j) of this section], the Secretary shall consider the application under the applicable requirements of such section. The Secretary of Health

and Human Services may not approve such an abbreviated new drug application which is filed for a drug which is described in sections 505(c)(3)(D) and 505(j)(4)(D) of the Federal Food, Drug, and Cosmetic Act [subsecs. (c)(3)(D) and (j)(4)(D) of this section] except in accordance with such section.".

**Construction of May 13, 1992 amendment.** For the effect of amendments made by Act May 13, 1992, P.L. 102-282, on other laws, see § 7 of such Act, which appears as *7 USCS § 335a* note.

**Data requirements for drugs and biologics.** Act Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, § 118, 111 Stat. 2316, provides: "Within 12 months after the date of enactment of this Act, the Secretary of Health and Human Services, acting through the Commissioner of Food and Drugs, shall issue guidance that describes when abbreviated study reports may be submitted, in lieu of full reports, with a new drug application under section 505(b) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(b)*) and with a biologics license application under section 351 of the Public Health Service Act (*42 U.S.C. 262*) for certain types of studies. Such guidance shall describe the kinds of studies for which abbreviated reports are appropriate and the appropriate abbreviated report formats.".

**Requirements for review of approval procedures and current good manufacturing practices for positron emission tomography.** Act Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, § 121(c), 111 Stat. 2321, provides:

"(1) Procedures and requirements.

(A) In general. In order to take account of the special characteristics of positron emission tomography drugs and the special techniques and processes required to produce these drugs, not later than 2 years after the date of enactment of this Act, the Secretary of Health and Human Services shall establish--

"(i) appropriate procedures for the approval of positron emission tomography drugs pursuant to section 505 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355*); and

"(ii) appropriate current good manufacturing practice requirements for such drugs.

"(B) Considerations and consultation. In establishing the procedures and requirements required by subparagraph (A), the Secretary of Health and Human Services shall take due account of any relevant differences between not-for-profit institutions that compound the drugs for their patients and commercial manufacturers of the drugs. Prior to establishing the procedures and requirements, the Secretary of Health and Human Services shall consult with patient advocacy groups, professional associations, manufacturers, and physicians and scientists licensed to make or use positron emission tomography drugs.

"(2) Submission of new drug applications and abbreviated new drug applications.

(A) In general. Except as provided in subparagraph (B), the Secretary of Health and Human Services shall not require the submission of new drug applications or abbreviated new drug applications under subsection (b) or (j) of section 505 (*21 U.S.C. 355*), for compounded positron emission tomography drugs that are not adulterated drugs described in section 501(a)(2)(C) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 351(a)(2)(C)*) (as amended by subsection (b)), for a period of 4 years after the date of enactment of this Act, or for 2 years after the date on which the Secretary establishes procedures and requirements under paragraph (1), whichever is longer.

"(B) Exception. Nothing in this Act shall prohibit the voluntary submission of such applications or the review of such applications by the Secretary of Health and Human Services. Nothing in this Act shall constitute an exemption for a positron emission tomography drug from the requirements of regulations issued under section 505(i) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(i)*).".

**"Compounded positron emission topography drug" defined.** Act Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, § 121(e), 111 Stat. 2321, provides: "As used in this section [amending *21 USCS §§ 321* and *351* and appearing in part as notes to *21 USCS §§ 351* and *355*], the term 'compounded positron emission tomography drug' has the meaning given the term in section 201 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 321*).".

**Requirements for radiopharmaceuticals.** Act Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, § 122, 111 Stat. 2322 (effective 90 days after enactment, as provided by § 501 of such Act, which appears as *21 USCS § 321* note), provides:

"(a) Requirements.

(1) Regulations.

(A) Proposed regulations. Not later than 180 days after the date of enactment of this Act, the Secretary of Health and Human Services, after consultation with patient advocacy groups, associations, physicians licensed to use radiopharmaceuticals, and the regulated industry, shall issue proposed regulations governing the approval of radiopharmaceuticals. The regulations shall provide that the determination of the safety and effectiveness of such a radiopharmaceutical under section 505 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355*) or section 351 of the Public Health Service Act (*42 U.S.C. 262*) shall include consideration of the proposed use of the radiopharmaceutical in the practice of medicine, the pharmacological and toxicological activity of the radiopharmaceutical (including any carrier or ligand component of the radio pharmaceutical), and the estimated absorbed radiation dose of the radio pharmaceutical.

"(B) Final regulations. Not later than 18 months after the date of enactment of this Act, the Secretary shall promulgate final regulations governing the approval of the radiopharmaceuticals.

"(2) Special rule. In the case of a radiopharmaceutical, the indications for which such radiopharmaceutical is approved for marketing may, in appropriate cases, refer to manifestations of disease (such as biochemical, physiological, anatomic, or pathological processes) common to, or present in, one or more disease states.

"(b) Definition. In this section, the term 'radiopharmaceutical' means--

"(1) an article--

"(A) that is intended for use in the diagnosis or monitoring of a disease or a manifestation of a disease in humans; and

"(B) that exhibits spontaneous disintegration of unstable nuclei with the emission of nuclear particles or photons; or

"(2) any nonradioactive reagent kit or nuclide generator that is intended to be used in the preparation of any such article.".

**Special rule.** Act Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, § 123(f), 111 Stat. 2324 (effective 90 days after enactment, as provided by § 501 of such Act, which appears as *21 USCS § 321* note), provides: "The Secretary of Health and Human Services shall take measures to minimize differences in the review and approval of products required to have approved biologics license applications under section 351 of the Public Health Service Act (*42 U.S.C. 262*) and products required to have approved new drug applications under section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(b)(1)*).".

**Applications for marketing of antibiotic drugs; transition.** Act Nov. 21, 1997, P.L. 105-115, Title I, Subtitle B, § 125(d), 111 Stat. 2326, provides:

"(1) In general. An application that was approved by the Secretary of Health and Human Services before the date of the enactment of this Act for the marketing of an antibiotic drug under section 507 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 357*), as in effect on the day before the date of the enactment of this Act, shall, on and after such date of enactment, be considered to be an application that was submitted and filed under section 505(b) of such Act (*21 U.S.C. 355(b)*) and approved for safety and effectiveness under section 505(c) of such Act (*21 U.S.C. 355(c)*), except that if such application for marketing was in the form of an abbreviated application, the application shall be considered to have been filed and approved under section 505(j) of such Act (*21 U.S.C. 355(j)*).

"(2) Exception. The following subsections of section 505 (*21 U.S.C. 355*) shall not apply to any application for marketing in which the drug that is the subject of the application contains an antibiotic drug and the antibiotic drug was the subject of any application for marketing received by the Secretary of Health and Human Services under section 507 of such Act (*21 U.S.C. 357*) before the date of the enactment of this Act:

"(A)

(i) Subsections (c)(2), (d)(6), (e)(4), (j)(2)(A)(vii), (j)(2)(A)(viii), (j)(2)(B), (j)(4)(B), and (j)(4)(D); and

"(ii) The third and fourth sentences of subsection (b)(1) (regarding the filing and publication of patent information); and

"(B) Subsections (b)(2)(A), (b)(2)(B), (b)(3), and (c)(3) if the investigations relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

"(3) Publication. For purposes of this section, the Secretary is authorized to make available to the public the established name of each antibiotic drug that was the subject of any application for marketing received by the Secretary for Health and Human Services under section 507 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 357*) before the date of enactment of this Act.".

**Report on patient access to new therapeutic agents for pediatric cancer.** Act Jan. 4, 2002, P.L. 107-109, § 15(d), 115 Stat. 1421; Sept. 27, 2007, P.L. 110-85, Title V, § 502(e)(2), 121 Stat. 890, provides: "Not later than January 31, 2009, the Secretary of Health and Human Services, acting through the Commissioner of Food and Drugs and in consultation with the Director of the National Institutes of Health, shall submit to the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Energy and Commerce of the House of Representatives a report on patient access to new therapeutic agents for pediatric cancer, including access to single patient use of new therapeutic agents.".

**Applicability of amendments made by § 1101(a) and (b) of Act Dec. 8, 2003, P.L. 108-173.** Act Dec. 8, 2003, P.L. 108-173, Title XI, Subtitle A, § 1101(c), 117 Stat. 2456, provides:

"(1) In general. Except as provided in paragraphs (2) and (3), the amendments made by subsections (a) and (b) [amending subsecs. (b), (c), and (j) of this section] apply to any proceeding under section 505 of the Federal Food,

Drug, and Cosmetic Act (*21 U.S.C. 355*) that is pending on or after the date of the enactment of this Act regardless of the date on which the proceeding was commenced or is commenced.

"(2) Notice of opinion that patent is invalid or will not be infringed. The amendments made by subsections (a)(1) and (b)(1) apply with respect to any certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355*) submitted on or after August 18, 2003, in an application filed under subsection (b) or (j) of that section or in an amendment or supplement to an application filed under subsection (b) or (j) of that section.

"(3) Effective date of approval. The amendments made by subsections (a)(2)(A)(ii)(I) and (b)(2)(B)(i) [amending subsecs. (j)(5)(B)(iii) and (c)(3)(C) of this section] apply with respect to any patent information submitted under subsection (b)(1) or (c)(2) of section 505 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355*) on or after August 18, 2003.".

**Effective date of amendments made by § 1102 of Act Dec. 8, 2003.** Act Dec. 8, 2003, P.L. 108-173, Title XI, Subtitle A, § 1102(b), 117 Stat. 2460, provides:

"(1) In general. Except as provided in paragraph (2), the amendment made by subsection (a) [amending subsec. (j)(5) of this section] shall be effective only with respect to an application filed under section 505(j) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)*) after the date of the enactment of this Act for a listed drug for which no certification under section 505(j)(2)(A)(vii)(IV) of that Act [subsec. (j)(2)(A)(vii)(IV) of this section] was made before the date of the enactment of this Act.

"(2) Collusive agreements. If a forfeiture event described in section 505(j)(5)(D)(i)(V) of that Act [subsec. (j)(5)(D)(i)(V) of this section] occurs in the case of an applicant, the applicant shall forfeit the 180-day period under section 505(j)(5)(B)(iv) of that Act [subsec. (j)(5)(B)(iv) of this section] without regard to when the first certification under section 505(j)(2)(A)(vii)(IV) of that Act [subsec. (j)(5)(A)(vii)(IV) of this section] for the listed drug was made.

"(3) Decision of a court when the 180-day exclusivity period has not been triggered. With respect to an application filed before, on, or after the date of the enactment of this Act for a listed drug for which a certification under section 505(j)(2)(A)(vii)(IV) of that Act [subsec. (j)(2)(A)(vii)(IV) of this section] was made before the date of the enactment of this Act and for which neither of the events described in subclause (I) or (II) of section 505(j)(5)(B)(iv) of that Act [subsec. (j)(5)(B)(iv) of this section] has occurred on or before the date of the enactment of this Act, the term 'decision of a court' as used in clause (iv) of section 505(j)(5)(B) of that Act [subsec. (j)(5)(B) of this section] means a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken.".

**Effect of Dec. 8, 2003 amendment of subsec. (j)(8).** Act Dec. 8, 2003, P.L. 108-173, Title XI, Subtitle A, § 1103(b), 117 Stat. 2461, provides: "The amendment made by subsection (a) [amending subsec. (j)(8) of this section] does not alter the standards for approval of drugs under section 505(j) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)*).".

**Federal Trade Commission Review.** Act Dec. 8, 2003, P.L. 108-173, Title XI, Subtitle B, 117 Stat. 2461, provides: "Sec. 1111. Definitions.

"In this subtitle:

"(1) ANDA. The term 'ANDA' means an abbreviated drug application, as defined under section 201(aa) of the Federal Food, Drug, and Cosmetic Act [*21 USCS § 321(aa)*].

"(2) Assistant attorney general. The term 'Assistant Attorney General' means the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice.

"(3) Brand name drug. The term 'brand name drug' means a drug for which an application is approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act [subsec. (c) of this section], including an application referred to in section 505(b)(2) of such Act [subsec. (b)(2) of this section].

"(4) Brand name drug company. The term 'brand name drug company' means the party that holds the approved application referred to in paragraph (3) for a brand name drug that is a listed drug in an ANDA, or a party that is the owner of a patent for which information is submitted for such drug under subsection (b) or (c) of section 505 of the Federal Food, Drug, and Cosmetic Act [this section].

"(5) Commission. The term 'Commission' means the Federal Trade Commission.

"(6) Generic drug. The term 'generic drug' means a drug for which an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act [subsec. (j) of this section] is approved.

"(7) Generic drug applicant. The term 'generic drug applicant' means a person who has filed or received approval for an ANDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act [subsec. (j) of this section].

"(8) Listed drug. The term 'listed drug' means a brand name drug that is listed under section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act [subsec. (j)(7) of this section].

"Sec. 1112. Notification of agreements.

"(a) Agreement with brand name drug company.

"(1) Requirement. A generic drug applicant that has submitted an ANDA containing a certification under section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act [subsec. (j)(2)(A)(vii)(IV) of this section] and a brand name drug company that enter into an agreement described in paragraph (2) shall each file the agreement in accordance with subsection (c). The agreement shall be filed prior to the date of the first commercial marketing of the generic drug that is the subject of the ANDA.

"(2) Subject matter of agreement. An agreement described in this paragraph between a generic drug applicant and a brand name drug company is an agreement regarding--

"(A) the manufacture, marketing or sale of the brand name drug that is the listed drug in the ANDA involved;

"(B) the manufacture, marketing, or sale of the generic drug for which the ANDA was submitted; or

"(C) the 180-day period referred to in section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act [subsec. (j)(5)(B)(iv) of this section] as it applies to such ANDA or to any other ANDA based on the same brand name drug.

"(b) Agreement with another generic drug applicant.

"(1) Requirement. A generic drug applicant that has submitted an ANDA containing a certification under section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act [subsec. (j)(2)(A)(vii)(IV) of this section] with respect to a listed drug and another generic drug applicant that has submitted an ANDA containing such a certification for the same listed drug shall each file the agreement in accordance with subsection (c). The agreement shall be filed prior to the date of the first commercial marketing of either of the generic drugs for which such ANDAs were submitted.

"(2) Subject matter of agreement. An agreement described in this paragraph between two generic drug applicants is an agreement regarding the 180-day period referred to in section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act [subsec. (j)(5)(B)(iv) of this section] as it applies to the ANDAs with which the agreement is concerned.

"(c) Filing.

"(1) Agreement. The parties that are required in subsection (a) or (b) to file an agreement in accordance with this subsection shall file with the Assistant Attorney General and the Commission the text of any such agreement, except that such parties are not required to file an agreement that solely concerns--

"(A) purchase orders for raw material supplies;

"(B) equipment and facility contracts;

"(C) employment or consulting contracts; or

"(D) packaging and labeling contracts.

"(2) Other agreements. The parties that are required in subsection (a) or (b) to file an agreement in accordance with this subsection shall file with the Assistant Attorney General and the Commission the text of any agreements between the parties that are not described in such subsections and are contingent upon, provide a contingent condition for, or are otherwise related to an agreement that is required in subsection (a) or (b) to be filed in accordance with this subsection.

"(3) Description. In the event that any agreement required in subsection (a) or (b) to be filed in accordance with this subsection has not been reduced to text, each of the parties involved shall file written descriptions of such agreement that are sufficient to disclose all the terms and conditions of the agreement.

"Sec. 1113. Filing deadlines.

"Any filing required under section 1112 shall be filed with the Assistant Attorney General and the Commission not later than 10 business days after the date the agreements are executed.

"Sec. 1114. Disclosure exemption.

"Any information or documentary material filed with the Assistant Attorney General or the Commission pursuant to this subtitle shall be exempt from disclosure under *section 552 of title 5, United States Code*, and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding. Nothing in this section is intended to prevent disclosure to either body of the Congress or to any duly authorized committee or subcommittee of the Congress.

"Sec. 1115. Enforcement.

"(a) Civil penalty. Any brand name drug company or generic drug applicant which fails to comply with any provision of this subtitle shall be liable for a civil penalty of not more than $ 11,000, for each day during which such entity is in violation of this subtitle. Such penalty may be recovered in a civil action brought by the United States, or brought by the Commission in accordance with the procedures established in section 16(a)(1) of the Federal Trade Commission Act (*15 U.S.C. 56(a)*).

"(b) Compliance and equitable relief. If any brand name drug company or generic drug applicant fails to comply with any provision of this subtitle, the United States district court may order compliance, and may grant such other equitable relief as the court in its discretion determines necessary or appropriate, upon application of the Assistant Attorney General or the Commission.

"Sec. 1116. Rulemaking.

"The Commission, with the concurrence of the Assistant Attorney General and by rule in accordance with *section 553 of title 5, United States Code*, consistent with the purposes of this subtitle--

"(1) may define the terms used in this subtitle;

"(2) may exempt classes of persons or agreements from the requirements of this subtitle; and

"(3) may prescribe such other rules as may be necessary and appropriate to carry out the purposes of this subtitle.

"Sec. 1117. Savings clause.

"Any action taken by the Assistant Attorney General or the Commission, or any failure of the Assistant Attorney General or the Commission to take action, under this subtitle shall not at any time bar any proceeding or any action with respect to any agreement between a brand name drug company and a generic drug applicant, or any agreement between generic drug applicants, under any other provision of law, nor shall any filing under this subtitle constitute or create a presumption of any violation of any competition laws.

"Sec. 1118. Effective date.

"This subtitle shall--

"(1) take effect 30 days after the date of the enactment of this Act; and

"(2) shall apply to agreements described in section 1112 that are entered into 30 days after the date of the enactment of this Act.".

**Effective date of Sept. 27, 2007 amendments.** Act Sept. 27, 2007, P.L. 110-85, Title VII, § 701(c), 121 Stat. 904, provides: "The amendments made by this section [amending subsec. (n) of this section and adding *21 USCS § 379d-1*] shall take effect on October 1, 2007.".

**Rule of construction.** Act Sept. 27, 2007, P.L. 110-85, Title IX, Subtitle A, § 905(b), 121 Stat. 949 (effective 180 days after enactment, as provided by § 909(a) of such Act, which appears as *21 USCS § 331* note), provides: "Nothing in this section or the amendment made by this section [adding subsec. (k)(3) and (4) of this section and in part unclassified] shall be construed to prohibit the lawful disclosure or use of data or information by an entity other than as described in paragraph (4)(B) or (4)(G) of section 505(k) of the Federal Food, Drug, and Cosmetic Act [subsec. (k) of this section], as added by subsection (a).".

**No effect on veterinary medicine.** Act Sept. 27, 2007, P.L. 110-85, Title IX, Subtitle A, § 907, 121 Stat. 950 (effective 180 days after enactment, as provided by § 909(a) of such Act, which appears as *21 USCS § 331* note), provides: "This subtitle, and the amendments made by this subtitle [for full classification, consult USCS Tables volumes], shall have no effect on the use of drugs approved under section 505 of the Federal Food, Drug, and Cosmetic Act [this section] by, or on the lawful written or oral order of, a licensed veterinarian within the context of a veterinarian-client-patient relationship, as provided for under section 512(a)(5) of such Act [*21 USCS § 360b(a)(5)*].".

**Transitional rules.** Act Oct. 8, 2008, P.L. 110-379, § 4(b), 122 Stat. 4077, provides:

"(1) With respect to a patent issued on or before the date of the enactment of this Act, any patent information required to be filed with the Secretary of Health and Human Services under subsection (b)(1) or (c)(2) of section 505 of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355*) to be listed on a drug to which subsection (v)(1) of such section 505 (as added by this section) applies shall be filed with the Secretary not later than 60 days after the date of the enactment of this Act.

"(2) With respect to any patent information referred to in paragraph (1) of this subsection that is filed with the Secretary within the 60-day period after the date of the enactment of this Act, the Secretary shall publish such information in the electronic version of the list referred to in section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)(7)*) as soon as it is received, but in no event later than the date that is 90 days after the enactment of this Act.

"(3) With respect to any patent information referred to in paragraph (1) that is filed with the Secretary within the 60-day period after the date of enactment of this Act, each applicant that, not later than 120 days after the date of the enactment of this Act, amends an application that is, on or before the date of the enactment of this Act, a substantially complete application (as defined in paragraph (5)(B)(iv) of section 505(j) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)*)) to contain a certification described in paragraph (2)(A)(vii)(IV) of such section 505(j) with respect to that patent shall be deemed to be a first applicant (as defined in paragraph (5)(B)(iv) of such section 505(j)).".

**Guidance on pathogen-focused antibacterial drug development.** Act July 9, 2012, P.L. 112-144, Title VIII, § 806, 126 Stat. 1082, provides:

"(a) Draft guidance. Not later than June 30, 2013, in order to facilitate the development of antibacterial drugs for serious or life-threatening bacterial infections, particularly in areas of unmet need, the Secretary of Health and Human Services shall publish draft guidance that--

"(1) specifies how preclinical and clinical data can be utilized to inform an efficient and streamlined pathogen-focused antibacterial drug development program that meets the approval standards of the Food and Drug Administration; and

"(2) provides advice on approaches for the development of antibacterial drugs that target a more limited spectrum of pathogens.

"(b) Final guidance. Not later than December 31, 2014, after notice and opportunity for public comment on the draft guidance under subsection (a), the Secretary of Health and Human Services shall publish final guidance consistent with this section.".

**Guidance on abuse-deterrent products.** Act July 9, 2012, P.L. 112-144, Title XI, Subtitle C, § 1122(c), 126 Stat. 1113, provides: "Not later than 6 months after the date of enactment of this Act, the Secretary shall promulgate guidance on the development of abuse-deterrent drug products.".

**Extension of period for first applicant to obtain tentative approval without forfeiting 180-day-exclusivity period.** Act July 9, 2012, P.L. 112-144, Title XI, Subtitle C, § 1133, 126 Stat. 1122, provides:

"(a) Extension.

(1) In general. If a first applicant files an application during the 30-month period ending on the date of enactment of this Act and such application initially contains a certification described in paragraph (2)(A)(vii)(IV) of section 505(j) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)*), or if a first applicant files an application and the application is amended during such period to first contain such a certification, the phrase '30 months' in paragraph (5)(D)(i)(IV) of such section shall, with respect to such application, be read as meaning--

"(A) during the period beginning on the date of enactment of this Act, and ending on September 30, 2015, '40 months'; and

"(B) during the period beginning on October 1, 2015, and ending on September 30, 2016, '36 months'.

"(2) Conforming amendment. In the case of an application to which an extended period under paragraph (1) applies, the reference to the 30-month period under section 505(q)(1)(G) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(q)(1)(G)*) shall be read to be the applicable period under paragraph (1).

"(b) Period for Obtaining Tentative Approval of Certain Applications. If an application is filed on or before the date of enactment of this Act and such application is amended during the period beginning on the day after the date of enactment of this Act and ending on September 30, 2017, to first contain a certification described in paragraph (2)(A)(vii)(IV) of section 505(j) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)*), the date of the filing of such amendment (rather than the date of the filing of such application) shall be treated as the beginning of the 30-month period described in paragraph (5)(D)(i)(IV) of such section 505(j).

"(c) Definitions. For the purposes of this section, the terms 'application' and 'first applicant' mean application and first applicant, as such terms are used in section 505(j)(5)(D)(i)(IV) of the Federal Food, Drug, and Cosmetic Act (*21 U.S.C. 355(j)(5)(D)(i)(IV)*).".

**Application of subsec. (w).** Act July 9, 2012, P.L. 112-144, Title XI, Subtitle C, § 1134(a), 126 Stat. 1123, provides: "The amendment made by subsection (a) [adding subsec. (w) of this section] shall apply to any petition that is submitted pursuant to subsection (b) of *section 314.161 of title 21, Code of Federal R*egulations (or any successor regulations), on or after the date of enactment of this Act.".



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2014, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This document is current through the October 9, 2014 ***
*** issue of the Federal Register ***

TITLE 21 -- FOOD AND DRUGS
CHAPTER I -- FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER A -- GENERAL
PART 10 -- ADMINISTRATIVE PRACTICES AND PROCEDURES
SUBPART B -- GENERAL ADMINISTRATIVE PROCEDURES

**Go to the CFR Archive Directory**

*21 CFR 10.30*

§ 10.30 Citizen petition.


   (a) This section applies to any petition submitted by a person (including a person who is not a citizen of the United States) except to the extent that other sections of this chapter apply different requirements to a particular matter.
 (b) A petition (including any attachments) must be submitted in accordance with the following paragraphs, as applicable:
 (1) Electronic submission. Petitions (including any attachments) may be electronically submitted in accordance with paragraph (b)(3) of this section and § 10.20 through http://www.regulations.gov at Docket No. FDA 2013-S-0610. It is only necessary to submit one copy.
 (2) Mail, delivery services, or other non-electronic submissions. A petition (including any attachments), that is not electronically submitted under paragraph (b)(1) of this section, must be submitted in accordance with paragraph (b)(3) and § 10.20 and delivered to this address: Division of Dockets Management, Department of Health and Human Services, Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.
 It is only necessary to submit two copies.
 (3) Petition format. A petition submitted under paragraphs (b)(1) or (b)(2) of this section must be in accordance with § 10.20 and in the following format:
 Citizen Petition
 Date:
 The undersigned submits this petition under (relevant statutory sections, if known) of the (Federal Food, Drug, and Cosmetic Act or the Public Health Service Act or any other statutory provision for which authority has been delegated to the Commissioner of Food and Drugs) to request the Commissioner of Food and Drugs to (issue, amend, or revoke a regulation or order or take or refrain from taking any other form of administrative action).
 A. Action Requested
 ((1) If the petition requests the Commissioner to issue, amend, or revoke a regulation, the exact wording of the existing regulation (if any) and the proposed regulation or amendment requested.)
 ((2) If the petition requests the Commissioner to issue, amend, or revoke an order, a copy of the exact wording of the citation to the existing order (if any) and the exact wording requested for the proposed order.)
 ((3) If the petition requests the Commissioner to take or refrain from taking any other form of administrative action, the specific action or relief requested.)

B. Statement of Grounds

(A full statement, in a well-organized format, of the factual and legal grounds on which the petitioner relies, including all relevant information and views on which the petitioner relies, as well as representative information known to the petitioner which is unfavorable to the petitioner's position.)

C. Environmental Impact

(A) Claim for categorical exclusion under §§ 25.30, 25.31, 25.32, 25.33, or § 25.34 of this chapter or an environmental assessment under § 25.40 of this chapter.)

D. Economic Impact

(The following information is to be submitted only when requested by the Commissioner following review of the petition: A statement of the effect of requested action on: (1) Cost (and price) increases to industry, government, and consumers; (2) productivity of wage earners, businesses, or government; (3) competition; (4) supplies of important materials, products, or services; (5) employment; and (6) energy supply or demand.)

E. Certification

The undersigned certifies, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

(Signature)

(Name of petitioner)

(Mailing address)

(Telephone number)

(c) A petition which appears to meet the requirements of paragraph (b)(3) of this section and § 10.20 will be filed by the Division of Dockets Management with the date of filing and assigned a unique docket number. The unique docket number identifies the docket file established by the Division of Dockets Management for all submissions relating to the petition, as provided in this part. Subsequent submissions relating to the matter must refer to the assigned docket number assigned in this paragraph and will be filed in the established docket file. Related petitions may be filed together and given the same docket number. The Division of Dockets Management will promptly notify the petitioner of the filing and unique docket number of the petition.

(d) An interested person may submit comments to the Division of Dockets Management on a filed petition, which comments become part of the docket file. The comments are to specify the docket number of the petition and may support or oppose the petition in whole or in part. A request for alternative or different administrative action must be submitted as a separate petition.

(e)(1) The Commissioner shall, in accordance with paragraph (e)(2), rule upon each petition filed under paragraph (c) of this section, taking into consideration (i) available agency resources for the category of subject matter, (ii) the priority assigned to the petition considering both the category of subject matter involved and the overall work of the agency, and (iii) time requirements established by statute.

(2) Except as provided in paragraph (e)(4) of this section, the Commissioner shall furnish a response to each petitioner within 180 days of receipt of the petition. The response will either:

(i) Approve the petition, in which case the Commissioner shall concurrently take appropriate action (e.g., publication of a FEDERAL REGISTER notice) implementing the approval;

(ii) Deny the petition; or

(iii) Provide a tentative response, indicating why the agency has been unable to reach a decision on the petition, e.g., because of the existence of other agency priorities, or a need for additional information. The tentative response may also indicate the likely ultimate agency response, and may specify when a final response may be furnished.

(3) The Commissioner may grant or deny such a petition, in whole or in part, and may grant such other relief or take other action as the petition warrants. The petitioner is to be notified of the Commissioner's decision. The decision will be placed in the public docket file and may also be in the form of a notice published in the Federal Register .

(4) The Commissioner shall furnish a response to each petitioner within 90 days of receipt of a petition filed under section 505(j)(2)(C) of the act. The response will either approve or disapprove the petition. Agency action on a petition shall be governed by § 314.93 of this chapter.

(f) If a petition filed under paragraph (c) of this section requests the Commissioner to issue, amend, or revoke a regulation, § 10.40 or § 10.50 also apply.

(g) A petitioner may supplement, amend, or withdraw a petition without Agency approval and without prejudice to resubmission at any time until the Commissioner rules on the petition, unless the petition has been referred for a hearing under parts 12, 13, 14, or 15 of this chapter. After a ruling or referral, a petition may be supplemented, amended, or

withdrawn only with the approval of the Commissioner. The Commissioner may approve withdrawal, with or without prejudice against resubmission of the petition.

(h) In reviewing a petition the Commissioner may use the following procedures:

(1) Conferences, meetings, discussions, and correspondence under § 10.65.

(2) A hearing under parts 12, 13, 14, 15, or 16.

(3) A FEDERAL REGISTER notice requesting information and views.

(4) A proposal to issue, amend, or revoke a regulation, in accordance with § 10.40 or § 12.20.

(5) Any other specific public procedure established in this chapter and expressly applicable to the matter.

(i) The record of the administrative proceeding consists of the following:

(1) The petition, including all information on which it relies, filed by the Division of Dockets Management.

(2) All comments received on the petition, including all information submitted as a part of the comments.

(3) If the petition resulted in a proposal to issue, amend, or revoke a regulation, all of the documents specified in § 10.40(g).

(4) The record, consisting of any transcripts, minutes of meetings, reports, FEDERAL REGISTER notices, and other documents resulting from the optional procedures specified in paragraph (h) of this section, except a transcript of a closed portion of a public advisory committee meeting.

(5) The Commissioner's decision on the petition, including all information identified or filed by the Commissioner with the Division of Dockets Management as part of the record supporting the decision.

(6) All documents filed with the Division of Dockets Management under § 10.65(h).

(7) If a petition for reconsideration or for a stay of action is filed under paragraph (j) of this section, the administrative record specified in § 10.33(k) or § 10.35(h).

(j) The administrative record specified in paragraph (i) of this section is the exclusive record for the Commissioner's decision. The record of the administrative proceeding closes on the date of the Commissioner's decision unless some other date is specified. Thereafter any interested person may submit a petition for reconsideration under § 10.33 or a petition for stay of action under § 10.35. A person who wishes to rely upon information or views not included in the administrative record shall submit them to the Commissioner with a new petition to modify the decision in accordance with this section.

(k) This section does not apply to the referral of a matter to a United States attorney for the initiation of court enforcement action and related correspondence, or to requests, suggestions, and recommendations made informally in routine correspondence received by FDA. Routine correspondence does not constitute a petition within the meaning of this section unless it purports to meet the requirements of this section. Action on routine correspondence does not constitute final administrative action subject to judicial review under § 10.45.

(l) The Division of Dockets Management will maintain a chronological list of each petition filed under this section and § 10.85, but not of petitions submitted elsewhere in the agency under § 10.25(a)(1), showing:

(1) The docket number;

(2) The date the petition was filed by the Division of Dockets Management;

(3) The name of the petitioner;

(4) The subject matter involved; and

(5) The disposition of the petition.

**HISTORY:** *[44 FR 22323,* Apr. 13, 1979, as amended at *46 FR 8455,* Jan. 27, 1981; 50 16656, Apr. 26, 1985; *54 FR 9034,* Mar. 3, 1989; *57 FR 17980,* Apr. 28, 1992; *59 FR 14364,* Mar. 28, 1994; *62 FR 40570, 40592,* July 29, 1997; *66 FR 6465, 6467,* Jan. 22, 2001; *66 FR 12848,* Mar. 1, 2001; *78 FR 76748, 76749,* Dec. 19, 2013]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*5 U.S.C. 551-*558, 701-706; *15 U.S.C. 1451-*1461; *21 U.S.C. 141-*149, 321-397, 467f, 679, 821, 1034; *28 U.S.C. 2112; 42 U.S.C. 201,* 262, 263b, 264.



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2014, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This document is current through the October 9, 2014 ***
*** issue of the Federal Register ***

TITLE 21 -- FOOD AND DRUGS
CHAPTER I -- FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER D -- DRUGS FOR HUMAN USE
PART 314 -- APPLICATIONS FOR FDA APPROVAL TO MARKET A NEW DRUG
SUBPART B -- APPLICATIONS

**Go to the CFR Archive Directory**

*21 CFR 314.53*

§ 314.53 Submission of patent information.

   (a) Who must submit patent information. This section applies to any applicant who submits to FDA a new drug application or an amendment to it under section 505(b) of the act and § 314.50 or a supplement to an approved application under § 314.70, except as provided in paragraph (d)(2) of this section.
  (b) Patents for which information must be submitted and patents for which information must not be submitted -- (1) General requirements. An applicant described in paragraph (a) of this section shall submit the required information on the declaration form set forth in paragraph (c) of this section for each patent that claims the drug or a method of using the drug that is the subject of the new drug application or amendment or supplement to it and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product. For purposes of this part, such patents consist of drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method-of-use patents. For patents that claim the drug substance, the applicant shall submit information only on those patents that claim the drug substance that is the subject of the pending or approved application or that claim a drug substance that is the same as the active ingredient that is the subject of the approved or pending application. For patents that claim a polymorph that is the same as the active ingredient described in the approved or pending application, the applicant shall certify in the declaration forms that the applicant has test data, as set forth in paragraph (b)(2) of this section, demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the new drug application. For patents that claim a drug product, the applicant shall submit information only on those patents that claim a drug product, as is defined in § 314.3, that is described in the pending or approved application. For patents that claim a method of use, the applicant shall submit information only on those patents that claim indications or other conditions of use that are described in the pending or approved application. The applicant shall separately identify each pending or approved method of use and related patent claim. For approved applications, the applicant submitting the method-of-use patent shall identify with specificity the section of the approved labeling that corresponds to the method of use claimed by the patent submitted. Process patents, patents claiming packaging, patents claiming metabolites, and patents claiming intermediates are not covered by this section, and information on these patents must not be submitted to FDA.
  (2) Test Data for Submission of Patent Information for Patents That Claim a Polymorph. The test data, referenced in paragraph (b)(1) of this section, must include the following:

(i) A full description of the polymorphic form of the drug substance, including its physical and chemical characteristics and stability; the method of synthesis (or isolation) and purification of the drug substance; the process controls used during manufacture and packaging; and such specifications and analytical methods as are necessary to assure the identity, strength, quality, and purity of the polymorphic form of the drug substance;

(ii) The executed batch record for a drug product containing the polymorphic form of the drug substance and documentation that the batch was manufactured under current good manufacturing practice requirements;

(iii) Demonstration of bioequivalence between the executed batch of the drug product that contains the polymorphic form of the drug substance and the drug product as described in the NDA;

(iv) A list of all components used in the manufacture of the drug product containing the polymorphic form and a statement of the composition of the drug product; a statement of the specifications and analytical methods for each component; a description of the manufacturing and packaging procedures and in-process controls for the drug product; such specifications and analytical methods as are necessary to assure the identity, strength, quality, purity, and bioavailability of the drug product, including release and stability data complying with the approved product specifications to demonstrate pharmaceutical equivalence and comparable product stability; and

(v) Comparative in vitro dissolution testing on 12 dosage units each of the executed test batch and the new drug application product.

(c) Reporting requirements -- (1) General requirements. An applicant described in paragraph (a) of this section shall submit the required patent information described in paragraph (c)(2) of this section for each patent that meets the requirements described in paragraph (b) of this section. We will not accept the patent information unless it is complete and submitted on the appropriate forms, FDA Forms 3542 or 3542a. These forms may be obtained on the Internet at http://www.fda.gov by searching for "forms".

(2) Drug substance (active ingredient), drug product (formulation or composition), and method-of-use patents -- (i) Original Declaration. For each patent that claims a drug substance (active ingredient), drug product (formulation and composition), or method of use, the applicant shall submit FDA Form 3542a. The following information and verification is required:

(A) New drug application number;

(B) Name of new drug application sponsor;

(C) Trade name (or proposed trade name) of new drug;

(D) Active ingredient(s) of new drug;

(E) Strength(s) of new drug;

(F) Dosage form of new drug;

(G) United States patent number, issue date, and expiration date of patent submitted;

(H) The patent owner's name, full address, phone number and, if available, fax number and e-mail address;

(I) The name, full address, phone number and, if available, fax number and e-mail address of an agent or representative who resides or maintains a place of business within the United States authorized to receive notice of patent certification under sections 505(b)(3) and 505(j)(2)(B) of the act and §§ 314.52 and 314.95 (if patent owner or new drug application applicant or holder does not reside or have a place of business within the United States);

(J) Information on whether the patent has been submitted previously for the new drug application;

(K) Information on whether the expiration date is a new expiration date if the patent had been submitted previously for listing;

(L) Information on whether the patent is a product-by-process patent in which the product claimed is novel;

(M) Information on the drug substance (active ingredient) patent including the following:

(1) Whether the patent claims the drug substance that is the active ingredient in the drug product described in the new drug application or supplement;

(2) Whether the patent claims a polymorph that is the same active ingredient that is described in the pending application or supplement;

(3) Whether the applicant has test data, described in paragraph (b)(2) of this section, demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the new drug application or supplement, and a description of the polymorphic form(s) claimed by the patent for which such test data exist;

(4) Whether the patent claims only a metabolite of the active ingredient; and

(5) Whether the patent claims only an intermediate;

(N) Information on the drug product (composition/formulation) patent including the following:

(1) Whether the patent claims the drug product for which approval is being sought, as defined in § 314.3; and

(2) Whether the patent claims only an intermediate;

(O) Information on each method-of-use patent including the following:

(1) Whether the patent claims one or more methods of using the drug product for which use approval is being sought and a description of each pending method of use or related indication and related patent claim of the patent being submitted; and

(2) Identification of the specific section of the proposed labeling for the drug product that corresponds to the method of use claimed by the patent submitted;

(P) Whether there are no relevant patents that claim the drug substance (active ingredient), drug product (formulation or composition) or method(s) of use, for which the applicant is seeking approval and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product;

(Q) A signed verification which states:

"The undersigned declares that this is an accurate and complete submission of patent information for the NDA, amendment or supplement pending under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to *21 CFR 314.53*. I attest that I am familiar with *21 CFR 314.53* and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct."; and

(R) Information on whether the applicant, patent owner or attorney, agent, representative or other authorized official signed the form; the name of the person; and the full address, phone number and, if available, the fax number and e-mail address.

(ii) Submission of patent information upon and after approval. Within 30 days after the date of approval of its application or supplement, the applicant shall submit FDA Form 3542 for each patent that claims the drug substance (active ingredient), drug product (formulation and composition), or approved method of use. FDA will rely only on the information submitted on this form and will not list or publish patent information if the patent declaration is incomplete or indicates the patent is not eligible for listing. Patent information must also be submitted for patents issued after the date of approval of the new drug application as required in paragraph (c)(2)(ii) of this section. As described in paragraph (d)(4) of this section, patent information must be submitted to FDA within 30 days of the date of issuance of the patent. If the applicant submits the required patent information within the 30 days, but we notify an applicant that a declaration form is incomplete or shows that the patent is not eligible for listing, the applicant must submit an acceptable declaration form within 15 days of FDA notification to be considered timely filed. The following information and verification statement is required:

(A) New drug application number;

(B) Name of new drug application sponsor;

(C) Trade name of new drug;

(D) Active ingredient(s) of new drug;

(E) Strength(s) of new drug;

(F) Dosage form of new drug;

(G) Approval date of new drug application or supplement;

(H) United States patent number, issue date, and expiration date of patent submitted;

(I) The patent owner's name, full address, phone number and, if available, fax number and e-mail address;

(J) The name, full address, phone number and, if available, fax number and e-mail address of an agent or representative who resides or maintains a place of business within the United States authorized to receive notice of patent certification under sections 505(b)(3) and 505(j)(2)(B) of the act and §§ 314.52 and 314.95 (if patent owner or new drug application applicant or holder does not reside or have a place of business within the United States);

(K) Information on whether the patent has been submitted previously for the new drug application;

(L) Information on whether the expiration date is a new expiration date if the patent had been submitted previously for listing;

(M) Information on whether the patent is a product-by-process patent in which the product claimed is novel;

(N) Information on the drug substance (active ingredient) patent including the following:

(1) Whether the patent claims the drug substance that is the active ingredient in the drug product described in the approved application;

(2) Whether the patent claims a polymorph that is the same as the active ingredient that is described in the approved application;

(3) Whether the applicant has test data, described at paragraph (b)(2) of this section, demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the approved application and a description of the polymorphic form(s) claimed by the patent for which such test data exist;

(4) Whether the patent claims only a metabolite of the active ingredient; and

(5) Whether the patent claims only an intermediate;

(O) Information on the drug product (composition/formulation) patent including the following:

(1) Whether the patent claims the approved drug product as defined in § 314.3; and

(2) Whether the patent claims only an intermediate;

(P) Information on each method-of-use patent including the following:

(1) Whether the patent claims one or more approved methods of using the approved drug product and a description of each approved method of use or indication and related patent claim of the patent being submitted;

(2) Identification of the specific section of the approved labeling for the drug product that corresponds to the method of use claimed by the patent submitted; and

(3) The description of the patented method of use as required for publication;

(Q) Whether there are no relevant patents that claim the approved drug substance (active ingredient), the approved drug product (formulation or composition) or approved method(s) of use and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product;

(R) A signed verification which states: "The undersigned declares that this is an accurate and complete submission of patent information for the NDA, amendment or supplement approved under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to *21 CFR 314.53*. I attest that I am familiar with *21 CFR 314.53* and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct."; and

(S) Information on whether the applicant, patent owner or attorney, agent, representative or other authorized official signed the form; the name of the person; and the full address, phone number and, if available, the fax number and e-mail address.

(3) No relevant patents. If the applicant believes that there are no relevant patents that claim the drug substance (active ingredient), drug product (formulation or composition), or the method(s) of use for which the applicant has received approval, and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product, the applicant will verify this information in the appropriate forms, FDA Forms 3542 or 3542a.

(4) Authorized signature. The declarations required by this section shall be signed by the applicant or patent owner, or the applicant's or patent owner's attorney, agent (representative), or other authorized official.

(d) When and where to submit patent information -- (1) Original application. An applicant shall submit with its original application submitted under this part, including an application described in section 505(b)(2) of the act, the information described in paragraph (c) of this section on each drug (ingredient), drug product (formulation and composition), and method of use patent issued before the application is filed with FDA and for which patent information is required to be submitted under this section. If a patent is issued after the application is filed with FDA but before the application is approved, the applicant shall, within 30 days of the date of issuance of the patent, submit the required patent information in an amendment to the application under § 314.60.

(2) Supplements. (i) An applicant shall submit patent information required under paragraph (c) of this section for a patent that claims the drug, drug product, or method of use for which approval is sought in any of the following supplements:

(A) To change the formulation;

(B) To add a new indication or other condition of use, including a change in route of administration;

(C) To change the strength;

(D) To make any other patented change regarding the drug, drug product, or any method of use.

(ii) If the applicant submits a supplement for one of the changes listed under paragraph (d)(2)(i) of this section and existing patents for which information has already been submitted to FDA claim the changed product, the applicant shall submit a certification with the supplement identifying the patents that claim the changed product.

(iii) If the applicant submits a supplement for one of the changes listed under paragraph (d)(2)(i) of this section and no patents, including previously submitted patents, claim the changed product, it shall so certify.

(iv) The applicant shall comply with the requirements for amendment of formulation or composition and method of use patent information under paragraphs (c)(2)(ii) and (d)(3) of this section.

(3) Patent information deadline. If a patent is issued for a drug, drug product, or method of use after an application is approved, the applicant shall submit to FDA the required patent information within 30 days of the date of issuance of the patent.

(4) Copies. The applicant shall submit two copies of each submission of patent information, an archival copy and a copy for the chemistry, manufacturing, and controls section of the review copy, to the Central Document Room, Center

for Drug Evaluation and Research, Food and Drug Administration, 5901-B Ammendale Rd., Beltsville, MD 20705-1266. The applicant shall submit the patent information by letter separate from, but at the same time as, submission of the supplement.

(5) Submission date. Patent information shall be considered to be submitted to FDA as of the date the information is received by the Central Document Room.

(6) Identification. Each submission of patent information, except information submitted with an original application, and its mailing cover shall bear prominent identification as to its contents, i.e., "Patent Information," or, if submitted after approval of an application, "Time Sensitive Patent Information."

(e) Public disclosure of patent information. FDA will publish in the list the patent number and expiration date of each patent that is required to be, and is, submitted to FDA by an applicant, and for each use patent, the approved indications or other conditions of use covered by a patent. FDA will publish such patent information upon approval of the application, or, if the patent information is submitted by the applicant after approval of an application as provided under paragraph (d)(2) of this section, as soon as possible after the submission to the agency of the patent information. Patent information submitted by the last working day of a month will be published in that month's supplement to the list. Patent information received by the Agency between monthly publication of supplements to the list will be placed on public display in FDA's Division of Freedom of Information. A request for copies of the file shall be sent in writing to the Division of Freedom of Information (ELEM-1029), Food and Drug Administration, 12420 Parklawn Dr., Element Bldg., Rockville, MD 20857.

(f) Correction of patent information errors. If any person disputes the accuracy or relevance of patent information submitted to the agency under this section and published by FDA in the list, or believes that an applicant has failed to submit required patent information, that person must first notify the agency in writing stating the grounds for disagreement. Such notification should be directed to the Office of Generic Drugs, OGD Document Room, Attention: Orange Book Staff, 7500 Standish Pl., Rockville, MD 20855. The agency will then request of the applicable new drug application holder that the correctness of the patent information or omission of patent information be confirmed. Unless the application holder withdraws or amends its patent information in response to FDA's request, the agency will not change the patent information in the list. If the new drug application holder does not change the patent information submitted to FDA, a 505(b)(2) application or an abbreviated new drug application under section 505(j) of the act submitted for a drug that is claimed by a patent for which information has been submitted must, despite any disagreement as to the correctness of the patent information, contain an appropriate certification for each listed patent.

**HISTORY:** *[59 FR 50363,* Oct. 3, 1994; *68 FR 36676, 36703,* June 18, 2003; *69 FR 13472, 13473,* Mar. 23, 2004; *74 FR 9765, 9766,* Mar. 6, 2009; *74 FR 36604, 36605,* July 24, 2009; *76 FR 31468, 31470,* June 1, 2011]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*21 U.S.C. 321,* 331, 351, 352, 353, 355, 356, 356a, 356b, 356c, 371, 374, 379e.



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2014, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This document is current through the October 9, 2014 ***
*** issue of the Federal Register ***

TITLE 21 -- FOOD AND DRUGS
CHAPTER I -- FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER D -- DRUGS FOR HUMAN USE
PART 314 -- APPLICATIONS FOR FDA APPROVAL TO MARKET A NEW DRUG
SUBPART C -- ABBREVIATED APPLICATIONS

**Go to the CFR Archive Directory**

*21 CFR 314.94*

§ 314.94 Content and format of an abbreviated application.

Abbreviated applications are required to be submitted in the form and contain the information required under this section. Three copies of the application are required, an archival copy, a review copy, and a field copy. FDA will maintain guidance documents on the format and content of applications to assist applicants in their preparation.

(a) Abbreviated new drug applications. Except as provided in paragraph (b) of this section, the applicant shall submit a complete archival copy of the abbreviated new drug application that includes the following:

(1) Application form. The applicant shall submit a completed and signed application form that contains the information described under § 314.50(a)(1), (a)(3), (a)(4), and (a)(5). The applicant shall state whether the submission is an abbreviated application under this section or a supplement to an abbreviated application under § 314.97.

(2) Table of contents. the archival copy of the abbreviated new drug application is required to contain a table of contents that shows the volume number and page number of the contents of the submission.

(3) Basis for abbreviated new drug application submission. An abbreviated new drug application must refer to a listed drug. Ordinarily, that listed drug will be the drug product selected by the agency as the reference standard for conducting bioequivalence testing. The application shall contain:

(i) The name of the reference listed drug, including its dosage form and strength. For an abbreviated new drug application based on an approverd petition under § 10.30 of this chapter or § 314.93, the reference listed drug must be the same as the listed drug approved in the petition.

(ii) A statement as to whether, according to the information published in the list, the reference listed drug is entitled to a period of marketing exclusivity under section 505(j)(4)(D) of the act.

(iii) For an abbreviated new drug application based on an approved petition under § 10.30 of this chapter or § 314.93, a reference to FDA-assigned docket number for the petition and a copy of FDA's correspondence approving the petition.

(4) Conditions of use. (i) A statement that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the drug product have been previously approved for the reference listed drug.

(ii) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(5) Active ingredients. (i) For a single-active-ingredient drug product, information to show that the active ingredient is the same as that of the reference single-active-ingredient listed drug, as follows:

(A) A statement that the active ingredient of the proposed drug product is the same as that of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(ii) For a combination drug product, information to show that the active ingredients are the same as those of the reference listed drug except for any different active ingredient that has been the subject of an approved petition, as follows:

(A) A statement that the active ingredients of the proposed drug product are the same as those of the reference listed drug, or if one of the active ingredients differs from one of the active ingredients of the reference listed drug and the abbreviated application is submitted under the approval of a petition under § 314.93 to vary such active ingredient, information to show that the other active ingredients of the drug product are the same as the other active ingredients of the reference listed drug, information to show that the different active ingredient is an active ingredient of another listed drug or of a drug that does not meet the definition of "new drug" in section 201(p) of the act, and such other information about the different active ingredient that FDA may require.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(6) Route of administration, dosage form, and strength. (i) Information to show that the route of administration, dosage form, and strength of the drug product are the same as those of the reference listed drug except for any differences that have been the subject of an approved petition, as follows:

(A) A statement that the route of administration, dosage form, and strength of the proposed drug product are the same as those of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(ii) If the route of administration, dosage form, or strength of the drug product differs from the reference listed drug and the abbreviated application is submitted under an approved petition under § 314.93, such information about the different route of administration, dosage form, or strength that FDA may require.

(7) Bioequivalence. (i) Information that shows that the drug product is bioequivalent to the reference listed drug upon which the applicant relies. A complete study report must be submitted for the bioequivalence study upon which the applicant relies for approval. For all other bioequivalence studies conducted on the same drug product formulation as defined in § 320.1(g) of this chapter, the applicant must submit either a complete or summary report. If a summary report of a bioequivalence study is submitted and FDA determines that there may be bioequivalence issues or concerns with the product, FDA may require that the applicant submit a complete report of the bioequivalence study to FDA; or

(ii) If the abbreviated new drug application is submitted under a petition approved under § 314.93, the results of any bioavailability of bioequivalence testing required by the agency, or any other information required by the agency to show that the active ingredients of the proposed drug product are of the same pharmacological or therapeutic class as those in the reference listed drug and that the proposed drug product can be expected to have the same therapeutic effect as the reference listed drug. If the proposed drug product contains a different active ingredient than the reference listed drug, FDA will consider the proposed drug product to have the same therapeutic effect as the reference listed drug if the applicant provides information demonstrating that:

(A) There is an adequate scientific basis for determining that substitution of the specific proposed dose of the different active ingredient for the dose of the member of the same pharmacological or therapeutic class in the reference listed drug will yield a resulting drug product whose safety and effectiveness have not been adversely affected.

(B) The unchanged active ingredients in the proposed drug product are bioequivalent to those in the reference listed drug.

(C) The different active ingredient in the proposed drug product is bioequivalent to an approved dosage form containing that ingredient and approved for the same indication as the proposed drug product or is bioequivalent to a drug product offered for that indication which does not meet the definition of "new drug" under section 201(p) of the act.

(iii) For each in vivo bioequivalence study contained in the abbreviated new drug application, a description of the analytical and statistical methods used in each study and a statement with respect to each study that it either was conducted in compliance with the institutional review board regulations in part 56 of this chapter, or was not subject to the regulations under § 56.104 or § 56.105 of this chapter and that each study was conducted in compliance with the informed consent regulations in part 50 of this chapter.

(8) Labeling -- (i) Listed drug labeling. A copy of the currently approved labeling (including, if applicable, any Medication Guide required under part 208 of this chapter) for the listed drug referred to in the abbreviated new drug application, if the abbreviated new drug application relies on a reference listed drug.

(ii) Copies of proposed labeling. Copies of the label and all labeling for the drug product including, if applicable, any Medication Guide required under part 208 of this chapter (4 copies of draft labeling or 12 copies of final printed labeling).

(iii) Statement on proposed labeling. A statement that the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a)(8)(iv) of this section.

(iv) Comparison of approved and proposed labeling. A side-by-side comparison of the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter with the approved labeling for the reference listed drug with all differences annotated and explained. Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(5)(F) of the act.

(9) Chemistry, manufacturing, and controls. (i) The information required under § 314.50(d)(1), except that § 314.50(d)(1)(ii)(c) shall contain the proposed or actual master production record, including a description of the equipment, to be used for the manufacture of a commercial lot of the drug product.

(ii) Inactive ingredients. Unless otherwise stated in paragraphs (a)(9)(iii) through (a)(9)(v) of this section, an applicant shall identify and characterize the inactive ingredients in the proposed drug product and provide information demonstrating that such inactive ingredients do not affect the safety or efficacy of the proposed drug product.

(iii) Inactive ingredient changes permitted in drug products intended for parenteral use. Generally, a drug product intended for parenteral use shall contain the same inactive ingredients and in the same concentration as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an applicant may seek approval of a drug product that differs from the reference listed drug in preservative, buffer, or antioxidant provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product.

(iv) Inactive ingredient changes permitted in drug products intended for ophthalmic or otic use. Generally, a drug product intended for ophthalmic or otic use shall contain the same inactive ingredients and in the same concentration as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an applicant may seek approval of a drug product that differs from the reference listed drug in preservative, buffer, substance to adjust tonicity, or thickening agent provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product, except that, in a product intended for ophthalmic use, an applicant may not change a buffer or substance to adjust tonicity for the purpose of claiming a therapeutic advantage over or difference from the listed drug, e.g., by using a balanced salt solution as a diluent as opposed to an isotonic saline solution, or by making a significant change in the pH or other change that may raise questions of irritability.

(v) Inactive ingredient changes permitted in drug products intended for topical use. Generally, a drug product intended for topical use, solutions for aerosolization or nebulization, and nasal solutions shall contain the same inactive ingredients as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an abbreviated application may include different inactive ingredients provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product.

(10) Samples. The information required under § 314.50(e)(1) and (e)(2)(i). Samples need not be submitted until requested by FDA.

(11) Other. The information required under § 314.50(g).

(12) Patent certification -- (i) Patents claiming drug, drug product, or method of use. (A) Except as provided in paragraph (a)(12)(iv) of this section, a certification with respect to each patent issued by the United States Patent and Trademark Office that, in the opinion of the applicant and to the best of its knowledge, claims the reference listed drug or that claims a use of such listed drug for which the applicant is seeking approval under section 505(j) of the act and for which information is required to be filed under section 505(b) and (c) of the act and § 314.53. For each such patent, the applicant shall provide the patent number and certify, in its opinion and to the best of its knowledge, one of the following circumstances:

(1) That the patent information has not been submitted to FDA. The applicant shall entitle such a certification "Paragraph I Certification";

(2) That the patent has expired. The applicant shall entitle such a certification "Paragraph II Certification";

(3) The date on which the patent will expire. The applicant shall entitle such a certification "Paragraph III Certification"; or

(4) That the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the drug product for which the abbreviated application is submitted. The applicant shall entitle such a certification "Paragraph IV Certification". This certification shall be submitted in the following form:

I, (name of applicant), certify that Patent No. ---------- (is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of) (name of proposed drug product) for which this application is submitted.

The certification shall be accompanied by a statement that the applicant will comply with the requirements under § 314.95(a) with respect to providing a notice to each owner of the patent or their representatives and to the holder of the approved application for the listed drug, and with the requirements under § 314.95(c) with respect to the content of the notice.

(B) If the abbreviated new drug application refers to a listed drug that is itself a licensed generic product of a patented drug first approved under section 505(b) of the act, the appropriate patent certification under paragraph (a)(12)(i) of this section with respect to each patent that claims the first-approved patented drug or that claims a use for such drug.

(ii) No relevant patents. If, in the opinion of the applicant and to the best of its knowledge, there are no patents described in paragraph (a)(12)(i) of this section, a certification in the following form:

In the opinion and to the best knowledge of (name of applicant), there are no patents that claim the listed drug referred to in this application or that claim a use of the listed drug.

(iii) Method of use patent. (A) If patent information is submitted under section 505(b) or (c) of the act and § 314.53 for a patent claiming a method of using the listed drug, and the labeling for the drug product for which the applicant is seeking approval does not include any indications that are covered by the use patent, a statement explaining that the method of use patent does not claim any of the proposed indications.

(B) If the labeling of the drug product for which the applicant is seeking approval includes an indication that, according to the patent information submitted under section 505(b) or (c) of the act and § 314.53 or in the opinion of the applicant, is claimed by a use patent, an applicable certification under paragraph (a)(12)(i) of this section.

(iv) Method of manufacturing patent. An applicant is not required to make a certification with respect to any patent that claims only a method of manufacturing the listed drug.

(v) Licensing agreements. If the abbreviated new drug application is for a drug or method of using a drug claimed by a patent and the applicant has a licensing agreement with the patent owner, a certification under paragraph (a)(12)(i)(A)(4) of this section ("Paragraph IV Certification") as to that patent and a statement that it has been granted a patent license.

(vi) Late submission of patent information. If a patent on the listed drug is issued and the holder of the approved application for the listed drug does not submit the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an abbreviated new drug application for that drug that contained an appropriate patent certification before the submission of the patent information is not required to submit an amended certification. An applicant whose abbreviated new drug application is submitted after a late submission of patent information, or whose pending abbreviated application was previously submitted but did not contain an appropriate patent certification at the time of the patent submission, shall submit a certification under paragraph (a)(12)(i) of this section or a statement under paragraph (a)(12)(iii) of this section as to that patent.

(vii) Disputed patent information. If an applicant disputes the accuracy or relevance of patent information submitted to FDA, the applicant may seek a confirmation of the correctness of the patent information in accordance with the procedures under § 314.53(f). Unless the patent information is withdrawn or changed, the applicant shall submit an appropriate certification for each relevant patent.

(viii) Amended certifications. A certification submitted under paragraphs (a)(12)(i) through (a)(12)(iii) of this section may be amended at any time before the effective date of the approval of the application. However, an applicant who has submitted a paragraph IV patent certification may not change it to a paragraph III certification if a patent infringement suit has been filed against another paragraph IV applicant unless the agency has determined that no applicant is entitled to 180-day exclusivity or the patent expires before the lawsuit is resolved or expires after the suit is resolved but before the end of the 180-day exclusivity period. If an applicant with a pending application voluntarily makes a patent certification for an untimely filed patent, the applicant may withdraw the patent certification for the untimely filed patent. An applicant shall submit an amended certification by letter or as an amendment to a pending application or by letter to an approved application. Once an amendment or letter is submitted, the application will no longer be considered to contain the prior certification.

(A) After finding of infringement. An applicant who has submitted a certification under paragraph (a)(12)(i)(A)(4) of this section and is sued for patent infringement within 45 days of the receipt of notice sent under § 314.95 shall amend

the certification if a final judgment in the action against the applicant is entered finding the patent to be infringed. In the amended certification, the applicant shall certify under paragraph (a)(12)(i)(A)(3) of this section that the patent will expire on a specific date. Once an amendment or letter for the change has been submitted, the application will no longer be considered to be one containing a certification under paragraph (a)(12)(i)(A)(4) of this section. If a final judgment finds the patent to be invalid and infringed, an amended certification is not required.

(B) After removal of a patent from the list. If a patent is removed from the list, any applicant with a pending application (including a tentatively approved application with a delayed effective date) who has made a certification with respect to such patent shall amend its certification. The applicant shall certify under paragraph (a)(12)(ii) of this section that no patents described in paragraph (a)(12)(i) of this section claim the drug or, if other relevant patents claim the drug, shall amend the certification to refer only to those relevant patents. In the amendment, the applicant shall state the reason for the change in certification (that the patent is or has been removed from the list). A patent that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such period of delay in effective dates of approval is ended. An applicant shall submit an amended certification. Once an amendment or letter for the change has been submitted, the application will no longer be considered to be one containing a certification under paragraph (a)(12)(i)(A)(4) of this section.

(C) Other amendments. (1) Except as provided in paragraphs (a)(12)(vi) and (a)(12)(viii)(C)(2) of this section, an applicant shall amend a submitted certification if, at any time before the effective date of the approval of the application, the applicant learns that the submitted certification is no longer accurate.

(2) An applicant is not required to amend a submitted certification when information on a patent on the listed drug is submitted after the effective date of approval of the abbreviated application.

(13) Financial certification or disclosure statement. An abbreviated application shall contain a financial certification or disclosure statement as required by part 54 of this chapter.

(b) Drug products subject to the Drug Efficacy Study Implementation (DESI) review. If the abbreviated new drug application is for a duplicate of a drug product that is subject to FDA's DESI review (a review of drug products approved as safe between 1938 and 1962) or other DESI-like review and the drug product evaluated in the review is a listed drug, the applicant shall comply with the provisions of paragraph (a) of this section.

(c) [Reserved]

(d) Format of an abbreviated application.

(1) The applicant must submit a complete archival copy of the abbreviated application as required under paragraphs (a) and (c) of this section. FDA will maintain the archival copy during the review of the application to permit individual reviewers to refer to information that is not contained in their particular technical sections of the application, to give other agency personnel access to the application for official business, and to maintain in one place a complete copy of the application.

(i) Format of submission. An applicant may submit portions of the archival copy of the abbreviated application in any form that the applicant and FDA agree is acceptable, except as provided in paragraph (d)(1)(ii) of this section.

(ii) Labeling. The content of labeling required under § 201.100(d)(3) of this chapter (commonly referred to as the package insert or professional labeling), including all text, tables, and figures, must be submitted to the agency in electronic format as described in paragraph (d)(1)(iii) of this section. This requirement applies to the content of labeling for the proposed drug product only and is in addition to the requirements of paragraph (a)(8)(ii) of this section that copies of the formatted label and all proposed labeling be submitted. Submissions under this paragraph must be made in accordance with part 11 of this chapter, except for the requirements of § 11.10(a), (c) through (h), and (k), and the corresponding requirements of § 11.30.

(iii) Electronic format submissions. Electronic format submissions must be in a form that FDA can process, review, and archive. FDA will periodically issue guidance on how to provide the electronic submission (e.g., method of transmission, media, file formats, preparation and organization of files).

(2) For abbreviated new drug applications, the applicant shall submit a review copy of the abbreviated application that contains two separate sections. One section shall contain the information described under paragraphs (a)(2) through (a)(6), (a)(8), and (a)(9) of this section 505(j)(2)(A)(vii) of the act and one copy of the analytical procedures and descriptive information needed by FDA's laboratories to perform tests on samples of the proposed drug product and to validate the applicant's analytical procedures. The other section shall contain the information described under paragraphs (a)(3), (a)(7), and (a)(8) of this section. Each of the sections in the review copy is required to contain a copy of the application form described under § 314.50(a).

(3) [Reserved]

 (4) The applicant may obtain from FDA sufficient folders to bind the archival, the review, and the field copies of the abbreviated application.

 (5) The applicant shall submit a field copy of the abbreviated application that contains the technical section described in paragraph (a)(9) of this section, a copy of the application form required under paragraph (a)(1) of this section, and a certification that the field copy is a true copy of the technical section described in paragraph (a)(9) of this section contained in the archival and review copies of the abbreviated application.

**HISTORY:** *[57 FR 17983,* Apr. 28, 1993, as amended at *57 FR 29353,* July 1, 1992; *58 FR 47352,* Sept. 8, 1993; *59 FR 50364,* Oct. 3, 1994; *63 FR 5233, 5252,* Feb. 2, 1998; *63 FR 66378, 66399,* Dec. 1, 1998; *64 FR 396, 401,* Jan. 5, 1999, as confirmed at *64 FR 26657,* May 17, 1999; *65 FR 56468, 56479,* Sept. 19, 2000; *67 FR 77668, 77672,* Dec. 19, 2002; *68 FR 69009, 69019,* Dec. 11, 2003; *69 FR 18728, 18766,* Apr. 8, 2004; *74 FR 2849, 2861,* Jan. 16, 2009; *76 FR 13880,* Mar. 15, 2011]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*21 U.S.C. 321,* 331, 351, 352, 353, 355, 356, 356a, 356b, 356c, 371, 374, 379e.